Volume 3

Pages 1 - 151

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
  VS.                               )     NO. CR 23-00264-2 JSW
                                    )
MORTEZA AMIRI,                      )
                                    )
            Defendant.              )
_____)
                          Oakland, California
                          Tuesday, August 6, 2024

**TRANSCRIPT OF PROCEEDINGS (EXCERPT)**

**APPEARANCES:**
For Plaintiff:
                    ISMAIL RAMSEY
                    United States Attorney
                    1301 Clay Street - Suite 340S
                    Oakland, California  94612
          BY:  **AJAY K. KRISHNAMURTHY**
               **ALETHEA SARGENT**
               **ERIC CHENG**
               **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant Morteza Amiri:
                    COBLENTZ PATCH DUFFY & BASS LLP
                    One Montgomery Street - Suite 3000
                    San Francisco, CA  94104
          BY:  **TIMOTHY P. CRUDO**
               **OLIVER W. HAMILTON**
               **RACHEL R. SUHR**
               **ATTORNEYS AT LAW**


Also Present:       **James Cho, Paralegal**
                    **Jessie Chelsea, Paralegal**


Reported By:  Ruth Levine Ekhaus, CSR No. 12219, RDR, FCRR
              Official Reporter

## <u>I N D E X</u>

Tuesday, August 6, 2024 - Volume 3

### <u>GOVERNMENT'S WITNESSES</u>                                <u>PAGE</u>  <u>VOL.</u>

### <u>REED, SAVANNAH (RECALLED)</u>
(PREVIOUSLY SWORN)                                            4     3
Direct Examination resumed by Ms. Sargent                     4     3
Cross-Examination by Mr. Crudo                              111     3

## <u>E X H I B I T S</u>

### <u>TRIAL EXHIBITS</u>                             <u>IDEN</u>  <u>EVID</u>  <u>VOL.</u>

100                                                        35     3

102                                                        85     3

103                                                        94     3

330                                                       123     3

391                                                       147     3

413                                                       139     3

<u>**Tuesday - August 6, 2024**</u>                                    <u>**7:51 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

--oOo--

(Begin excerpt.)

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

**THE CLERK:**  Please remain seated.  Come to order.
Court is back in session.

**THE COURT:**  Good morning, everybody.  Thank you for
your prompt attendance today.  It gives us the ability to -- to
start right on time.

I'm going to give you your early morning instruction,
which I'm required to do and it's also very important.  First I
have to find it.

Okay.  There we are.

I hope you-all had a restful evening and were able to
relax and enjoy the rest of your day.

So, as I reminded you at the beginning of the trial
and yesterday and I'm continuing to emphasize to you today, it
is important that you decide this case based solely on the
evidence and the law presented here.  So you must not learn any
additional information about the case from sources outside the
courtroom.  To ensure fairness to all parties in this trial, if
you think that you might have done so, please let me know now
by raising your hand.

```
 1                         (No response.)

 2          THE COURT:  No hands are raised.

 3          And, again, if you ever would like to talk to

 4  the Court privately with counsel present, just let us know.

 5          So thank you for your careful adherence to my

 6  instructions.

 7          As you recall yesterday, we're still in the

 8  Government's case-in-chief, and we have Ms. Reed continuing her

 9  testimony.  So I'll have Government counsel bring their witness

10  forward.

11          MS. SARGENT:  Ms. Reed, if you would please come to

12  the witness stand.

13       (Savannah Reed steps forward to resume testimony.)

14                      SAVANNAH REED,

15  called as a witness for the Government, having been previously

16  duly sworn, testified further as follows:

17          THE COURT:  Good morning, Ms. Reed.

18          THE WITNESS:  Good morning.

19          THE COURT:  Just to remind you, as we do all witnesses

20  when we have a break, you're still oath.

21          All right.  You may continue.

22                 DIRECT EXAMINATION  (resumed)

23  BY MS. SARGENT:

24  Q.   Good morning, Ms. Reed.

25  A.   Good morning.
```

1    Q.    We were talking about the coursework you completed for

2    Mr. Berhan's bachelor's degree.  Do you remember that?

3    A.    Yes.

4    Q.    Okay.

5              Can we show the witness Exhibit 51, please?

6              That's Exhibit 51, page 2.

7              And we were looking at this document.  Do you remember

8    that, Ms. Reed?

9    A.    Yes.

10   Q.    Okay.  Could you remind us what this document is?

11   A.    It is Patrick Berhan's unofficial transcript.

12             THE COURT:  Okay.  Again, you have a very soft voice,

13   so just speak right --

14             THE WITNESS:  Sorry.

15             THE COURT:  That microphone has a goose neck on it, so

16   you can pull it really close.  Thank you so much, Ms. Reed.

17             THE WITNESS:  Of course.

18   BY MS. SARGENT:

19   Q.    Ms. Reed, you told us yesterday which of these classes you

20   completed for Mr. Berhan, but I'd like to talk to you a little

21   bit about your experience completing those courses.

22             How much time, when you were taking these courses,

23   were you spending on Mr. Berhan's college curriculum?

24   A.    Do you mean per class or the overall?

25   Q.    I mean your experience in your life, working on those

REED - DIRECT / SARGENT

1   courses.

2   **A.**   Typically I would get a class done within a day or two of

3   starting.  Usually I would get all the quizzes done in one day

4   and maybe a couple essays and then finish a couple essays and

5   then a final.

6   **Q.**   And how much time during a typical day would that take

7   you?

8   **A.**   Anywhere between maybe like three to six hours.

9          **MS. SARGENT:**  Your Honor, quickly, this exhibit has

10   already been admitted, so permission to publish.

11          **THE COURT:**  Yes.  If the exhibit is already in

12   evidence and it's already been published, then you don't need

13   the Court's permission, but thanks for asking.

14          **MS. SARGENT:**  Thank you.

15   **BY MS. SARGENT:**

16   **Q.**   Sorry, Ms. Reed.  Could you repeat that?

17   **A.**   Anywhere between three to six hours depending on if I was

18   doing essays that day.

19   **Q.**   And how did this coursework fit in with the rest of your

20   life at that point?

21   **A.**   Well, I was no longer working at this point and I was

22   doing my own school, so it would just depend if I had classes

23   that day or not.

24   **Q.**   And what school was that for you?

25   **A.**   I believe I was attending Samuel Merritt at the time, and

1    I was doing some other courses.

2    **Q.**    Was this prior to your actually doing courses at CCU?

3    **A.**    Yes, I believe so.  Yes.

4    **Q.**    Either during or immediately prior?

5    **A.**    Yeah.

6    **Q.**    Okay.  Did Mr. Berhan check in with you about the progress

7    of your work in his classes?

8    **A.**    Yes.

9    **Q.**    Could you describe that?

10    **A.**    It was something that we would talk about when he would

11    get off work.  Sometimes he would text me, calls.  I would just

12    update him on how far I was through the program and if I was

13    having trouble in classes.

14    **Q.**    Did you have the impression that he expected you to finish

15    courses or the full curriculum in a certain amount of time?

16    **A.**    It was expected to have it done quickly so that the raise

17    could be in place sooner.

18    **Q.**    And how did that -- how was that expectation conveyed to

19    you?

20    **A.**    Just by asking me to finish the classes in a timely

21    manner.

22    **Q.**    Okay.  Did you also take courses for Mr. Berhan toward a

23    master's degree?

24    **A.**    Yes.

25    **Q.**    How did that begin?

1    **A.**   He wanted to -- he heard that he would get another raise

2    in his pay and it would drastically help out, so he asked,

3    after seeing that I could complete the bachelor's degree, that

4    I would start the master's as well.

5    **Q.**   Okay.  And did you do that?

6    **A.**   Yes.

7    **Q.**   Why did you do that?

8    **A.**   I saw how happy it made him.  It was something that was

9    expected in the relationship, so I continued without question.

10   **Q.**   Did Mr. Berhan -- strike that.

11        You told us yesterday that you completed the

12   bachelor's for Mr. Berhan.  Do you recall any discussions with

13   him about his actually submitting and receiving that raise?

14   **A.**   Yes.  We did have conversations about him getting the

15   diploma and bringing it into his work and submitting for the

16   raise.

17   **Q.**   What was his attitude about that?

18   **A.**   He was very excited.

19   **Q.**   Okay.  After completing Mr. Berhan's bachelor's degree,

20   did you take courses for other police officers and employees?

21   **A.**   Yes.

22   **Q.**   How did that begin?

23   **A.**   Patrick had discussed this with a couple of close friends

24   at work.  Those close friends were either already enrolled in

25   the program -- and struggling with completing the program.  He

1    talked about how quickly I was --

2              MR. CRUDO:  Objection, Your Honor.

3              THE COURT:  Sustained.

4              MR. CRUDO:  Thank you.

5              THE COURT:  Please, be mindful of hearsay problems.

6              MS. SARGENT:  Yes.

7    BY MS. SARGENT:

8    Q.    Ms. Reed, when you discuss things that happened, if you

9    could avoid saying what someone else told you.

10   A.    Okay.

11   Q.    Does that make sense?  I'll remind you if I catch you.

12             THE COURT:  Unless counsel asks you a specific

13   question certain -- about what somebody told you, unless that's

14   a specific question, just avoid talking about what other people

15   may have told you.  Okay?

16             THE WITNESS:  Okay.

17             THE COURT:  Thank you.

18   BY MS. SARGENT:

19   Q.    Okay.  So why don't -- I guess, to be more pointed about

20   this, how did it first come to your attention that you may be

21   doing classes for other people?

22   A.    Patrick had asked me if I could do classes for these other

23   officers.

24   Q.    Okay.  And what officers were those?

25   A.    It was Morteza, Amanda, Brauli, Ernesto, and I -- I'm

**REED - DIRECT / SARGENT**

1    sorry, I'm blanking.  I believe that was it.

2    **Q.**    That's okay for now.  We can --

3    **A.**    Okay.

4    **Q.**    We'll get into more detail, but I want to focus on this in

5    terms of sort of a timeline.

6              **THE COURT:**  Before we do that, Counsel, would you mind

7    asking the witness to put some last names with those folks?

8              **MS. SARGENT:**  Yes, Your Honor.

9    **BY MS. SARGENT:**

10   **Q.**    You mentioned a Morteza and Amanda, a Brauli, and an

11   Ernesto.

12            Could you -- to the extent you know the full names,

13   could you provide the full names?

14   **A.**    Yes.  Morteza Amiri, Amanda Theodosy, Ernesto Mejia-Orozco

15   Rodriguez, and Samantha Peterson.

16   **Q.**    Okay.  Let's talk about this in sequential order.

17            What did Mr. Berhan -- what proposition did Mr. Berhan

18   bring to you first?

19   **A.**    That if I -- like, the person he brought me first or --

20   **Q.**    The first conversations about another individual.

21   **A.**    He asked me if I could possibly complete somebody else's

22   coursework.  It would help them, it would make him happy, and

23   he would set a price on how much the classes would be.

24   **Q.**    Okay.  And which police departments were these other

25   individuals from?

1    A.    From Pittsburg and Antioch Police Department.

2    Q.    Okay.  What degree were these proposed courses toward?

3    A.    They -- most of them were in criminal justice, for a

4    bachelor's.

5    Q.    Was there a particular University that they were for?

6    A.    All for California Coast University.

7    Q.    Did Mr. Berhan give you any indication of how he selected

8    particular friends?

9    A.    It was close friends to him, friends that he trusted to

10    not talk about these things.

11    Q.    Were you aware of his trust in them just from the history

12    of your relationship with him and your knowledge of these

13    people?

14    A.    Yes.

15    Q.    Did Mr. Berhan ever tell you that you should not take

16    classes for someone?

17    A.    Yes.  There was one person in particular.

18    Q.    Can you describe that?

19    A.    Rose, another officer from the department, asked if --

20    asked for detail.

21    Q.    Again, why don't you just explain what Mr. Berhan asked

22    you to do and the reasons that he explained to you for not

23    doing what -- strike that.

24          Can you explain what happened from your perspective?

25    A.    Yes.  I told Patrick that I would -- if I could complete

**REED - DIRECT / SARGENT**

1  Rose's classes.  He told me that I was not allowed to talk to

2  her about it, and that she was a loud mouth and would discuss

3  this with other officers at the department.

4  **Q.**  And how had -- sorry.

5       And what was Rose's last name?

6  **A.**  Oreja.

7  **Q.**  How had Ms. Oreja first come to your attention regarding

8  her interest in classes?

9  **A.**  She had sent me a text.

10  **Q.**  What department was Ms. Oreja from?

11  **A.**  Pittsburg Police Department.

12  **Q.**  Is that the same department Mr. Berhan was from?

13  **A.**  Yes, it is.

14  **Q.**  Okay.  Did Mr. Berhan explain to you why it was important

15  not to have a, in your words, loud mouth involved?

16  **A.**  He did not want other officers finding out and getting to

17  admin or higher-ups at the police department.

18  **Q.**  So for the friends that Mr. Berhan selected, did you get

19  paid for taking classes?

20  **A.**  Yes, I did.

21  **Q.**  How -- how much were you paid, generally speaking?

22  **A.**  It was anywhere between 200 to, like, $350 a class.

23  **Q.**  How did you determine those rates?

24  **A.**  Patrick would base it on who the person was, depending,

25  I guess, how close they were to him and kind of what the degree

**REED - DIRECT / SARGENT**

1    was.

2    Q.   Did you ever independently decide on rates for someone?

3    A.   No, I don't believe so.

4    Q.   Did you ever have input on rates for someone?

5    A.   I -- if -- if I was close to someone, I didn't feel like

6    it was justified charging like a full amount, so I would voice

7    that, but Patrick would tell me how much would be fair.

8    Q.   Okay.  Generally speaking, how did you get paid?

9    A.   Through Venmo, some cash, and then I believe there was one

10   instance of trying with Zelle.

11   Q.   And how would the method of payment get arranged,

12   generally speaking?

13   A.   Typically when the text thread would first start, we would

14   establish through Venmo that that's how it would get paid and

15   that it would get paid after the end of each class.

16   Q.   How, again, generally speaking, did you receive log-ins

17   and passwords for these people?

18   A.   Typically through text message.

19   Q.   A text message with whom?

20   A.   A text message between me and the person I was doing

21   classes for.

22   Q.   Okay.  Was that always the case?

23   A.   Not always.

24   Q.   How did you know, for a given individual, what classes

25   needed to be taken?

**REED - DIRECT / SARGENT**

1  **A.**   When you logged onto the portal, there would be like a

2  couple classes that would either already be opened or classes

3  that had been, like, started and then there was also a tab

4  where you could request classes to start.

5  **Q.**   And, again, as a general matter and reflecting -- I guess

6  going back to the processes we were talking about yesterday,

7  how did you go about completing classes for these people?

8  **A.**   I would start the class, start the quizzes, do the essays,

9  finish the finals, and I would just go through the coursework

10  until it was done.

11  **Q.**   Okay.  So let's take essays as an example.  How did you go

12  about composing and submitting essays for someone?

13  **A.**   Before I had started, Patrick had let me know that they

14  were rather particular about their essay structure.  So I just

15  stuck to the five-paragraph essay for --

16  **Q.**   Ms. Reed, sorry.

17  **A.**   Yeah.

18  **Q.**   You said "they were particular."  Who do you mean?

19  **A.**   The professors at CCU.

20  **Q.**   Okay.  Go forward.

21  **A.**   So I would just do a basic five-paragraph essay and

22  introduction, name the three topics that would be in the body,

23  and then conclude.

24  **Q.**   And were you composing these essays on your own personal

25  computer?

**REED - DIRECT / SARGENT**

1    **A.**    It was a computer that Patrick and I shared.

2    **Q.**    Did you compose the essays directly in a web interface?

3    **A.**    It -- I believe I started on Word and then I moved to

4    Google and I would do it through Google Docs.

5    **Q.**    Okay.  And so how did you then get the text from Word or

6    Google Docs into the CCU portal?

7    **A.**    You would download -- well, you had to copy and paste it

8    and then put it into their -- it -- so when you opened it up,

9    it was like an interface that you would type out an essay, and

10   I would just copy and paste it into there.

11   **Q.**    Okay.  In the course of completing this coursework for

12   multiple individuals, did you ever encounter the same essay

13   question twice?

14   **A.**    Yes.

15   **Q.**    What did you do in that instance?  Or if you did multiple

16   things, could you explain that variety of things?

17   **A.**    There was every once in a while, I had only done the essay

18   once, I would pick the same topic to ensure that it would be

19   easier to write the essay.  If it was too hard to change the

20   wordings in the essay, I would complete a completely different

21   topic.

22   **Q.**    And you just referenced "changing the wordings."  Were you

23   repeating these essays from your memory?

24   **A.**    No.  I would copy and paste from like a prior student that

25   I would do, and sometimes I would change the wording or

1    sometimes I would go back into the book and change a couple of

2    the examples.

3    Q.    So you would go back and refer to the book for new

4    examples?

5    A.    Yes.

6    Q.    I see.

7          When you copied and pasted those old essays, where --

8    where did you access the old essays from?

9    A.    I would access them through the Google Docs or the Word

10   that I was using prior.

11   Q.    Okay.  So is it the case that you retained, at this time,

12   old essays on your computer, your shared computer with

13   Mr. Berhan?

14   A.    Yes.

15   Q.    Let's talk about the quizzes and exams.

16         Did you ever encounter the same questions multiple

17   times in the course of completing this coursework for multiple

18   individuals?

19   A.    Yes.

20   Q.    And how did you approach -- strike that.

21         Let me ask you this:  Were quizzes in the same course

22   across multiple people identical?

23   A.    They weren't necessarily identical.  They would be

24   switched up.  Like, they would switch them -- the questions up

25   and then every once in a while they would actually go through

REED - DIRECT / SARGENT

1   and revise the quizzes.  So they could have been completely

2   different, but there were some questions that I did notice were

3   very similar.

4   Q.   So what was your approach to completing quizzes --

5   multiple quizzes and exams for the same course repeatedly?

6   A.   Most of them I would remember just from memory.  I would

7   see keywords that kind of sparked my brain, and I knew which

8   question they were.

9           Sometimes I would go into Quizlet and copy and paste

10  the question.  Sometimes I would go through the e-book and find

11  keywords and copy and paste it into there.  And there were a

12  couple of times where I had Patrick helping me with some of the

13  quizzes -- the quizzes and finals.

14  Q.   When you asked for -- did you -- you asked for

15  Mr. Berhan's assistance sometimes?

16  A.   Yes.

17  Q.   How often did you ask for Mr. Berhan's assistance?

18  A.   Probably a handful of times.

19  Q.   And how generally did he respond to those requests?

20  A.   He would help me.

21  Q.   Did individuals taking these courses have to have proctors

22  in the way you described Mr. Berhan had?

23  A.   Yes, they did.

24  Q.   Okay.  Did you act as any of these individual's proctor?

25  A.   Just Patrick's.

**REED - DIRECT / SARGENT**

1  Q.   Why didn't you act as anyone else's proctor?

2  A.   You can't be another person's -- you can only be a proctor

3  once, and then you can't be a proctor after you've completed

4  CCU.

5  Q.   Okay.  How did you generally communicate with other

6  individuals' proctors?

7  A.   I didn't have direct communication with most people's

8  proctors.  Most of it would be just through the student.

9  Q.   Going back to the coursework that you completed, fair to

10 say you saw some of same courses multiple times?

11 A.   Yes.

12 Q.   And you talked about remembering answers to quizzes after

13 the fact.  Do you still remember some of the content from

14 that -- those courses?

15 A.   I'm sure if I saw questions, I would.

16 Q.   Did you have a favorite course?

17 A.   I -- well, I was in the medical field, so I had human body

18 and a couple other courses that related back to medicine.

19 Q.   So you personally preferred those to the criminal justice

20 courses?

21 A.   Yes.

22 Q.   How could you tell, in an individual's online portal, that

23 a degree had been completed?

24 A.   It wouldn't tell me that the degree was completed; but

25 after all the courses were done, it would say zero credits

1  left.  And I would check both the page where the courses are

2  started and then make sure on the second page, where you can

3  request courses, that everything was done.

4  Q.   And what did you do, generally speaking, when you saw that

5  there were zero courses left?

6  A.   I would let the officer know that their courses were

7  complete.  They would usually know that I was on the last class

8  anyways.  So once I let them know that it was complete, they

9  knew that the coursework was done.

10  Q.   After you completed a course for an officer, was there

11  ever a time --

12        Well, let me ask you this:  Were you still able, after

13  the fact, to log into their account after the course was

14  completed?

15  A.   Yes.  I would often log in to double-check some quizzes.

16  If I had some classes that I had a hard time on, I would go

17  back to other officers' portals to see if I could find those

18  answers.

19  Q.   With regard to those completed quizzes, what -- what could

20  you see in those portals where the quizzes had been completed

21  that helped you with the subsequent students' work?

22  A.   So for most of the quizzes, I would actually -- I had

23  binder paper that I'd write down the answers to the quizzes on,

24  and then I would be able to go back and compare, like, what

25  question it was and then be able to go down my -- I made almost

1   like a Scantron for myself of the answers for the quizzes.

2   Q.   Okay.  So it was the case -- it sounds like it was the

3   case that you had a handwritten record of your answers, and you

4   looked in the prior students' course for the questions?

5   A.   Yes, but that was only for the quizzes.  You wouldn't --

6   from my recollection, you couldn't look back at the final to

7   get any questions from there.

8   Q.   And was the reason that that matching up was helpful

9   because the quizzes -- the questions were reordered in

10  subsequent --

11          MR. CRUDO:  Objection.  Leading, Your Honor.

12          THE COURT:  Sustained.

13          MS. SARGENT:  Yes.

14  BY MS. SARGENT:

15  Q.   Why was it helpful to look back at a prior student's, say

16  Student A's, particular quiz against the answers that you had

17  written down on that binder paper?

18  A.   Some of the questions would match.  I didn't do it super

19  often.  It was just if I had a really hard time finding the

20  question.  Because, again, it was a lot quicker and easier for

21  myself to copy and paste the question into the Internet, and it

22  would usually pull it right up.

23  Q.   Okay.  We've talked a little bit about why you completed

24  Mr. Berhan's courses for him.  Why did you complete these

25  others people's coursework when Mr. Berhan asked you?

REED - DIRECT / SARGENT

1    **A.**   A lot of them were close friends.  I felt like I was

2    helping them out.  It made Patrick happy and it helped him, and

3    I wanted to do the same for his friends.

4    **Q.**   After you completed the coursework for Mr. Berhan, putting

5    your own coursework aside, who did you take courses for next?

6    **A.**   I believe it was for Morteza Amiri.

7    **Q.**   And when did the possibility of your taking courses

8    specifically for Mr. Amiri come up?

9    **A.**   He had sent me a text message asking if I could complete

10   them.

11            **THE COURT:**  Excuse me.  Who?  You say "he"?

12            **THE WITNESS:**  Sorry.  Morteza sent me a text message.

13            **THE COURT:**  Thank you.

14   **BY MS. SARGENT:**

15   **Q.**   Had you had any conversations with Mr. Berhan about

16   Mr. Amiri's interest in coursework?

17   **A.**   Yes.

18   **Q.**   And what was your understanding based on your conversation

19   with Mr. Berhan?

20   **A.**   That I would do the coursework and I had a set amount of

21   money that I would do it for.

22   **Q.**   So you mentioned that Mr. Amiri approached you via text

23   message; is that right?

24   **A.**   Yes.

25   **Q.**   What were the different ways that you communicated with

REED - DIRECT / SARGENT

1   Mr. Amiri about CCU?

2   **A.**   We were all very close friends.  We'd hang out often, in

3   person, over phone, text.

4   **Q.**   Okay.  And what was your response to Mr. Amiri when he

5   asked you if you could complete courses?

6   **A.**   Yes, I would.

7   **Q.**   I want to show you, and display for the witness, please,

8   an exhibit that has already been admitted yesterday as

9   Exhibit 82.

10          And can we look at 82-001?

11          **MS. SARGENT:**  Your Honor, I'd also like to show her a

12   binder.  May I approach?

13          **THE COURT:**  Yes, you may.

14               (Counsel approaches witness.)

15   **BY MS. SARGENT:**

16   **Q.**   Ms. Reed, you should have the same exhibit front of you

17   both in paper and on the screen.  It's rather long, so I've

18   given you the paper copy so you can flip through if it's

19   helpful.

20          Do you recognize this document?

21   **A.**   Yes.

22   **Q.**   How do you recognize it?

23   **A.**   These are text messages between me and Morteza Amiri.

24   **Q.**   And did these text messages include the discussions we

25   just talked about regarding CCU?

1  **A.**    Yes, part of it.

2  **Q.**    Do they include discussion about you taking classes for

3  Mr. Amiri?

4  **A.**    Yes.

5  **Q.**    And did they include further discussion about your

6  progress taking classes for Mr. Amiri?

7  **A.**    Not on this direct page but, yes.

8  **Q.**    But you texted with Mr. Amiri about that topic?

9  **A.**    Yes.

10 **Q.**    Okay.  Let's look at this first page.  For the record,

11 this is Exhibit-82-001.

12         Based on looking at this and your recollection of this

13 conversation, whose texts are in blue?

14 **A.**    My texts are in blue.

15 **Q.**    And whose are in green?

16 **A.**    Morteza's.

17 **Q.**    And can you read the bottom text message on the first page

18 along with who wrote the message and the date it was sent?

19 **A.**    On 12/6/2019, at 1:05 a.m., Morteza Amiri sent (as read):

20         "I've been meaning to ask you can I hire you" --

21     "can I hire your to do my Cal Coast classes?  I'll

22     pay you per class."

23 **Q.**    And was this a text message you just described to us prior

24 to looking at the exhibit?

25 **A.**    Sorry, what was that?

REED - DIRECT / SARGENT

1   Q.   Was this the text message we were just talking about?

2   A.   Yes.

3   Q.   Turning to the next page, please, you respond that you can

4   talk about it when you come over, to which Mr. Amiri responds

5   "Okay.  Sweet."

6         Did you talk about it in person after that?

7   A.   Yes, we did.

8   Q.   To the best of your recollection, do you recall that

9   discussion?

10  A.   I -- I do not.

11  Q.   Okay.  Did you charge Mr. Amiri?

12  A.   Yes.

13  Q.   How much did you charge Mr. Amiri?

14  A.   I believe it was somewhere between, like, 200 to $300 a

15  class.

16  Q.   And how was that rate determined for Mr. Amiri?

17  A.   Through Patrick.

18  Q.   Did Patrick have any -- strike that.

19        Let's turn to the next page.  For the record, this is

20  Exhibit-082-003.

21        You write (as read):

22        "just looked at your courses.  Between Patrick

23        and me, I already" -- "I have already completed all

24        of them, so it should be quick."

25        How does Mr. Amiri respond on the next page?

**REED - DIRECT / SARGENT**

1  **A.**   "Perfect.  Do them," on 12/26/2019, at 5:29 p.m.

2          **MS. SARGENT:**  Can we advance to the next page, please?

3  **BY MS. SARGENT:**

4  **Q.**   Can you explain what you were describing when you wrote

5  "Just looked at your courses"?

6  **A.**   I had logged on to his CCU portal.  I had gone through to

7  see what courses he had, how many courses he did have, and I

8  wanted to see how many courses that I had already completed for

9  both Patrick and I.

10 **Q.**   And did you recognize some of those courses?

11 **A.**   Yes, a lot of them.

12 **Q.**   Was Mr. Amiri assigned certain courses as part of his

13 program of study?

14 **A.**   Yes.

15 **Q.**   Did you have personally any role in selecting Mr. Amiri's

16 courses?

17 **A.**   No.  You cannot select any of the courses.

18 **Q.**   As a student yourself at CCU, did you have an opportunity,

19 during enrollment, to select any courses?

20 **A.**   For myself?

21 **Q.**   Yes, for yourself.

22 **A.**   No.

23 **Q.**   What was Mr. Amiri's program of study?

24 **A.**   It was for criminal justice.

25 **Q.**   All right.  I'd like to show you an exhibit that has

1    already been admitted.  It's Exhibit 55.

2            And if we could turn to the second page of this

3    exhibit, please.

4            Ms. Reed, do you recognize this -- we've looked at

5    something like this, but do you recognize this general kind of

6    document?

7    **A.**    Yes, I do.

8    **Q.**    What do you recognize the kind of document to be?

9    **A.**    It is an unofficial transcript for CCU.

10   **Q.**    And do you recognize the name on this transcript?

11   **A.**    Yes, I do.

12   **Q.**    Do you recognize the courses listed?

13   **A.**    Yes.

14   **Q.**    How do you recognize the courses listed?

15   **A.**    All of the courses after Winter 2020 are courses that I've

16   taken.

17   **Q.**    Okay.  And if we could zoom in to everything under "Winter

18   2020," please.

19           Ms. Reed, which of these classes did you complete for

20   Mr. Amiri?

21   **A.**    I completed every single course on this zoomed-in page:

22   United States government, human body, juvenile justice,

23   terrorism, forensic science, and domestic violence.

24   **Q.**    Okay.  And now if we could zoom into the column on the

25   right-hand side of the page.

1              Which of the classes in the column on the right-hand

2     side of the pages -- page did you complete for Mr. Amiri?

3     **A.**   All of them, including introduction to humanities,

4     business communication, criminal justice, research methods in

5     criminal justice and criminology, organizational theory and

6     behavior, and introduction to sociology.

7     **Q.**   You mentioned that, at the time, you were already familiar

8     with a number of these courses.

9     **A.**   Yes.

10    **Q.**   How did that familiarity affect how quickly you could take

11    courses?

12    **A.**   I would be able to get done a course within four hours if

13    I had the time.

14    **Q.**   Just that -- that may sound impossible, so could you just

15    describe that process of completing a course in four hours to

16    the jury?

17    **A.**   Quizzes would typically take me no more than 15 minutes

18    each, so I could get all four quizzes done within an hour.  The

19    essays would usually only take me about an hour and a half,

20    maybe two hours at most, depending on if I had to switch some

21    wording in the essay or pick a whole new topic.

22    **Q.**   Is that per essay or for the -- a lot of the essays?

23    **A.**   That would be for a lot of the essays.

24    **Q.**   And how many essays were there per course?  Can you remind

25    us?

REED - DIRECT / SARGENT

1    **A.**    I believe there were four.

2    **Q.**    Okay.  And what about exams?

3    **A.**    There were -- there were four quizzes and then one final.

4    **Q.**    How long would an exam -- a final take you?

5    **A.**    A final there was a hundred questions, so it could take

6    sometimes 30, 40 minutes if I knew every question.  Sometimes

7    it could take, like, an hour and a half if I didn't know a lot

8    of the questions.

9    **Q.**    What resources did you use in order to complete this

10   coursework so quickly?

11   **A.**    I had the e-book, so I was able to type in keywords on the

12   e-book to find the answer to questions.  I was using Quizlet a

13   lot online, and then --

14   **Q.**    Did you explain what Quizlet is?

15   **A.**    Quizlet is -- it's basically like flashcards online.  A

16   lot of students use it.  They'll use it to quiz themselves for

17   their own tests, but they list out the answers on there.  So it

18   was easy to find answers for these quizzes.

19           And then I had a stack of quizzes from other officers

20   that I was able to sometimes flip through and find.

21   **Q.**    How did you get that stack of quizzes from other officers?

22   **A.**    Through Morteza Amiri.

23   **Q.**    How did that happen?

24   **A.**    There were other officers that had quizzes that they were

25   able to print out and circle the answers to and were passed

REED - DIRECT / SARGENT

 1  around.

 2  **Q.**    Okay.  And so was that a physical stack of quizzes?

 3  **A.**    Yes, it was.

 4  **Q.**    Okay.  Let's turn to back to Exhibit 82, and if you could

 5  turn to page 4 of this.  And when I mention pages, I'm

 6  referring to the Exhibit dash 082 dash, the page after that.

 7  **A.**    Okay.

 8  **Q.**    What does Mr. Amiri say in his next two text messages to

 9  you that's after "Perfect.  Do them"?  The bottom two text

10  messages.

11  **A.**    On December 26, 2019, at 5:29 p.m., he said (as read):

12         "I will pay you as quick as you do them."

13         On December 26, 2019, 5:29 p.m. (as read):

14         "Same day payment."

15  **Q.**    How did Mr. Amiri pay you for these courses?

16  **A.**    Through Venmo.

17  **Q.**    And did Mr. Amiri, in fact, pay you the same day?

18  **A.**    Yes.

19  **Q.**    Can you describe to the jury what Venmo is?

20  **A.**    Venmo is a -- a way to send payments and request payments

21  from other people, and you can quickly deposit in -- directly

22  into your account.

23  **Q.**    And, generally speaking, when you used Venmo for this

24  purpose, did you request a payment through Venmo or did the

25  student simply pay you through Venmo?

1    **A.**    They would directly just pay me.

2    **Q.**    For people who aren't familiar with Venmo, is it possible

3    to send a completely blank payment, as in a dollar amount

4    without any memoranda?

5    **A.**    No.  You have to have words or an emoji to be able to send

6    a payment.

7    **Q.**    Was there a -- generally speaking, across the variety of

8    people you took Venmo payments for, was there any typical way

9    that people filled in that memorandum?

10   **A.**    Not -- not really.  They -- mostly it was random emojis.

11   **Q.**    Okay.  So we'll come back to the Venmo.

12           But in order to complete coursework, and I think you

13   just gestured to this, did you need books?

14   **A.**    Yes, I did.

15   **Q.**    You mentioned e-books.  How did the process of acquiring

16   books at CCU work?

17   **A.**    You would go through, I believe it was, a separate website

18   that CCU gave you, and you would go through and purchase the

19   book that the coursework required for.

20   **Q.**    Let's go to page 8 of this Exhibit 82.

21           Can you read, please, Ms. Reed, the bottom two text

22   messages?

23   **A.**    I said on 1/15/2020 (as read):

24           "Some of the books that you need already expired

25           that I had, so I will let you know as I go how much

1        the books are.  They range between 30 to $60" --

2        "bucks, but I try not to get them for every class."

3   Q.   And the next one, please.

4   A.   On 1/15/2020, at 5:04 p.m., Morteza said (as read):

5            "Just let me know."

6   Q.   What did you mean when you referenced, in the first text

7   message, a book expiring?

8   A.   So when you would buy an e-book online, they would only

9   let you have it for a certain amount of days if you rented

10  versus buying it.  So there were a couple of books that I

11  already had for certain courses that I didn't need to rebuy.

12  Q.   What was the difference in price, just in terms of less

13  versus more, of renting versus buying?

14  A.   I can't remember renting versus buying, but I know for

15  e-books it was cheaper than buying, like, the hardback book.

16  Q.   Okay.  Did you typically rent or buy e-books, or did you

17  do a combination of those two things?

18  A.   I believe it was a combination.  Some books you just had

19  to buy.  There wasn't the option.  And if -- yeah.

20  Q.   Okay.  Did Mr. Amiri reimburse you when you did buy books?

21  A.   Yes.

22  Q.   In order to complete exams, did Mr. Amiri need a proctor?

23  A.   Yes.

24  Q.   Who was Mr. Amiri's proctor?

25  A.   Emily Amiri.

**REED - DIRECT / SARGENT**

1  Q.   Who was Emily Amiri?

2  A.   At the time, it was just his partner.

3  Q.   Okay.  And did you receive information from that person?

4  A.   Yes.

5  Q.   Taking one step back, just do you know -- you said that

6  she was his partner at that time.  Do you know what her name

7  was at that time?

8  A.   Emily Azevedo.

9  Q.   So, again, did you have to receive information from

10 Ms. Azevedo?

11 A.   Yes.

12 Q.   What information?

13 A.   So there would be passwords that were sent to the proctor.

14 I would have to take that password and then put it into the

15 final exam in order for it to be unlocked for me to take.

16 Q.   In Mr. Amiri's case, how did you get that information?

17 A.   Typically it was through him; and then after a

18 relationship evolved between me and Emily, I was able to reach

19 out to her sometimes and get the password.

20 Q.   Okay.  Let's go to page 10 of this exhibit.

21      At the bottom of this page, what do you ask Mr. Amiri?

22 A.   "Who is your proctor?"

23 Q.   And turning to the next page, please.

24      What does Mr. Amiri respond?

25 A.   On 1/15/2020, at 5:33 p.m., he said, "IDK.  LOL."

1  Q.   Based on your knowledge of text message lingo and your

2  relationship with Mr. Amiri and knowledge of these texts, what

3  do "IDK" and "LOL" mean?

4  A.   I don't know and "LOL" is laugh out loud.

5  Q.   Can you read through the rest of this page?

6  A.   On 1/15/2020, at 5:34 p.m., I responded (as read):

7         "Okay.  I'll look."

8         And at 1/15 on -- 2020, at 5:51 p.m., I said (as

9  read):

10        "Emily is your proctor, go on her e-mail and

11     screenshot the password it sends you."

12  Q.   How did you go about determining who Mr. Amiri's proctor

13  was when he didn't know?

14  A.   I had to go onto his CCU portal, and you're able to pull

15  up, under a proctor page, the proctor's name because through

16  there you can also change who your proctor is.

17  Q.   Okay.  You mentioned that Mr. Amiri paid you through

18  Venmo; is that right?

19  A.   Yes.

20  Q.   I am going to -- I want to show the witness an exhibit

21  that has been premarked as Exhibit 100.  So we are not

22  publishing.

23        And this should appear on the screen in front you.

24        Ms. Reed, do you recognize this document?

25  A.   Yes, I do.

**REED - DIRECT / SARGENT**

1    Q.    How do you recognize it?

2    A.    This is Venmo transactions on my Venmo that I provided.

3    Q.    Can you describe how -- and can we flip very quickly, for

4    the witness, through all of the pages so that she sees the

5    entirety?

6             Thank you.

7             Can you describe how you got this document?

8    A.    I went onto my Venmo page.  I was able to just pull up

9    Venmo transactions between me and Morteza, and I was able to

10   screenshot the Venmo transactions.

11   Q.    Okay.  And did you combine those screenshots into a single

12   document?

13   A.    No.  I could only -- the ones that I could screenshot,

14   that is what --

15   Q.    Okay.

16   A.    -- came off as a single document.

17   Q.    Did you provide the set of documents that you

18   screenshotted to the Government?

19   A.    Yes.

20   Q.    Did you alter the screenshots in any way when you captured

21   them?

22   A.    No.

23   Q.    Going back to the first page quickly.

24             What is the yellow tab on the first page?

25   A.    This is a sticky note that I wrote "School" on.

1          MS. SARGENT:  Your Honor, I move to admit.

2          THE COURT:  Any objection?

3          MR. CRUDO:  No objection, Your Honor.

4          THE COURT:  It's admitted.

5      (Trial Exhibit 100 received in evidence.)

6          MS. SARGENT:  Permission to publish.

7          THE COURT:  Yes, you may.

8          MS. SARGENT:  Can we put the first two pages side by

9  side?  Actually, can we just look at the second one?

10 BY MS. SARGENT:

11 Q.   Okay.  Do you see that there are three payments in these

12 two pages on January 16, 2020?

13 A.   Yes, I do.

14 Q.   Do you have a recollection of why Mr. Amiri paid you three

15 times in one day?

16 A.   Me and Morteza had a very close relationship.  We would

17 often banter back and forth between each other, so it was just

18 a joke from what I recall.

19 Q.   Okay.  And let's look at the text messages to see that

20 joke.

21          Can we move back to Exhibit 82?  This time at page 21,

22 please.

23          Can you read this exchange, beginning with the blue

24 bubble on this page through the end of page 23, so we're going

25 to read for three pages, including who's speaking and the date

REED - DIRECT / SARGENT

 1   and time?

 2   **A.**   On 1/16/2020, at 12:29 p.m., I texted (as read):

 3         "Done with one class."

 4         On 1/16/2020, at 12:41 p.m., Morteza said (as read):

 5         "Nice.  What grade" -- "What graded did I get?"

 6         On 1/16/2020, at 12:42 p.m., I stated (as read):

 7         "They have to grade the essays, but that could

 8   take a week.  I got an A on all quizzes and the

 9   final."

10         Morteza texted back on 1/16/2020, at 12:43 p.m. (as

11   read):

12         "Hell, yeah!  Paid."

13         On 1/16/2020, at 12:44 p.m., I texted back (as read):

14         "I should have another one done" -- "down before

15   I leave for class, but we will see."

16   **Q.**   Okay.  And then let's go to the next page.

17   **A.**   On 1/16/2020, at 12:44 p.m., Morteza replied, "Sweet."

18         On 1/16/2020, at 8:20 p.m., I replied (as read):

19         "I finished another class.  I was two points away

20   from an A.  LOL."

21         On 1/16/2020, at 8:38 p.m., Morteza replied (as read):

22         "Half price then."

23   **Q.**   You mentioned that you and Mr. Amiri had a relationship

24   that entailed a fair amount of banter.  Was this banter?

25   **A.**   Yeah.  We would often joke around and -- yeah, we were

REED - DIRECT / SARGENT

```
 1   very sarcastic with each other and would often joke back and
 2   forth.
 3              THE COURT:  You have some tissues over there if you'd
 4   like.
 5              THE WITNESS:  Thank you.
 6              THE COURT:  Do you need a break or are you okay?
 7              THE WITNESS:  No.  I'm okay.
 8   BY MS. SARGENT:
 9   Q.   Okay.  Once you're able, can you read forward until
10   page 27?  But take your time.
11   A.   On 1/16/2020, at 8:38 p.m., he said (as read):
12              "Finished another whole class?!"
13              On 1/16/2020, at 8:39 p.m., I replied (as read):
14              "Yeah, no.  LMAO.  And, yes."
15              On 1/16/2020, at 8:40 p.m., he replied, "Paid."
16              THE COURT:  Let's take a brief stretch break.  Stand
17   up.
18              Ms. Reed, you may stand if you wish to take a stretch
19   and gather yourself.
20                        (Pause in proceedings.)
21              THE COURT:  Ladies and gentlemen, we're going to
22   stop -- we're going to break for the first break, because of my
23   afternoon calendar at -- 9:15 will be our first break, and then
24   we'll with be done at 12:15 today.
25                        (Pause in proceedings.)
```

 1              THE COURT:  All right.  Are you okay to continue?

 2              THE WITNESS:  Yeah.

 3              THE COURT:  All right.  Please continue.

 4   BY MS. SARGENT:

 5   Q.   Ms. Reed, I see these conversations take place on

 6   January 16, 2020.  From your recollection, does this

 7   conversation reflect the same payments we just saw in the Venmo

 8   record, including that discounted rate payment on January 16,

 9   2020?

10   A.   Yes, it does.

11   Q.   Let's go to page 57.

12        Can you please read the last text message on this page

13   and the first one on the next?  57.  I'll give you a second to

14   get there.

15   A.   On 1/30/2020, at 10:45 a.m., I responded (as read):

16        "Almost done with another final.  I had to buy

17        the book for $50."

18   Q.   And the next one?

19   A.   On 1/30/2020, at 10:45 a.m., Morteza replied (as read):

20        "Sweet.  Let me know when it's done and I'll

21        Venmo you $300."

22   Q.   We can pause there and move on to page 60.

23        Can you just read -- can you just read the final text

24   on this page?

25   A.   On 1/30/2020, at 1:01 p.m., I put (as read):

```
 1              "Okay.  Done.  I got a B, but I'm disputing three
 2         answers because they were straight from the book."
 3    Q.    Ms. Reed, how did the dispute process at CCU work?
 4    A.    You would go into the portal, you would see who the
 5    professor is of the -- of the class, and then you could e-mail
 6    them through the portal to chat with them about a particular
 7    essay, quiz, or final.
 8    Q.    And would you be registering, then, the dispute with the
 9    specific professor who was the grader?
10    A.    I -- yes.  I would e-mail that specific professor, but it
11    would not attach the actual quiz, from my recollection.  I
12    would just let them know it was for a particular class and what
13    quiz.  And then I believe sometimes I'd copy and paste the
14    questions in there so they would know what I was talking about.
15    Q.    When you disputed a grade like that or engaged in
16    conversation with professors, could that slow down final
17    grades?
18    A.    Yes and no.  I think in this case, it kind of sped it up
19    because they were able to go back and quickly look then and
20    there.
21    Q.    Are there any other reasons that there could be a delay
22    between completing coursework and getting a grade posted?
23    A.    With essays, yes.  If I had completed the essays within
24    the same day as the final, it would sometimes, on average, take
25    a day to sometimes three days to grade those essays and finish
```

1    the actual course.

2    **Q.**    Okay.  Process-wise, were you able to do a final before

3    you completed an essay?

4    **A.**    No.  You had to complete all quizzes, all essays, and then

5    you were able to unlock the exam.

6    **Q.**    Okay.  But were there instances in which you completed an

7    essay very close in time to the point you did the final?

8    **A.**    Yes.

9    **Q.**    I notice that these text messages are from January 2020.

10   Were you still doing coursework for Mr. Amiri during March of

11   2020, when the shutdown happened?

12   **A.**    I believe so, yes.

13   **Q.**    Did that experience change the process of getting grades

14   at all or slow down grades?

15   **A.**    Yes.  It drastically had slowed it down from, I would say

16   on average, one to three days to sometimes almost ten days.

17   **Q.**    Okay.  Going back to Exhibit 100, at page 3, please.

18          Is there a payment on that same day of January 30,

19   2020?

20   **A.**    Yes.

21   **Q.**    And going to Exhibit 55, at page 2.  If we could zoom into

22   the bottom left-hand side of the page, please.

23          Is this timeline roughly consistent with Mr. Amiri

24   getting a B for terrorism on February 8, 2020?

25   **A.**    Yes.

REED - DIRECT / SARGENT

1   **Q.**   Okay.  Let's go to Exhibit 82, at page 58.  So 58 of the

2   text messages.

3          Can you please read the last two texts on this page

4   and then through the top of page 60, so three pages, starting

5   at the last two texts on page 58?

6   **A.**   On 1/30, at 10:46, I texted (as read):

7          "KK.  I'll try to finish the juvenile justice

8          final today.  I just want to double-check all the

9          answers before I submit."

10         On 1/30/2020, Morteza liked the text message.  I sent

11  (as read):

12         "KK.  I'll try to finish the juvenile justice

13         final too.  I just want to double-check all the

14         answers before I submit."

15         On 1/30/2020, at 10:49 a.m., he texted back (as read):

16         "Don't I have a class on there where I did the

17         exams but no essays or final?"

18         He then texted again on 1/30/2020, at 10:50 a.m. (as

19  read):

20         "Maybe I'm working" -- or "Maybe I'm wrong.

21         IDK."

22         On 1/30/2020, at 10:50 a.m., I replied back (as read):

23         "I already finished that a while ago.  It was

24         four quizzes and one essay."

25  **Q.**   And then one more page, please.

1   **A.**   On 1/30/2020, at 10:50 a.m., he put, "Sweet."

2           On 1/30 -- 1/30/2020, at 10:50, he said, "Knock 'em

3   out."

4   **Q.**   And we can stop there.  Thank you.

5           Do you remember finishing a class that Mr. Amiri had

6   started?

7   **A.**   Yes.

8   **Q.**   How many of the classes you did for him, if you remember,

9   had he already done anything already?

10  **A.**   I believe there was one, maybe two at the most.

11  **Q.**   And when you signed into the CCU portal, how did you know

12  that coursework had already been completed for a class?

13  **A.**   When -- the courses you can start, I believe it was three

14  at a time.  You can click on the class and it would show you

15  the quizzes, the essays, and then a final; and it would show

16  you if certain quizzes or essays were done.

17  **Q.**   Okay.  Let's move to the next page, please, 61.

18          No.  I'm sorry.  That's Exhibit 82, page 61.

19          Can you read for the record the second two texts on

20  this page?

21  **A.**   On 1/30/2020, at 8:01 p.m., Morteza said (as read):

22          "You think all the classes will be done in

23          February?"

24          On 1/30/2020, at 1:09 p.m., I said (as read):

25          "Yeah.  They should.  I have to have mine done by

1          the end" -- "by then and I have 10 more.  So I'm

2          hoping to have both done, but I have -- I have to

3          have mine done for nursing applications."

4     Q.   Ms. Reed, what else were you doing at the time other than

5     Mr. Amiri's coursework?

6     A.   I was also in CCU.

7     Q.   Okay.  And why did you have to have your courses done by

8     February?

9     A.   From what I remember, the nursing applications were due in

10    April, so I had to have a bachelor's degree prior to that to

11    get accepted into the accelerated program.

12    Q.   And why were you applying to nursing school?

13    A.   I was trying to become a nurse so that Patrick and I would

14    have more money and that I could complete my dream of becoming

15    a nurse.

16    Q.   Let's go to page 67.

17          It looks like you tell Mr. Amiri that you still

18    haven't -- sorry.

19          Okay.  It looks like you tell Mr. Amiri that (as

20    read):

21          "You still haven't finished the juvenile justice

22        class."

23          Do you see that?

24    A.   Yes.

25    Q.   Can you read for the record the texts that follow, through

1    the end of page 70?

2    **A.**   Starting with the middle text message?

3    **Q.**   You -- we can skip that one.  You can go to the next.

4    **A.**   Okay.

5            On February 1st, 2020, at 2:17 p.m., I said (as read):

6            "The book I bought was for the last class and I

7    just finished."

8    **Q.**   And the next page.

9    **A.**   Morteza replied on 2/1/2020, at 2:17 p.m. (as read):

10           "If you finish all the classes this month, I'll

11   throw you an extra 300."

12           On February 1st, 2020, at 2:17 p.m., I said (as read):

13           "Okay.  I'll try.  LOL."

14           On 2/1/2020, at 2:17 p.m., he said (as read):

15           "I know you're going to do it all this month

16   anyways but a little extra thank you money."

17   **Q.**   The next page, please.

18   **A.**   On 2/1/2020, at 2:18 p.m., Morteza emphasized (as read):

19           "okay.  I'll try.  LOL."

20           On February 1st, 2020, at 2:31 p.m., I replied (as

21   read):

22           "Oh, am I?  LMAO."

23           On February 1st, 2020, at 2:32 p.m., Morteza replied

24   (as read):

25           "THIS MONTH ONLY" -- in all caps -- "LOL."

1  Q.   And the next page, please.

2  A.   On 2/1/2020 at 2:33 p.m., Morteza responded (as read):

3        "If I submit my request for the degree on time,

4        by the end" -- "by the end for of the month, I can

5        coordinate my raise in a timely manner."

6  Q.   Let's pause there quickly.

7        Did Mr. Amiri ever explain to you more about what he

8  meant by coordinate his raise in a timely manner?

9  A.   I -- I don't recall if there was ever an explanation.

10 Q.   Okay.

11       Okay.  Can you continue through page 73, please?

12 A.   On 2/1/2020, at 2:37 p.m., I put (as read):

13       "Oh, interesting.  I'll see what I can do.  500

14       sounds more" -- "a little more motivating."

15       On 2/1/2020, at 2:37 p.m., Morteza responded (as

16 read):

17       "500 for all classes done this month."

18       On 2/1/2020, at 2:38 p.m., Morteza responded (as

19 read):

20       "Only if it's all done by the 29th.  It's a short

21       month too."

22       On 2/1/2020, at 2:42 p.m., I replied (as read):

23       "I can try but, yeah, if I get done like two

24       classes a day and actually do it on the weekends, I

25       can for sure get it done."

**REED - DIRECT / SARGENT**

1          On 2/1/2020, at 2:46 p.m., he put (as read):

2          "BTW, you owe me $4,656.69 after the accumulated

3     interest."

4          On 2/1/2020, at 2:47 p.m., I put (as read):

5          "LMAO.  Good one."

6          On 2/4/2020, at 4:59 p.m., I put (as read):

7          "Just finished another course."

8          On 2/24/2020, at 5:02 p.m., he responded (as read):

9          "Which class?"

10         On 2/4/2020, at 5:03 p.m., I responded (as read):

11         "Juvenile justice."

12         On 2/4/2020, at 5:03 p.m., I responded (as read):

13         "I'm annoyed.  I got an A in everything and I did

14    the final and did bad, so I get a B in the class.  I

15    worked so hard."

16         On 2/4/2020, at 5:04 p.m., he put (as read):

17         "All good."

18    Q.   Okay.  Let's go back to Exhibit 100, at page 4.

19         Ms. Reed, did Mr. Amiri pay you on February 4, 2020?

20    A.   Yes, he did.

21    Q.   Was that for completing juvenile justice on February 4,

22    2020, as we just saw?

23    A.   Yes.

24    Q.   Do you remember anything notable about completing the

25    juvenile justice class?

**REED - DIRECT / SARGENT**

1   A.   Not from my recollection.

2   Q.   It sounded like it was hard for you, from the text.

3   A.   Oh.  Yes.

4   Q.   Okay.  Let's look at page 31 of the text messages, page --

5   I mean, Exhibit 82.

6           Can you read from the bottom text on this page?

7   A.   I said, on 1/20/2020, at 2:45 p.m. (as read):

8           "Can you ask Elmore to send you a picture of the

9       final from BCJ210 juvenile justice?"

10  Q.   Who is Elmore?

11  A.   Elmore is an officer.

12  Q.   Where did he work?

13  A.   At Pittsburg Police Department.

14  Q.   How did you know him?

15  A.   He lived two doors down from Patrick and I in Oakley.

16  Q.   Did you know his family?

17  A.   I knew his wife and then their child, but not his full

18  family.

19  Q.   Who was his wife?

20  A.   Tricia Elmore.

21  Q.   Do you know Tricia's maiden name?

22  A.   DiLorenzo.

23  Q.   Was Elmore someone you trusted?

24  A.   He was definitely a friend, someone that we were very

25  friendly with, yes.

1   **Q.**   Based on your knowledge from your relationship with

2   Mr. Berhan, did he seem to be someone Mr. Berhan trusted?

3   **A.**   Yes.

4           **MR. CRUDO:**  Objection.  Foundation, Your Honor.

5           **THE COURT:**  Sustained.

6   BY MS. SARGENT:

7   **Q.**   And did Mr. Amiri also know him?

8   **A.**   Yes.

9   **Q.**   Do you have any knowledge of how well Mr. Amiri knew him?

10  **A.**   I believe through -- met through Patrick and then they

11  were friendly.

12  **Q.**   Why did you think that Elmore might have a picture of a

13  CCU final?

14  **A.**   I had known, through Patrick and Morteza, that he had a

15  stack of tests.

16  **Q.**   Okay.  Can you continue, please, reading through page 37

17  of this exhibit?

18  **A.**   On 1/20/2020, at 2:45 p.m., Morteza replied "Yep."

19          On 1/20/2020, at 2:45 p.m., I said, "Thanks!"

20          On 1/2/2020, at 2:46 p.m., Morteza wrote "Just asked."

21          On 1/20/2020, at 2:54 p.m., Morteza said (as read):

22          "When was the test revised?"

23          On 1/20/2020, at 5:55 p.m., he said (as read):

24          "He might have the outdated version at home."

25          On 1/20/2020, at 2:55 p.m., I replied (as read):

**REED - DIRECT / SARGENT**

1           "I am not sure.  Tell him to send a picture with

2      the questions.  There are questions I can't find

3      online so they might be on that final."

4           On 1/20/2020, at 3:06 p.m., Morteza replied (as read):

5           "He has the same one, and I [sic] will send it to

6      me in an hour," and sent an attachment.

7           On 1/20/2020, at 3:07 p.m., I put (as read):

8           "Okay.  Perf!  Thank you."

9  **Q.**   Next page, please.  Can you read this page as well,

10 Ms. Reed?

11 **A.**   Yes.

12           On 1/20/2020, at 4:18 p.m., he put (as read):

13           "Any day now."

14           On 1/20/2020, at 4:20 p.m. he put (as read):

15           "Still waiting."

16           On 1/20/2020, at 4:20 p.m., he put (as read):

17           "Next year.  LOL."

18 **Q.**   Next page, please.

19 **A.**   On 1/20/2020, at 4:21 p.m., I put (as read):

20           "Hopefully it's the same test."

21           On 1/20/2020, at 4:25 p.m., he put (as read):

22           "I remember last week."

23           On 1/20/2020, at 4:25 p.m., he responded again (as

24 read):

25           "When you were fast and actually finished

**REED - DIRECT / SARGENT**

1          classes."

2  **Q.**    And final page, please.

3  **A.**    On 1/20/2020, at 4:25 p.m., he put hashtag "TBT."

4          On 1/20/2020, at 4:25 p.m., I put (as read):

5          "Good one.  LOL."

6          On 1/20/2020, at 4:31 p.m., I put (as read):

7          "By the time I get this test they are only" --

8      "they are going to revise it again..."

9  **Q.**    Can you explain this discussion about CCU revising the

10 test?

11 **A.**    After a certain amount of time, CCU will revise quizzes,

12 finals, restructure them, add new questions to ensure that

13 there is no cheating.

14 **Q.**    Do you have -- can you remember, based on your experiences

15 with CCU, how often that happened?

16 **A.**    I want to say it was every, like, six months to a year.

17 It wasn't super often.  But sometimes when I started some of

18 these courses, it would be right when they start to revise

19 tests.

20 **Q.**    Okay.

21          **THE COURT:**  Can we take a break now?

22          **MS. SARGENT:**  Yes, we can.

23          **THE COURT:**  Let's take our 15-minute break.  And keep

24 on open mind, and remember the Court's admonitions.  We'll see

25 you in 15 minutes.

 1              You may step down temporarily, Ms. Reed.

 2         **THE CLERK:**  All rise.

 3                   (The jury leaves the courtroom.)

 4                   (Recess taken at 9:14 a.m.)

 5              (Proceedings resumed at 9:31 a.m.)

 6                   (The jury enters the courtroom.)

 7         (Proceedings were heard in the presence of the jury.)

 8         **THE CLERK:**  All rise.  Please be seated.

 9         Please remain seated.  Come to order.  Court is back

10    in session.

11         **THE COURT:**  Welcome back.

12         You may continue, Counsel.

13         **MS. SARGENT:**  Thank you, Your Honor.

14         Can we put on previously admitted Exhibit 82, please,

15    at page 43?

16    **BY MS. SARGENT:**

17    **Q.**  Ms. Reed, we were just talking about some texts relating

18    to the completion of juvenile justice.

19         What, if you remember, was the difficulty with

20    juvenile justice?

21    **A.**  From what I remember, it was just the questions.  They

22    were trying to kind of reword things and the questions to throw

23    you off.  And then the essay, from what I remember, there were

24    certain -- the examples weren't just like laid out in there.

25    Again, I didn't read every single book for the courses; I was

1    just skimming through them.  So it was kind of hard to do that

2    without reading the full book.

3    **Q.**    Okay.  Can you read page 43, Exhibit 82, through page 46?

4    **A.**    On 1/20/2020, at 4:50 p.m., Morteza said (as read):

5           "He said to check" -- "check to see if it's

6    all right" -- "if it's right."

7           And then he sent an attachment.

8           On 1/20/2020, at 4:50 p.m., I replied (as read):

9           "Does he have the questions too?  LOL."

10   **Q.**    And is this part of the same conversation about Elmore and

11   his tests that we were previously looking at?

12   **A.**    Yes.

13   **Q.**    Okay.  Can you continue with this page, please?

14   **A.**    Yes.  On 1/20/2020 at 4:52 p.m., Morteza responded (as

15   read):

16          "He doesn't have them."

17          On 1/20/2020 at 4:52, Morteza said (as read):

18          "I told him to text you for more details since

19   you asked me to contact him.  IDK."

20          On 1/20/2020, at 4:53 p.m., he responded (as read):

21          "He said he will call you in five minutes."

22          On 1/20/2020, at 4:53 p.m., I responded "KK."

23          On 1/20/2020, at 4:54 p.m., Morteza responded (as

24   read):

25          "JK he ain't going to call you.  I didn't mention

1    your name.  He doesn't have the questions."

2         On 1/20/2020, at 4:55 p.m., Morteza said, "At work."

3  **Q.**   The final page, please.

4  **A.**   On 1/20/2020, at 4:55 p.m., I put (as read):

5         "Ugh.  Ask him if he's used" -- "used those

6    answers on his final.  If he has, then he'll have the

7    questions on his Cal Coast account."

8         On 1/20/2020, at 4:56 p.m., he responded (as read):

9         "He said to check the first few and see if it

10   matches.  He said he doesn't."

11        On 1/20/2020, at 4:57 p.m., I responded (as read):

12        "I can't find any of the answers anywhere, so the

13   problem is I have no clue if they will.  LOL."

14 **Q.**   Can you explain this discussion about Elmore having the

15 questions on his Cal Coast account?

16 **A.**   So on -- I had the answers just like I used to make a

17 Scantron on binder paper, but he had printed out answers and

18 then some tests that were printed out with the -- with the

19 answers that were circled.  So I needed to go and find the

20 actual questions because he just had the answers, like a

21 Scantron of answers.  So I needed to go back and find the tests

22 that those answers were for to see what questions they were

23 for.

24 **Q.**   Okay.  And what does Mr. Amiri mean, if you understand,

25 based on your experience with CCU, about when he says "see if

**REED - DIRECT / SARGENT**

1  any match"?

2  **A.**   He's asking if the -- the questions that were on

3  Jonathan's -- Elmore's tests matched the ones that were under

4  his CCU account.

5  **Q.**   Okay.  And we talked earlier about using information from

6  one CCU account related to a class when you're working on the

7  same class for someone else.  Did you do that ever in the case

8  of Mr. Amiri's courses?

9  **A.**   Sorry, what was the question?

10  **Q.**   When you were doing Mr. Amiri's courses, did you ever use

11  other CCU accounts that you had access to to get information?

12  **A.**   Yes.

13  **Q.**   Let's look at page 75 of this exhibit.

14       For the record, this is right after the text that we

15  looked at earlier, where you told Mr. Amiri you got a B in

16  juvenile justice.  Can you read this and the next page, please?

17  **A.**   On 2/5/2020, at 1:17 p.m., I put (as read):

18       "LOL.  You trying to rub it in?"  With an

19       attachment attached.

20       On 2/5/2020, at 1:18 p.m., he responded (as read):

21       "Yes, ma'am.  LOL.  No.  I am sending it to you

22       in case you needed the answers that were wrong."

23  **Q.**   The next page, please.

24  **A.**   On 2/5/2020, at 1:18 p.m., he also stated (as read):

25       "IDK if you print out the tests and save them or

1  not."

2      On 2/5/2020, at 1:19 p.m., I put (as read):

3      "No.  I can see it on the computer even after you

4  graduated, but I wish I had the answers to that test.

5  Patrick even helped me."

6      On 2/5/2020, at 1:34 p.m., he put (as read):

7      "No worries.  I thought it didn't tell you right

8  away."

9  Q.  And Mr. Amiri said earlier, in the text you just quoted,

10  that he doesn't know if you print out tests to save them.  What

11  was the context of this back and forth?  What was he -- what

12  were you talking about?

13  A.  Other officers would print off their tests and save them

14  with the answers.  He was just wondering if I needed to print

15  them off, if I needed to do other tests.

16  Q.  And was this referring to the juvenile justice test

17  specifically?

18  A.  I don't recall if this was specific to juvenile justice,

19  but I'm assuming.

20  Q.  Okay.  In your text message, you noted that Patrick even

21  helped you.

22      Do you remember -- well, what do you remember about

23  Patrick helping with classes generally?

24  A.  Every once in a while, I would be on the laptop and he

25  would sit next to me on the bed and try to look up, on his cell

1    phone, questions.  It didn't help much, though, because you

2    would have to type in the full question on your phone versus me

3    just copying and pasting in the laptop.

4    Q.   What was Mr. Berhan's attitude, if you remember, in those

5    moments when he tried to help you?

6    A.   He helped me.  He was nice and helped me.

7    Q.   Okay.

8         Okay.  Let's move on from juvenile justice, and in

9    this same exhibit, go to page 77.

10        Can you read this page for the record?

11   A.   On 2/7/2020, at 11:12 a.m., I texted (as read):

12        "Just got done with another class."

13        On 2/7/2020, at 11:47 a.m., he responded (as read):

14        "Nice.  Which one?"

15        On 2/7/2020, at 11:47 a.m., I responded (as read):

16        "Forensic science.  The book was $15.99."

17   Q.   We're going to move to another previously admitted

18   exhibit, which is Exhibit 100, at page 5.

19        Ms. Reed, do you see a matching payment on February 7,

20   2020?

21   A.   Yes, I do.  Well, not matching, but this was for a class

22   and the book.

23   Q.   Okay.  And how much of this payment was for the class?

24   A.   The class was 250 and then the book was $15.99, but I'm

25   assuming they rounded up.

**REED - DIRECT / SARGENT**

1    Q.    And is that -- was that reflected in the text messages we

2    just looked at?

3    A.    Yes.

4    Q.    Okay.  I'd like to show you another previously admitted

5    exhibit, Exhibit 55, at page 2.

6           And if we could zoom into the bottom portion of that

7    page.

8           Was that text message about forensic science and the

9    payment on February 7 consistent, based on your experience with

10   CCU, with forensic science being completed on February 8, 2020?

11   A.    Yes.

12   Q.    Let's go back to previously admitted Exhibit 82, at

13   page 86.

14          Can you read this and the next page for the record?

15   A.    On 2/18/2020, at 10:07 a.m., I wrote (as read):

16          "Before I forgot the domestic violence book was

17          39.95, and I'm just waiting for the password to do

18          the final."

19          On 2/18/2020, at 10:07 a.m., I also said (as read):

20          "I think you have six classes left."

21          On 2/18/2020, at 12:12 p.m., he put, "Sweet."

22          On 2/18/2020, at 5:55 p.m., I responded (as read):

23          "Just finished domestic violence class."

24          On 2/18/2020, at 7:14 p.m., he loved the text message

25   that I said "Just finished the domestic violence class."

1          On 2/18/2020, at 7:14 p.m., Morteza replied, "Paid."

2    **Q.**   And the next exhibit is previously admitted Exhibit 100.

3    If we could go to that exhibit, at page 6.

4          Those text messages reference the $39.95 book and a

5    class completed on February 18, 2020.

6          Ms. Reed, do you see matching payments on February 18,

7    2020?

8    **A.**   Yes.

9    **Q.**   And can we move to previously admitted Exhibit 55, at

10   page 2?

11         Based on your experience with CCU, is that consistent

12   with this transcript, with domestic violence being completed a

13   few days later, on February 23, 2020?

14   **A.**   Yes.

15   **Q.**   Going back to previously admitted Exhibit 82, at page 92,

16   can you read this and the next page for the record, please?

17   **A.**   On 2/27/2020, at 9:54 a.m., I said (as read):

18         "Just finished a class on 2/27/2020, at

19         11:15 a.m."

20         He responded (as read):

21         "Nice.  Which one?"

22         On 2/27/2020, at 11:15 a.m., I responded, "GED120."

23         On 2/27/2020, at 11:15 a.m., I responded (as read):

24         "Intro to humanities."

25         On 2/27/2020, he responded -- at 12:08 p.m., he

REED - DIRECT / SARGENT

1  responded "Paid."

2  **Q.**   And you can stop there.

3        Can we put previously admitted Exhibit 100 on the

4  right-hand side of the screen, side by side?

5        And this is page 6 of that exhibit.

6        Ms. Reed, page 6, please.

7        Ms. Reed, do you see a corresponding payment on

8  February 27, 2020?

9  **A.**   Yes.

10  **Q.**   And moving to previously admitted Exhibit 55, at page 2.

11        Is that February 27, 2020, payment, which the text

12  message reflected was for GED120, consistent with the

13  completion of GED120, intro to humanities, on February 27,

14  2020?

15  **A.**   Yes, it was.

16  **Q.**   Moving back to previously admitted Exhibit 82, at page 98,

17  please.

18        Can you read this page for the record, page 98?

19  **A.**   Yes.

20        On 3/9/2020, at 2:24 p.m., I said (as read):

21        "Waiting for a password for another final for

22     criminal behavior.  The book was $54."

23        On 3/9/2020, at 5:55 p.m., I put (as read):

24        "Done with the class."

25        On 3/9/2020, at 5:55 p.m., Morteza wrote (as read):

1        "Sorry for the delay.  I was slammed at work."

2  **Q.**   Okay.  And, again, moving to previously admitted

3  Exhibit 100, at page 7, please.

4        Are there matching payments for that $54 book and

5  class on March 9, 2020?

6  **A.**   Yes.

7  **Q.**   Can you describe those?

8  **A.**   There is one on March 9th, 2020, from Morteza to myself

9  for $54 and another one on March 9th, 2020, from Morteza to

10  myself for $250.

11  **Q.**   Can you describe for the record the emoji in the

12  bottommost of those?

13  **A.**   It's a book emoji.

14  **Q.**   Moving to previously admitted Exhibit 55, at page 2.

15        Yes, if we could enlarge the top.

16        Based on your experience at CCU and having taken those

17  classes, is that consistent with criminal behavior having been

18  completed on March 20, 2020?

19  **A.**   Yes, it is.

20  **Q.**   We talked a little bit about what happened in March of the

21  year 2020.

22        Do you have any recollection generally, from that time

23  period, about why a grade in this class may not have been

24  posted until March 2020?

25  **A.**   This was right around when COVID just had started.  Even

1  though it was an online class, there was a lot of professors

2  that took time to grade the courses.

3  **Q.**   Let's move back to previously admitted Exhibit 82, at

4  page 102.

5         Can you please read this page for the record.

6  **A.**   On 3/18/2020, at 4:50 -- sorry -- 4:43 p.m., I wrote (as

7  read):

8         "BCJ470 is done and the book was $13.50."

9         On 3/18/2020, at 4:45 p.m., Morteza wrote (as read):

10        "Thanks.  Paid.  Keep it up."

11        On 3/18/2020, at 4:46 p.m., I responded (as read):

12        "Three more classes."

13 **Q.**   Okay.  Let's move back to previously admitted Exhibit 100,

14 this time at page 9, please.

15        Is there a payment on March 18, 2020?

16 **A.**   Yes, there is.

17 **Q.**   And how much is that payment for?

18 **A.**   For $250.

19        **MS. SARGENT:**  Can we go to the previous page as well?

20 **BY MS. SARGENT:**

21 **Q.**   Let's look, again, at previously admitted Exhibit 55, at

22 page 2, please.

23        Is that $250 payment that was discussed in the text

24 messages for BCJ470 consistent with -- in this -- in this

25 exhibit, BCJ470, research methods in criminal justice and

1    criminology, being completed on March 26, 2020?

2    **A.**    Yes, it is.

3    **Q.**    Moving back to previously admitted Exhibit 82, this time

4    at page 103.

5              Can you please read this page for the record,

6    Ms. Reed?

7    **A.**    On 3/18/2020, at 4:56 p.m., he liked my previous message

8    "Three more classes."

9              On 3/19/2020, at 8:34 a.m., I responded (as read):

10             "Sorry.  This next book was $75, but I had to buy

11        it because I've had this professor for four classes

12        and she has failed like six of my essays."

13   **Q.**    Can we pause there quickly?

14             Ms. Reed, what happened when you were completing a CCU

15   course and a professor failed an essay?  Can you describe what

16   that meant and what the process was following that?

17   **A.**    Typically it would be after a final was done.  So

18   sometimes that would delay the process of closing the actual

19   class.  If there was an essay that was failed, the professor

20   would let you know -- sometimes they would reach out and let

21   you know why they failed the essay, and then you could revise

22   it.  I can't remember how many attempts, but there was a

23   certain limited amount of attempts that you were able to revise

24   an essay.

25   **Q.**    Was there ever a time when you were unable to successfully

1  revise an essay in the end?

2  **A.**   I think -- I can't remember.

3  **Q.**   Okay.  Is that another reason that there could be a delay

4  between your perceiving that you finished a class and a grade

5  actually being posted?

6  **A.**   Yes.

7  **Q.**   Okay.  Can you continue and read the final page on -- I'm

8  sorry -- the final text on this page and then on through

9  page 107, please?

10  **A.**   On 3/19/2020, at 8:46 a.m., I said (as read):

11          "wait.  It is" -- "it's $71."

12          On 3/19/2020, at 9:59 a.m., he replied (as read):

13          "LOL.  No worries."

14          On 3/19/2020, at 10:00 a.m., he replied (as read):

15          "Did you finish another class?"

16          On 3/19/2020, at 10:12 a.m., I replied (as read):

17          "I'm about done with the fourth essay."

18          On 3/19/2020, at 10:16 a.m., he replied but there's no

19  message.

20          On 3/19/2020, at3 -- sorry -- at 12:35 p.m., I

21  responded (as read):

22          "Emily should have gotten a password.  If you

23      could check."

24          On 3/19 at 12:50 p.m., he responded (as read):

25          "I'm at training but I will text her."

**REED - DIRECT / SARGENT**

```
 1              On 3/19 at 12:51 p.m., I responded (as read):
 2              "KK.  I did put" -- "I did but she didn't
 3         answer."
 4              On 3/19/2020, at12:52 p.m., he responded (as read):
 5              "She's got a client at the house right now."
 6    Q.   And when you say "right now" --
 7    A.   Sorry.
 8    Q.   -- what does it actually say?
 9    A.   "RN."
10    Q.   Based on your text message correspondences generally and
11    with Mr. Amiri, what do you understand "RN" to mean?
12    A.   To mean right now.
13    Q.   Okay.  Can you continue?
14    A.   On 3/19/2020, at 12:52 p.m., I put "KK."
15              On 3/19/2020, at 8:08 p.m., I put (as read):
16              "Another class is closed, BM" -- "BAM312."
17              On 3/19/2020, at 1:09 p.m., Morteza responded (as
18    read):
19              "Two left?"
20              On 3/19/2020 and 1:09 p.m. I wrote "Yep."
21    Q.   Ms. Reed, do you have any recollection of what the prefix
22    "BAM" on a class meant?
23    A.   I don't.  I believe it was possibly the -- the, like, area
24    of study, but I -- I can't remember.
25    Q.   What this particular one was?
```

**REED - DIRECT / SARGENT**

1   A.   Yeah.

2   Q.   Okay.

3        All right.  Moving to previously admitted Exhibit 100,

4   at page 8, please.

5        Is there a matching course payment on March 19, 2020?

6   A.   Yes.

7   Q.   And moving to the next page, page 9, do you also see a

8   book payment that -- for $71?

9   A.   Yes, I do.

10  Q.   And did the text messages also discuss a book being $71?

11  A.   Yes.

12  Q.   Can you describe for the record the emoji on that -- on

13  that payment?

14  A.   It looks like a notebook or a book.

15  Q.   Okay.  I'd like to put up previously admitted Exhibit 55,

16  at page 2.  And if we could highlight the top right.

17       Are those text messages and the payments we just saw

18  consistent with BAM312, business communications, being

19  completed on March 19, 2020?

20  A.   Yes.

21  Q.   Going back to previously admitted Exhibit 82, at page 109,

22  can you read this page for the record, please?

23  A.   On March 25th, 2020, on -- 9:51 a.m., I responded (as

24  read):

25       "Just submitted for another final, so let me know

REED - DIRECT / SARGENT

1      when the password comes in.  And the book was $60."

2           On 3/25/2020, at 9:51 a.m., Morteza responded.

3    There's no text message there.

4           On 3/25/2020, at 9:51 a.m., I responded (as read):

5           "One more class and then I'm done with your ass

6           finally.  JK LOL."

7    Q.   Okay.  Now, let's look at a text from later the same day,

8    March 25, 2020, at page 116, please.

9           Can you read this page for the record?

10   A.   On 3/25/2020, at 1:17 p.m., I responded (as read):

11          "Just finished BAM410 class."

12          On 3/25/2020, at 2:02 p.m., he responded (as read):

13          "Sweet.  Thanks.  I'll Venmo you now."

14          On 3 --

15   Q.   We can stop there, actually.

16          I'd like to show you previously admitted Exhibit 100,

17   please, at page 8.

18          Ms. Reed, do you see a payment or payments on

19   March 25, 2020?

20   A.   Yes.

21   Q.   Can you describe those payments?

22   A.   One of the payments is on March 25th, 2020, with an open

23   book emoji for $60, and another payment on March 25th, 2020,

24   from Morteza saying "Yardwork" for $250.

25   Q.   Ms. Reed, has Mr. Amiri ever, in fact, paid you for doing

1  yardwork?

2  **A.**   No.

3  **Q.**   I'd like to show you previously admitted Exhibit 100 at,

4  page 8.  Oh.  That's where we are.  Sorry.

5         I'd like to show you previously admitted Exhibit 55

6  at, page 2.

7         And based on your experience with CCU and having done

8  these courses, is -- are those payments and those text messages

9  we just saw about BAM410 consistent with BAM410 here being

10  completed on March 30, 2020?

11  **A.**   Yes.

12  **Q.**   Moving back to previously admitted Exhibit 82, at

13  page 116, can you read the bottom text on this page through

14  page 118.

15  **A.**   On 3/27/2020, at 8:22 a.m., Morteza said (as read):

16         "Already started the last class?"

17         On 3/27/2020, at 8:22 a.m., he said (as read):

18         "Got hella e-mails last night."

19         On 3/27/2020, at 8:23 a.m., I replied (as read):

20         "No.  LOL.  I will tomorrow morning before we

21     come over.  I'm trying to finish my last two."

22         On 3/27/2020, at 6:45 a.m., he put (as read):

23         "Okay.  Cool."

24         On --

25  **Q.**   Sorry, and this one too, please.

**REED - DIRECT / SARGENT**

1    **A.**    On 3/27/2020, at 8:45 a.m., he liked my previous text

2    saying (as read):

3           "No.  LOL.  I will tomorrow morning before we

4        come over.  I'm trying to finish my last two."

5           On 3/27/2020, at 8:45 a.m., he put (as read):

6           "I'm going to rush order my degree to get my

7        pay" -- "pay raise jump started."

8           On 3/27/2020, at 8:47 a.m. I put "Okay."

9    **Q.**    Based on your knowledge of the CC system, do you have any

10   understanding of what Mr. Amiri meant by "rush order my

11   degree"?

12   **A.**    I -- from my recollection, once you receive the actual

13   diploma is when you're able to get the pay increase.  So until

14   the actual school is fully paid off, you can't receive the

15   actual degree.

16   **Q.**    To be clear, is that based on your experience with

17   Mr. Berhan's --

18   **A.**    Yes.

19   **Q.**    -- pay raise?

20          Okay.  But in terms of the CCU system itself, do you

21   know what that technically meant, rush ordering your degree?

22   **A.**    No.

23   **Q.**    Okay.  You did not, in fact, receive a degree from CCU?

24   **A.**    Right.  I didn't receive an official degree, no.

25   **Q.**    Okay.  Let's look at page 123 of this exhibit.

1         Can you read your text on this page for the record?

2  **A.**  On 4/7/2020, at 12:56 p.m., I put (as read):

3         "You are officially smarter" -- or "smart."

4  **Q.**  What did you mean?

5  **A.**  I was letting him know that all the courses were finished.

6  **Q.**  Okay.  Let's turn to page 130, please.

7         Can you read for the record the bottom text on this

8  page?

9  **A.**  On 4/14/2020, Morteza wrote (as read):

10        "this F'ing guy hasn't graded shit."

11  **Q.**  Was Mr. Amiri referring to this last class you took?

12  **A.**  Yes.

13  **Q.**  Can we turn to page 131?

14         And if you could read 131 to 133, please.

15  **A.**  On 4/14/2020, at 6:06 p.m., I replied I would e-mail him.

16         On 4/14/2020, 6:07 p.m., he responded (as read):

17         "Would that piss him off and make him fail me?"

18         On 4/14/2020, at 6:08 p.m., I put (as read):

19         "No.  I would just be nice about it.  Just tell

20  him the situation and I'm sure he'll work with you."

21         On 4/14/2020, at 6:08 p.m., I said (as read):

22         "Send me the e-mail before you send it."

23         On 4/14/2020, at 6:08 p.m., he put (as read):

24         "What's his e-mail?"

25         On 4/14/2020, at 6:16 p.m., I put (as read):

1          "Go on your Cal Coast and e-mail it through

2     there.  It will have you pick his class and then you

3     can e-mail the professor" -- "e-mail to the

4     professor."

5          On 4/14/2020, at 6:16 p.m., he put (as read):

6          "Hello, Professor Mufasa.  I apologize to bug

7     you, but I am e-mailing you to inquire about my

8     written exams for GED216.  I completed the exam about

9     a week ago and the exam's" -- "the exam's still in

10    pending status.  I have been in contact with the

11    registration" -- "registrar, and I am unable to

12    obtain my BS degree until these last written exams

13    are graded.  I understand with COVID-19 pandemic

14    everything has been put on hold, but I am hoping I

15    could obtain your assistance with finishing my

16    program.  I apologize for the inconvenience this may

17    have caused.

18         "Thank you, Amiri."

19 **Q.**   Okay.  And you can stop there.

20         In the bottom text message, does Mr. Amiri question

21 the text message he just sent?

22 **A.**   Yes.

23 **Q.**   Why did you ask Mr. Amiri to send you a draft of the

24 e-mail before he sent it?

25 **A.**   I just wanted to make sure he wasn't being too pushy.

**REED - DIRECT / SARGENT**

1   Q.   Okay.  Did the courses required for Mr. Amiri's bachelor's

2   degree finally get finished?

3   A.   Yes.

4   Q.   And so did this professor in fact return a grade for this

5   class?

6   A.   Yes.

7   Q.   Turning to previous admitted Exhibit 55, at page 2.

8        Is the back and forth we just looked at consistent

9   with GED216, introduction to sociology, being completed on

10  April 17, 2020?

11  A.   Yes.

12  Q.   Okay.  Let's turn to page 10.

13       THE COURT:  Of what exhibit, Counsel?

14       MS. SARGENT:  Huh?

15       THE COURT:  You said --

16       MS. SARGENT:  Oh, I'm sorry.  Exhibit 82.  Same

17  exhibit, please.

18       THE COURT:  Thank you.

19       MS. SARGENT:  Oh, not same exhibit.  I'm changing

20  exhibits.  Previously admitted Exhibit 82, page 10, please.

21  BY MS. SARGENT:

22  Q.   Can you read this page through page 12, please, Ms. Reed?

23  A.   On 1/15/2020, at 5:05 p.m., Morteza said (as read):

24       "let me check."

25       On 1/15/2020, at 5:06 p.m., I replied (as read):

REED - DIRECT / SARGENT

```
 1              "I'm already almost done with the class.  I
 2       couldn't find it on e-textbook."
 3   Q.   I'm sorry.  Can we actually go back to the previous page.
 4   Okay?  Go forward.  I apologize.
 5   A.   On --
 6   Q.   Can you read the bottom text message?  Now I think we were
 7   there.
 8   A.   On 1/15/2020, at 5:31 p.m., I responded (as read):
 9              "Who is your proctor?"
10   Q.   Next page, please.
11   A.   On 1/15/2020, at 5:53 p.m., he put (as read):
12              "IDK LOL."
13              On 1/15/2020, at 5:34 p.m., I put (as read):
14              "Okay.  I'll look."
15              On 1/15/2020, at 5:51 p.m., I responded (as read):
16              "Emily is your proctor.  Go on her e-mail and
17       screenshot the password it sends you."
18   Q.   We can stop there.  Thanks.
19              So we talked --
20              THE COURT:  Excuse me, Counsel.  I think we already
21   went through that.
22              MS. SARGENT:  I apologize, Your Honor.  That's -- I
23   realized that as we were going through, and I apologize for
24   that repetition and we can move forward.
25   \\\
```

1   BY MS. SARGENT:

2   Q.   Let's move to page 16.

3        Okay.  Can you please read this page and the next page

4   for the record?

5   A.   On 1/16/2020, at 7:23 a.m., I said (as read):

6        "I stayed up and got done four quizzes and two

7        essays.  So hopefully I'll have two of your classes

8        closed by today."

9        On 1/16/2020, at 7:24 a.m., he replied "Nice."

10       On 1/16/2020, at 7:24 a.m., he replied (as read):

11       "That's 5 hunid."

12       On 1/16/2020, at 5 -- sorry -- at 7:25 a.m., I

13  responded (as read):

14       "500 towards my hundred K student loan."

15       On 1/16/2020, at 7:26 a.m., he put "LMAO."

16       On 1/16/2020, at 7:28 a.m., I responded (as read):

17       "If you know anyone else that needs their school

18       done, I'll do it for 300 a class but keep it on the

19       DL."

20  Q.   Ms. Reed, we talked earlier about those conversations you

21  had with Mr. Berhan about potentially doing courses for other

22  people and we talked a little bit about the timeline of that.

23       At what point after you discussed Mr. Amiri's

24  coursework with Mr. Berhan did Mr. Berhan bring up other people

25  generally or other people specifically?

1          MR. CRUDO:  Objection.  Hearsay, Your Honor.

2          THE COURT:  I think she's asking for -- are you asking

3   for date or --

4          MS. SARGENT:  I am asking for, I suppose, Ms. Reed's

5   experience in the courses, when she was aware that -- that she

6   may be doing courses for other people.

7          THE COURT:  Sustain the objection.

8          MR. CRUDO:  Thank you.

9   BY MS. SARGENT:

10  Q.   At what point did you become aware that there may be other

11  people that you might do courses for?

12         MR. CRUDO:  Same objection, Your Honor.

13         THE COURT:  Well, overruled.  That's just asking about

14  her awareness, not necessarily at this point, how she became

15  aware.

16         So I guess you're asking for a relative time period?

17         MS. SARGENT:  Yes, Your Honor.

18         THE COURT:  Overruled.

19         THE WITNESS:  I would say shortly after that, within a

20  couple of weeks, maybe a month or so.

21  BY MS. SARGENT:

22  Q.   Okay.  And in this text message with Mr. Amiri, you

23  referenced potential other people and you wrote "Keep it on the

24  DL."

25         Why -- why did you reference keeping this comment on

REED - DIRECT / SARGENT

1    the DL?

2    **A.**    It was stressed from both Patrick and Morteza that I do

3    not talk about these things with anybody.

4    **Q.**    Okay.  Let's flip to page 41.

5         Can you read the top two text messages on this page?

6    **A.**    On 1/20/2020, at 4:36 p.m., he put (as read):

7         "my sergeant might use you."

8         On 1/20/2020, at 4:36 p.m., he said (as read):

9         "You do master's degrees too?"

10   **Q.**    Okay.  Did Mr. Amiri ever refer a sergeant to you?

11   **A.**    No.

12   **Q.**    Did he ever refer anyone else to you?

13   **A.**    Yes.

14   **Q.**    Who was that?

15   **A.**    Samantha Peterson.

16   **Q.**    Did Mr. -- we'll get to that, but did Mr. Amiri ever

17   mention this sergeant to you again?

18   **A.**    No, I don't believe so.

19   **Q.**    Did you ever complete coursework for anyone else at the

20   Antioch Police Department?

21   **A.**    No.

22   **Q.**    Were any of the other people you actually did coursework

23   for from the Antioch Police Department?

24   **A.**    I -- no.  I believe they were from Pittsburg.

25   **Q.**    Did Mr. Amiri follow up further regarding getting a

1  master's degree?

2  **A.**    We did have a conversation, yes.

3  **Q.**    And can you just generally describe that conversation?

4  **A.**    It was a conversation about him getting another increase,

5  from my recollection -- recollection, about a master's.  He

6  asked about the master's and, unfortunately, he wouldn't get a

7  pay increase unless he became higher ranked within the

8  department.

9  **Q.**    Okay.  Let's turn to page 110.

10           And, I'm sorry, did Mr. Amiri explain to you, in the

11  course of that conversation, about what he meant by higher

12  ranked within the department?

13  **A.**    From what I remember, it was if you move up to like a

14  lieutenant or a sergeant, that you would be able to use that

15  master's to get another increase.

16  **Q.**    Okay.  So let's look at this conversation.

17           Could you please read this page for the record?

18  **A.**    On 3/25/2020, at 9:52 a.m., he said (as read):

19           "Ha ha.  Probably going to sign up for the

20        master's course after."

21           On 3/25/2020, Morteza said (as read):

22           "It's expensive, though.  11K."

23           On 3/25/2020, at 9:53 a.m., I responded (as read):

24           "Patrick just signed up too.  It's worth it for

25        sure for him.  Do you have an incentive for school or

 1         does it just get you to your advanced post faster?"

 2    Q.   Okay.  And is this the -- some of the initial discussion

 3    that we were just talking about?

 4    A.   Yes.

 5    Q.   Okay.  Can we turn to the next page, please?

 6         And if you could read on through page 114, please.

 7    A.   On 3/25/2020, 9:53 a.m., I corrected myself with an

 8    asterisk and put "Quicker."

 9         On 3/25/2020, at 9:53 a.m., Morteza responded (as

10    read):

11         "5 percent for bachelor's.  7.5 for master's."

12         On 3/25/2020, at 9:54 a.m., he responded (as read):

13         "If he's doing it too, then we should probably

14    pick the same degree."

15    Q.   And can we go to the next page, please?

16    A.   On 3/25/2020, at 9:54 a.m., he responded (as read):

17         "He's doing criminal justice, I assume?"

18         On 3/25/2020, at 9:54 a.m., I put (as read):

19         "Yeah, he is."

20         On 3/25/2020, at 9:54 a.m., Morteza responded (as

21    read):

22         "Okay.  Cool."

23    Q.   And one more page, please.

24    A.   On 3/25/2020, at 9:55 a.m., Morteza said (as read):

25         "Should be all the same shit then?"

1              On 3/25/2020, at 9:55 a.m., I responded (as read):

2              "You going to put" -- "You going to put source

3        that to me?  LOL."

4   Q.   Ms. Reed, do you take that to be a typo?

5   A.   Yes.

6   Q.   What do you think you meant there, based on your

7   recollection?

8   A.   "You going to source that out to me too?"

9   Q.   Okay.  Can you go on and also read the next page, please?

10  A.   On 3/25/2020, at 9:55 a.m., he responded (as read):

11             "Probably if you're going to be doing it

12        anyways."

13             On 3/25/2020, at 9:55 a.m., he responded (as read):

14             "It's like doing the same class twice."

15  Q.   You can stop there.  Thank you.

16             Did you ultimately end up completing a master's for

17  Mr. Amiri?

18  A.   No, I did not.

19  Q.   Why did you not?

20  A.   It didn't benefit him in any way until he moved into a

21  lieutenant position.

22  Q.   Okay.  Can we turn to page 141 of this exhibit, please?

23             Can you read this page for the record?

24  A.   On 4/26/2020, at 12:24 p.m., Morteza said (as read):

25             "Bad news.  Although I signed up for my master's,

1    I just found out we don't get paid for it.  Only

2    lieutenants and up."

3        On 4/26/2020, at 12:27 p.m., I put (as read):

4    "Oh, that sucks.  Okay."

5        On 4/26/2020, at 12:28 p.m., he put (as read):

6    "I know.  Hella annoying.  Wanted TY at extra

7    boost in pay."

8  Q.   Moving on to a different subject, did Mr. Amiri ever

9  express concern to you about keeping your arrangement

10 confidential?

11 A.   Yes.

12 Q.   Can we turn to page 30, please, of this exhibit?

13        Can you read for the record the last two text messages

14 on this page?

15 A.   On 1/19/2020, at 12:43 p.m., he put (as read):

16    "Do me a solid and don't tell a soul about me

17    hiring you for this.  We can't afford it getting

18    leaked and me losing my job and et cet."

19        On 1/19/2020, at 12:48 p.m. I responded (as read):

20    "I know.  LOL.  I'm not dumb.  I haven't told

21    anyone."

22 Q.   And can you look at the next page, please?

23        How does Mr. Amiri respond in the middle text message?

24 A.   He liked the previous text message on 1/19/2020, at

25 12:49 p.m.

1    Q.   And for the record, what was that text message he liked?

2    A.   (as read):

3          "I know.  LOL.  I'm not dumb.  I haven't told

4    anyone."

5    Q.   Okay.  Thank you.

6          Let's move to page 100 of this exhibit.

7          Can you read the second two text messages on this page

8    for the record?  Actually, just the last -- the last text

9    message, please.

10   A.   I said, on 3/9/2020, at 5:59 p.m. (as read):

11          "Okay.  I have someone else classes I'm doing as

12          soon as I finish yours, so give me like a month after

13          that to start it."

14   Q.   And going back to the page you were responding to

15   Mr. Amiri's text, what were -- to start what?  What were you

16   referring to there?

17   A.   I was starting another officer's courses.

18   Q.   Okay.  Who were you talking about in this text message?

19   A.   I believe it was about Amanda Theodosy.

20   Q.   Did you end up completing courses for Ms. Theodosy?

21   A.   Yes.

22   Q.   And, in fact, did you complete a degree for Ms. Theodosy?

23   A.   Yes, I did.

24   Q.   Did you know Ms. Theodosy prior to doing coursework for

25   her?

1   **A.**   Yes.

2   **Q.**   How did you know her?

3   **A.**   She went to the academy with Patrick.

4   **Q.**   How long had you known her?

5   **A.**   A couple of years before that.  We were all pretty good

6   friends.

7   **Q.**   Okay.  How did you first learn that Ms. Theodosy's

8   coursework was going to be done by yourself?

9   **A.**   Through Patrick.

10   **Q.**   Okay.  How did you first connect with Ms. Theodosy about

11   the coursework?

12   **A.**   I believe it was over text message.

13   **Q.**   Okay.  What police department did -- or I'm sorry.

14        Where did Ms. Theodosy work, if you know?

15   **A.**   Pittsburg Police Department.

16   **Q.**   And was that also where Mr. Berhan worked?

17   **A.**   Yes.

18   **Q.**   You mentioned earlier that taking classes for other

19   people -- or that it was your perception that taking classes

20   for other people helped Patrick.  Do you recall that?

21   **A.**   I -- I guess, what do you mean?

22   **Q.**   Yes.  Can you remind us why you took classes for other

23   people, other than Mr. Berhan?

24   **A.**   They were Patrick's friends and they wanted the same

25   benefit of getting more money per paycheck as Patrick did.

**REED - DIRECT / SARGENT**

1  Q.   And -- but why did you -- why did that make you decide to

2  take courses for them?

3  A.   Patrick had asked me to; and they were good friends, and I

4  wanted them to succeed just like Patrick was.

5  Q.   Okay.  At any point prior to Ms. Theodosy reaching out to

6  you about coursework, had you mentioned to Ms. Theodosy that

7  you were taking courses for other officers?

8  A.   No.  I don't recall.

9  Q.   Okay.  And when you had that discussion with Mr. Berhan

10  about Ms. Theodosy, do you remember if that was before or after

11  you received a text message from her?

12  A.   I believe, from what I recall, that me and Patrick had an

13  in-person conversation about it and he would let me know before

14  they would just reach out.

15  Q.   Okay.  And is that your recollection that's what happened

16  in this case with Ms. Theodosy?

17  A.   Yes.

18  Q.   How did you generally communicate with Ms. Theodosy?

19  A.   Through text message.  We would see each other sometimes

20  in person, though.

21  Q.   Did your arrangement involve receiving payment from

22  Ms. Theodosy?

23  A.   Yes.

24  Q.   Can you describe that arrangement?

25  A.   It was solely through Venmo.

**REED - DIRECT / SARGENT**

1   Q.   How did you determine how much Ms. Theodosy would pay you?

2   A.   Patrick had let me know, because of what I charged

3   Morteza, that that's a fair assessment.  I can't remember if we

4   had charged a little bit more or not.

5   Q.   And how did you communicate the costs per course to

6   Ms. Theodosy?

7   A.   Through text message.

8   Q.   Okay.  And I'm sorry if you already said this.  How did

9   she pay you?

10  A.   Through Venmo.

11  Q.   Okay.  Did you begin taking courses for Ms. Theodosy?

12  A.   Yes, I did.

13  Q.   What was her plan of study?

14  A.   Criminal justice.

15  Q.   Did you need a password and log-in to access her account?

16  A.   Yes.

17  Q.   How did you receive those things?

18  A.   Through text message.

19  Q.   And were you able to successfully access her account?

20  A.   Yes.

21  Q.   I am going to show you an exhibit that was previously

22  admitted yesterday as Exhibit 319.

23       Ms. Reed, do you recognize this type of document?

24  A.   Yes, I do.

25  Q.   Can you remind us what type of document this is?

**REED - DIRECT / SARGENT**

1  **A.**  This is an unofficial transcript from CCU.

2  **Q.**  And can you tell from this transcript whose transcript it

3  is?

4  **A.**  Yes.  It's Amanda's.

5  **Q.**  Do you recognize the courses on this transcript?

6  **A.**  Yes.

7  **Q.**  How do you recognize the courses on this transcript?

8  **A.**  I took most of these courses.

9  **Q.**  Can we zoom in on the right-hand column?

10       Do you recollect which of these courses you took for

11  Ms. Theodosy?

12  **A.**  I -- it was starting Spring 2020; and it was the forensic

13  science, mathematics, criminal behavior, domestic violence,

14  juvenile justice, computer forensic and cyber crime research

15  methods in criminal justice and criminology, early United

16  States history, operations management.

17  **Q.**  Thank you.

18       I'd like to show you a document that has not been

19  admitted, Exhibit 102.

20       And can we page through this document for the witness

21  just so she can see the full extent?

22       Ms. Reed, do you recognize this document?

23  **A.**  Yes.

24  **Q.**  How do you recognize it?

25  **A.**  It's Venmo transactions that I provided you guys between

1    me and Amanda Theodosy.

2    **Q.**    Okay.  And can you describe how you got this record to

3    provide to us?

4    **A.**    This was directly from my Venmo account.

5    **Q.**    Okay.  And how did you create that -- or how did you

6    assemble these records?

7    **A.**    I went under my transaction history on Venmo.  I was able

8    to only separate the ones between me and Amanda Theodosy and

9    then screenshot them and print them out.

10   **Q.**    Did you alter the screenshots in any way when you printed

11   them out?

12   **A.**    No, I did not.

13   **Q.**    What is the yellow tab on the first page?

14   **A.**    It's labeled "School."

15   **Q.**    And who put that yellow tab on and wrote "School"?

16   **A.**    Myself.

17          **MS. SARGENT:**  Move to admit.

18          **THE COURT:**  Any objection?

19          **MR. CRUDO:**  No objection, Your Honor.

20          **THE COURT:**  Admitted.

21       (Trial Exhibit 102 received in evidence.)

22          **MS. SARGENT:**  Permission to publish, Your Honor.

23          **THE COURT:**  Yes.  And I would suggest that, given the

24   previous testimony, you don't need to go through this in

25   detail.

1          **MS. SARGENT:**  We don't intend to, Your Honor.

2          **THE COURT:**  Very well.  Thank you.

3          Yes, you may publish.

4  **BY MS. SARGENT:**

5  **Q.**   Just to take one example, on this first page, May 5, 2020,

6  why did Amanda Theodosy pay you $200 on May 5, 2020?

7  **A.**   For taking one of her classes.

8  **Q.**   How do you know, sitting here, that this payment is for a

9  class?

10  **A.**   Because I would message her and let her know that a class

11  was completed.  Me and Amanda did not -- we were not that close

12  where we'd pay each other or have other Venmo transactions.

13  **Q.**   So was there any other reason that Amanda Theodosy would

14  have paid you $200 on this day?

15  **A.**   No.

16  **Q.**   Are there any other reasons that any of the other

17  transactions in the packet you provided would have existed?

18  **A.**   No.

19  **Q.**   Okay.  Generally speaking, how did Ms. Theodosy know when

20  to pay you?

21  **A.**   I would text her and let her know that the class was

22  complete.

23  **Q.**   Okay.  Let's move to the last page.

24          Ms. Reed, I notice that this last payment on June 17,

25  2020, is for $300, which is more than the others.  Do you have

**REED - DIRECT / SARGENT**

1  a recollection, sitting here, of why this payment was for more

2  than the other payments?

3  **A.**   I believe this was the last payment for the classes once I

4  completed the full bachelor's degree.

5  **Q.**   Okay.  We can take that down.  Thank you.

6         Ms. Reed, you previously mentioned someone named

7  Samantha Peterson.  Do you remember that?

8  **A.**   Yes.

9  **Q.**   Did you also complete coursework for an officer named

10  Samantha Peterson?

11  **A.**   Yes.

12  **Q.**   Do you know where Ms. Peterson worked?

13  **A.**   Antioch Police Department.

14  **Q.**   Okay.  How did you come to begin to take coursework for

15  Samantha Peterson?

16  **A.**   She had reached out to me over a text message.

17         **MR. CRUDO:**  Objection, Your Honor.  Hearsay.

18         **THE COURT:**  Sustained.

19         You need to ask without reference to getting into a

20  hearsay statement, if you can.

21         **MS. SARGENT:**  Yes, I didn't think I was, Your Honor,

22  so I'm trying to think to myself how to reformulate this.

23  **BY MS. SARGENT:**

24  **Q.**   Why did you begin -- without making a reference to -- to

25  the -- why did you begin to take courses for Ms. Peterson?

1    **A.**    I was asked to and then I received a text message from

2    her.

3            **MR. CRUDO:**  Objection, Your Honor.  Hearsay.  Move to

4    strike.

5            **THE COURT:**  Are you offering this for the truth of the

6    matter or to explain why she began to take courses?

7            **MS. SARGENT:**  To explain why she began to take

8    courses, and I'm struggling with figuring out how to do that.

9            **THE COURT:**  Well, in light of that, I'm going to

10   overrule the objection and, again, instruct the jury that, at

11   this point in the trial, you're not to accept or construe

12   anything that Ms. Peterson may have said for the truth of that

13   matter, only to explain those conversations with Ms. Peterson

14   and the witness.  You may only consider those, if at all, to

15   explain why Ms. Reed took the action that she says she took.

16           Go ahead.

17           **MS. SARGENT:**  Thank you, Your Honor.

18           **THE COURT:**  Overruled.

19           You may answer -- or ask it again because I've been

20   babbling for the last three minutes, so...

21   **BY MS. SARGENT:**

22   **Q.**    So with all that in mind, can you explain why you began to

23   take classes for Ms. Peterson?

24   **A.**    I was asked to take the classes for her, and then I

25   received a text message from Ms. Peterson introducing herself.

**REED - DIRECT / SARGENT**

1    Q.    Okay.  And was it the case that you would take classes for

2    anyone who texted you?

3    A.    No.

4    Q.    Did you know Ms. Peterson prior to her texting you?

5    A.    No.

6    Q.    Was she -- was her phone number in your phone?

7    A.    No.

8    Q.    So why was it -- when she texted you, did you begin to

9    take classes for her?

10   A.    Because I trusted --

11   Q.    I'm sorry.  When she texted you, did you, in fact, begin

12   to take classes for her?

13   A.    Yes.

14   Q.    Why did you make that decision?

15   A.    Because I was asked to do them from someone I trusted.

16         MS. SARGENT:  Your Honor, I think she can say who that

17   was because it's her -- the reason for her actions.

18         THE COURT:  Objection?  Do you have an objection?

19         MR. CRUDO:  I don't.  I mean, I think we have the

20   answer.

21         THE COURT:  Right.  Overruled.

22         Tell us who the person was.

23         THE WITNESS:  Morteza Amiri.

24         MR. CRUDO:  Your Honor, if I could have a --

25         THE CLERK:  Can you please approach the mic?

1      **MR. CRUDO:**  Sure.

2          I understand this is coming in not for the truth of

3   the matter asserted, and I understand the Court's instruction

4   to the jury is a continuing instruction for all these alleged

5   communications.

6          **THE COURT:**  For the moment, yes, that's correct.

7          **MS. SARGENT:**  Your Honor, but I would also note that

8   the name she just gave is the defendant's name, and so --

9          **THE COURT:**  I understand that, and it's a different

10  situation --

11         **MS. SARGENT:**  Yes.

12         **THE COURT:**  -- with respect to a defendant.

13         So, ladies and gentlemen, without getting too deeply

14  into the legal weeds -- I've already gone pretty deep -- but I

15  want you to understand what's going on.

16         Statements, if made by a defendant, if you find that a

17  defendant made statements, are not considered hearsay.  They

18  are, by law, in federal court, not hearsay.

19         So if a defendant in a case says something that the

20  Government claims may be an admission, then that is not

21  considered hearsay and can be -- and can be accepted by you if

22  you find that that statement was made for the truth of the

23  matter.

24         All right.  Continue.

25         **MS. SARGENT:**  Thank you, Your Honor.

1    BY MS. SARGENT:

2    Q.   Can you tell us about that conversation with Mr. Amiri?

3    A.   I believe it was in person.  He just let me know that

4    somebody was going to reach out from his work that needed help

5    with coursework, and Patrick had also known about this prior.

6    Q.   Okay.  Did your arrangement with Ms. Peterson involve you

7    receiving payment from Ms. Peterson?

8    A.   Yes.

9    Q.   How much did Ms. Peterson pay you per course?

10   A.   I believe it was like 250 to $300.

11   Q.   How was that arranged?  Do you remember?

12   A.   It was something that I asked Patrick how much would be a

13   fair amount.

14   Q.   How did Ms. Peterson pay you?

15   A.   Through Venmo.

16   Q.   Did you begin taking courses for Ms. Peterson?

17   A.   Yes.

18   Q.   What was Ms. Peterson's course of study?

19   A.   It was criminal justice.

20   Q.   Did Ms. Peterson give you access to her CCU account?

21   A.   Yes, she did.

22   Q.   And what information did you need to have access to her

23   CCU account?

24   A.   Her log-in information, including her username, and then

25   the password.

**REED - DIRECT / SARGENT**

1   Q.   Did you successfully access her CCU account?

2   A.   Yes.

3   Q.   And did you complete courses for Ms. Peterson?

4   A.   Yes.

5   Q.   Did you complete enough courses to complete a degree for

6   Ms. Peterson?

7   A.   Yes, I did.

8   Q.   I'd like to show you a document that was previously

9   admitted yesterday as Exhibit 320.  We've talked about this

10  form of document.

11          Ms. Reed, do you recognize the name in the top left

12  corner of this document?

13  A.   Yes, I do.

14  Q.   Whose name is that?

15  A.   Samantha Peterson.

16  Q.   Do you recognize -- well, let's zoom into the right -- the

17  right column, please.

18          Do you recognize the courses listed here?

19  A.   Yes, I do.

20  Q.   How do you recognize them?

21  A.   I took most of these courses.

22  Q.   Okay.  Sitting here, do you remember which ones you took?

23  A.   I believe it was the ones starting from Fall 2020,

24  criminal behavior, terrorism, forensic science, research

25  methods in criminal justice and criminology, domestic violence,

REED - DIRECT / SARGENT

1   criminal law; and then Winter 2021, criminology, introduction

2   to sociology, and Homeland Security.

3       **MS. SARGENT:**  Okay.  I'd like to show the witness an

4   exhibit that's not been admitted.  It's Exhibit 103.

5       **THE COURT:**  And just for your own timing, Counsel,

6   we're going to take our second break at 10:45.

7       **MS. SARGENT:**  10:45?

8       **THE COURT:**  Yes.

9       **MS. SARGENT:**  Okay.  I think we can move through this

10  quickly and then take a break.

11      **THE COURT:**  Okay.  Not too quickly.

12  **BY MS. SARGENT:**

13  **Q.**   Ms. Reed, do you recognize this document?

14  **A.**   Yes.

15  **Q.**   How do you recognize it?

16  **A.**   It was me requesting Samantha Peterson for $275 through

17  Venmo on November 18th, 2020.

18  **Q.**   And was this part of a multipage document that you

19  provided to the Government.

20  **A.**   (No verbal response.)

21  **Q.**   Can you describe how you got the records within this

22  document?

23  **A.**   Yes.  I went on my Venmo page, through my transaction

24  history.  I was able to sort out just Samantha Peterson's

25  transactions and then screenshot them and print them out.

**REED - DIRECT / SARGENT**

1  Q.    And in this packet of records, did you alter the

2  screenshots in any way when you captured them?

3  A.    No.

4  Q.    What is this yellow tab on the first page?

5  A.    It says "School," and it was a handwritten sticky note

6  that I put on there.

7  Q.    Who wrote "School"?

8  A.    Myself.

9          MS. SARGENT:  Move to admit.

10          MR. CRUDO:  No objection, Your Honor.

11          THE COURT:  Admitted.

12      (Trial Exhibit 103 received in evidence.)

13          THE COURT:  Would this be a good time to take our

14  break?

15          MS. SARGENT:  This is a fine time, Your Honor.

16          THE COURT:  All right.  Ladies and gentlemen, we're

17  take -- take our last 15-minute break.  We're stopping at

18  12:15.

19          Please remember the Court's usual admonitions.

20          You're excused for 15 minutes.

21          You may step down.

22              (The jury leaves the courtroom.)

23               (Recess taken at 10:42 a.m.)

24          (Proceedings resumed at 10:58 a.m.)

25              (The jury enters the courtroom.)

```
 1          (Proceedings were heard in the presence of the jury.)

 2          THE CLERK:  All rise.

 3          Please be seated.

 4                  (Pause in proceedings.)

 5          THE CLERK:  Please remain seated.  Come to order.

 6   Court is back in session.

 7          THE COURT:  Please have the witness resume the stand.

 8                  (Pause in proceedings.)

 9          THE COURT:  You may proceed.

10          MS. SARGENT:  Thank you, Your Honor.

11   BY MS. SARGENT:

12   Q.   Ms. Reed, we were just looking at Exhibit 103, which we

13   just admitted.

14          Can we please put that up?

15          And can we page through this exhibit?  Just until the

16   end.

17          Oh, I'm sorry.

18          A JUROR:  Our monitor is not working.  Just ours,

19   though?

20          THE COURT:  The monitor's not working.

21          All good?  Thumbs-up, please.

22          Okay, thank you.

23          Proceed.

24   BY MS. SARGENT:

25   Q.   Ms. Reed, I believe you testified that you did not know
```

1    Ms. Peterson previously to this; is that correct?

2    A.    Yes.

3    Q.    Had you ever exchanged any payments with Ms. Peterson

4    other than these payments?

5    A.    No.

6    Q.    Did you ever exchange any future payments with

7    Ms. Peterson?

8    A.    No.

9    Q.    Was there any reason for Ms. Peterson to have made these

10   payments to you other than for your work on her courses?

11   A.    No.

12   Q.    Did you ultimately complete Ms. Peterson's bachelor's

13   degree for her?

14   A.    Yes.

15   Q.    And did you notify her that you had completed it?

16   A.    Yes.

17   Q.    Okay.  Were there any other officers you completed

18   coursework for?

19   A.    Yes.

20   Q.    Can you name one?

21   A.    Brauli Rodriguez.

22   Q.    Did you know Mr. Rodriguez prior to doing coursework for

23   him?

24   A.    Yes.

25   Q.    How did you know Mr. Rodriguez?

**REED - DIRECT / SARGENT**

1   **A.**   His wife was one of my best friends.

2   **Q.**   And do you know how Mr. Rodriguez was employed?

3   **A.**   Yes.

4   **Q.**   How was he employed?

5   **A.**   Through Oakland Housing Authorities.

6   **Q.**   To your knowledge, had Mr. Rodriguez ever worked anywhere

7   else?

8   **A.**   Yes.  Pittsburg Police Department.

9   **Q.**   And did Mr. Berhan also know Mr. Rodriguez?

10  **A.**   Yes.

11  **Q.**   How did you know Mr. Rodriguez's wife?

12  **A.**   We -- I met Eva through Patrick.  Brauli and Patrick had

13  worked together at Pittsburg PD, and we became very close and

14  started vacationing and spending a lot of the time with them.

15  **Q.**   Okay.  How did you first connect with Mr. Rodriguez about

16  his request for coursework?

17  **A.**   His -- Brauli and Patrick had chatted about it quite

18  often, and Eva --

19          **MR. CRUDO:**  Objection.  Hearsay, Your Honor.

20          **THE COURT:**  Sustained.

21          Move on to something else, please.

22          **MS. SARGENT:**  Okay.

23  **BY MS. SARGENT:**

24  **Q.**   Did your arrangement involve you receiving payment from

25  Mr. Rodriguez?

1    A.    Yes.

2    Q.    Do you remember roughly how much Mr. Rodriguez paid you

3    per course?

4    A.    About 250 or 300.

5    Q.    How did you determine to charge 250 or $300?

6    A.    I was told how much to charge.

7    Q.    By whom?

8    A.    By Patrick.

9    Q.    And how did Mr. Rodriguez pay you that money?

10   A.    It was through cash.

11   Q.    Did he pay it to you directly?

12   A.    No.  His wife, Eva, had given me the cash.

13   Q.    Okay.  Had Mr. Rodriguez already begun taking coursework

14   at CCU at this time?

15   A.    I don't believe so.  I think I had helped them enroll and

16   start the courses.

17   Q.    Okay.  What was Mr. Rodriguez's course of study?

18   A.    Criminal justice.

19   Q.    And did you need a password and log-in in order to access

20   his account?

21   A.    Yes.

22   Q.    Did you receive those?

23   A.    Yes.

24   Q.    And did you successfully access the account?

25   A.    Yes.

**REED - DIRECT / SARGENT**

1  Q.  When you signed into his account, were you able to take

2  courses for him?

3  A.  Yes.

4  Q.  And did you, in fact, take courses for him?

5  A.  Yes.

6  Q.  Do you recall roughly how many courses you completed for

7  Mr. Rodriguez?

8  A.  It was only like one or two courses.

9  Q.  Okay.  We'll come back to that.

10      Was there anyone else you completed coursework for?

11 A.  Ernesto Mejia.

12 Q.  Okay.  Did you know Mr. Mejia prior to doing coursework

13 for him?

14 A.  I knew him just casually from like Pittsburg Police

15 Department holiday parties or if I had gone to the police

16 department for any reason.

17 Q.  And why did you -- why did you begin taking courses for

18 Mr. Mejia?

19 A.  I was asked to take courses for him.

20 Q.  Did you interface with Mr. Mejia directly?

21 A.  No.

22 Q.  Regarding coursework, mean.

23 A.  I don't believe -- I don't think we had any, really,

24 interaction.  It was mostly through Patrick.

25 Q.  Okay.  How -- did your arrangement with Mr. Mejia involve

**REED - DIRECT / SARGENT**

1   you receiving payment?

2   **A.**   Through cash.

3   **Q.**   How much, roughly, did Mr. Mejia pay you per course, if

4   you recall?

5   **A.**   Only about 250 to 300 as well.

6   **Q.**   And that cash, did he give it directly to you?

7   **A.**   No.

8   **Q.**   How did you receive it?

9   **A.**   He gave it to Patrick during work and Patrick brought it

10  home.

11  **Q.**   Okay.  Had Mr. Mejia already begun taking his degree at

12  the time?

13  **A.**   Yes.

14  **Q.**   What was his program of study?

15  **A.**   I believe it was criminal justice as well.

16  **Q.**   Did Mr. Mejia give you access to his CCU account?

17  **A.**   Yes.

18  **Q.**   And when you signed into -- were you able to sign into his

19  account?

20  **A.**   Yes.

21  **Q.**   And did you complete coursework for Mr. Mejia?

22  **A.**   Yes.

23  **Q.**   Do you recall, roughly, how many courses you took for

24  Mr. Mejia?

25  **A.**   Yeah.  His bachelor's degree was close to being finished,

1    so it was only two or three classes.  And there was one course

2    that he was having a lot of issues with, so I took over.

3    Q.    Okay.  Did you ultimately complete a degree for Mr. Mejia?

4    A.    Yes.

5    Q.    Okay.

6    A.    Technically, yes.

7    Q.    What do you mean "Technically, yes"?

8    A.    He -- I can't remember if the very last class that he

9    finished was around the time that I finished the class for him.

10   Q.    Okay.  You mentioned earlier that you only did --

11   regarding Mr. Rodriguez, that you only did one or two classes

12   for him.  Had you intended to do more?

13   A.    Yes.

14   Q.    Why did you stop?

15   A.    During that time, an officer at Pittsburg Police

16   Department --

17   Q.    No, we don't need details.  But why did you stop without

18   details?

19   A.    During that time, another officer was walked out.

20   Q.    Again, we don't --

21   A.    Sorry.

22   Q.    Was -- were you told to stop?

23   A.    Yes.

24   Q.    Without providing details about why you were told to stop

25   in those underlying conversations, who told you to stop?

**REED - DIRECT / SARGENT**

1   **A.**   Patrick.

2   **Q.**   Do you remember how he said that?

3   **A.**   He explained to me that we need --

4           **THE COURT:**  All right.  Let's move on.   Thank you.

5   **BY MS. SARGENT:**

6   **Q.**   Was it -- was it ultimately your impression that -- strike

7   that.

8           Did Mr. Berhan generally display concern around this

9   time?

10  **A.**   Yes.

11  **Q.**   Around this time, did anything else significant in your

12  life happen?  When was this, first of all?

13  **A.**   This was May 2021.  During this time, it -- it was very

14  stressful.  I had to get rid of my Apple ID.

15  **Q.**   Let's pause there.

16          **MR. CRUDO:**  Your Honor, may we have a sidebar, please?

17  I think we're going to -- the witness may be getting into areas

18  that the judge has already talked about in some pretrial

19  orders.

20          **MS. SARGENT:**  I'd like to discuss, if Your Honor

21  would --

22          **THE COURT:**  I'm sorry.  Say it into the microphone.   I

23  can't hear you.

24          **MS. SARGENT:**  Yes, Your Honor.  The Government would

25  request a sidebar too, if Your Honor is willing.

1          **THE COURT:**  All right.  We're going to have a sidebar.

2          You may stand, if you wish to, while we're doing that.

3          And let's wait for the court reporter.

4          (The following proceedings were heard at the sidebar:)

5          **THE COURT:**  So why don't you tell me your offer of

6     proof, then I'll hear your objection.

7          **MS. SARGENT:**  So the two points that are -- there two

8     things that are very relevant here.  Number one, the reason we

9     do not have text messages --

10         **THE COURT:**  Wait, wait.  You're way ahead of me

11    because -- what is it you're going -- what are you trying to

12    adduce?

13         **MS. SARGENT:**  Two things that I'm trying to anticipate

14    that Ms. Reed will testify to; that she deleted all of her text

15    messages at this time period, was unable to provide the

16    Government any text messages for Ms. Theodosy or Ms. Peterson

17    because of something that happened at work.  I don't intend to

18    get into that.  The other significant thing that happened at

19    this time -- and that was because Mr. Berhan indicated that the

20    secret might be uncovered.

21         The other significant thing that happened was that

22    Mr. Berhan told Ms. Reed that they needed to get married

23    immediately, and they had a conversation with the defendant in

24    which the defendant said that he agreed that things would be

25    easier if they were married.  This is a suggestion that marital

1   privilege might be involved, I believe.

2         **THE COURT:**  So who were the people getting married?

3   Berhan and Reed?

4         **MS. SARGENT:**  Berhan and Reed were close to Mr. Amiri,

5   and Mr. Amiri implied to Ms. Reed things would be easier if

6   Mr. Berhan and Ms. Reed were married because -- which, the

7   Government would submit, shows consciousness of guilt.

8         **THE COURT:**  All right.

9         **MR. CRUDO:**  This runs directly into the conduct in the

10   other case.  More important, Mr. Amiri is not involved in the

11   steroid issue.  The -- I'm getting ahead of Your Honor.

12         The witness -- the specific -- the witness, the

13   officer that she was referring to was Mr. Manly, not anybody

14   who was involved in this case; and that Mr. Berhan and

15   Mr. Manly were using steroids.  And that is the subject that

16   Mr. Amiri has nothing to do with.  That is why the phone was

17   wiped.  That is why the computer was wiped.

18         We are now going to get into this:  Is it -- is it

19   relevant that she wiped her phone and her computer?

20         Yes, I think she can say that she did that.  I think

21   getting into the reasons for that other than to say they had

22   referred to reasons other than this is very prejudicial.

23         **THE COURT:**  Okay.  What about -- okay.

24         So that's one part of it.  But what about the part of

25   the discussion with Mr. Amiri about getting married?  Because I

 1  think that's an admission and the jury could find that that is

 2  relevant too.

 3          MS. SARGENT:  And, Your Honor --

 4          THE COURT:  One at a time.

 5          MR. CRUDO:  Again, I think in the context of the time

 6  that this was happening, nobody was thinking about this.  The

 7  issue was Mr. Manly, who had been walked out, was related to --

 8  primarily related to steroids which Mr. Berhan also had a

 9  problem with, not Mr. Amiri.  And so there's going to be a

10  taint that Mr. Amiri relates to this conduct and that Mr. Amiri

11  is somehow involved in this when he wasn't, and that's very

12  prejudicial.

13          THE COURT:  All right.  Go ahead.

14          MS. SARGENT:  Your Honor, I was going to say that I

15  expect that the witness will testify -- that I will not ask her

16  anything about steroids, but I expect she will testify that the

17  existence of text messages related to the college fraud scheme

18  are part of what the concern was within the phone and about

19  getting married.

20          THE COURT:  Okay.  So I think -- I think that what --

21  the way counsel just characterized that, I think it's a jury

22  question of how to construe that.  But I'm going to require

23  that -- you can object, of course -- at least initially, to

24  lead here.

25          MR. CRUDO:  I would and that -- yes.

1        **THE COURT:**  To the point of "I deleted them," and just

2   very briefly based upon what concerns, but relating to the

3   alleged college scheme.

4        And then I think any conversation between Mr. Amiri

5   about the subject of getting -- the importance of getting

6   married, I think is appropriate.

7        You can argue whatever you want and open up -- I

8   wouldn't want you to open up that can of worms, but I think

9   that's something that I think a juror may or may not find is

10  relevant to intent, but you need to be very specific.

11       **MS. SARGENT:**  I will be, Your Honor.

12       **THE COURT:**  And lead her so she doesn't -- because

13  she's a lay witness and you have to be careful on cross about

14  going into it too deeply behind the reasons.  I mean, you're

15  not going to bring out, of course, "oh, that was not" -- "that

16  was a different alleged crime, not this alleged crime," but

17  that's up to you.

18       **MR. CRUDO:**  Yeah.

19       **THE COURT:**  I think it's appropriate in a very narrow

20  basis.  I think it's relevant, and you can deal with the 403

21  problems, the prejudice, by asking her leading questions --

22       **MS. SARGENT:**  Okay.

23       **THE COURT:**  -- without prejudice to Mr. Crudo being

24  able to object.  In other words, I'm not -- I'm not preventing

25  you from objecting to any of this line of questioning.  I'm

1    telling you the way I think this ought to go.

2          **MS. SARGENT:**  Thank you.

3          **MR. CHENG:**  Thank you, Your Honor.

4          (The following proceedings were heard in open court:)

5          **THE COURT:**  Again, this is another reason, ladies and

6    gentlemen, why we have these strict rules of conduct for you,

7    because there are certain matters that the law says you're not

8    allowed to hear and consider, and this goes way back into

9    our -- you know, the depth of our legal system.  And if you

10   were to get information outside of this courtroom, you might

11   run afoul and find out information that the law does not allow

12   you to hear.

13         So we finely strain, if you will, what comes out in

14   the courtroom to what is legally appropriate for you to hear,

15   and that's why sometimes we have to do that at what we call

16   sidebar, out of your presence.

17         So you may continue along the lines that we discussed,

18   Counsel.

19         **MS. SARGENT:**  Yes, Your Honor.

20   **BY MS. SARGENT:**

21   **Q.**   Ms. Reed, we were just discussing your stopping doing

22   coursework for Mr. Rodriguez in or around May of 2021; is that

23   right?

24   **A.**   Yes.

25   **Q.**   And I believe you also testified that, around that time,

REED - DIRECT / SARGENT

1  you also deleted your iCloud account --

2  **A.**   Yes.

3  **Q.**   -- is that correct?

4         When you deleted your iCloud account, did you lose

5  access to your text messages?

6  **A.**   Yes.

7  **Q.**   Were you able to provide any text messages to the

8  Government in this case?

9  **A.**   I -- I was not able to provide, no.

10  **Q.**   Okay.  Did you delete your iCloud account at the

11  direction of Mr. Berhan?

12  **A.**   Yes.

13  **Q.**   Did Mr. Berhan reference the college fraud -- or the

14  college courses you had taken for him and other officers as

15  part of the content that was going to be deleted?

16  **A.**   Yes.

17  **Q.**   Did Mr. Berhan himself take your phone and confirm

18  deletions?

19  **A.**   Yes.

20  **Q.**   Did Mr. Berhan generally have access to your phone?

21  **A.**   Yes.

22  **Q.**   And how do you know that?

23  **A.**   He had my password to my phone any time that I changed it.

24  He needed access, and I would often wake up and he would be

25  going through my phone.

**REED - DIRECT / SARGENT**

1  Q.    Okay.  Around this time, did you also -- were you married

2  to Mr. Berhan at this time?

3  A.    Not at this exact point in time.

4  Q.    Did you have a plan to be married to Mr. Berhan?

5  A.    He -- yes.

6  Q.    When was your wedding originally schedule scheduled for?

7  A.    Our original plan was to get married in October of 2021.

8  Q.    In May of 2021, around the time Mr. Berhan instructed you

9  to delete your phone contents, did Mr. Berhan also tell you

10 that he wanted to get married earlier?

11 A.    Yes.

12 Q.    Did the college courses that you had taken for him and

13 other officers, were they part of that discussion?

14 A.    Yes.  Vaguely.

15 Q.    Okay.  Around that time, did you also have a get-together

16 with Mr. Berhan, Mr. Amiri, and Mr. Amiri's wife?

17 A.    Yes.

18 Q.    In the course of that get-together, did Mr. Amiri tell you

19 that being married would be easier?

20 A.    Yes.  Both him and Patrick, yes.

21 Q.    Did you get married at that point?

22 A.    Yes.  We had scheduled to get married, yes.

23 Q.    Where did you get married?

24 A.    In Martinez courthouse.

25 Q.    When did you get married?

**REED - DIRECT / SARGENT**

1   A.   On June 3rd of 2021.

2   Q.   Who was present at your wedding?

3   A.   Morteza and Emily were both outside of the courthouse; but

4   during this time, they would not let in others due to COVID.

5   Q.   And so it was just you and Mr. Berhan?

6   A.   Yes.

7   Q.   And Mr. Amiri and Emily outside?

8   A.   Yes.

9   Q.   Was anyone else present at your wedding?

10  A.   No.

11  Q.   Did anyone else know you got married?

12  A.   No.

13  Q.   And were the series of events that led to the deletion of

14  your phone and your marriage to Mr. Berhan also what caused you

15  to stop doing coursework for Mr. Rodriguez?

16  A.   Yes.

17  Q.   Okay.  Other than the people we've talked about today, did

18  you complete coursework for anyone else in exchange for

19  payment?

20  A.   No.

21  Q.   How much did you make in all for taking classes on behalf

22  of other people?

23  A.   Maybe a little north of like $11,000, maybe $12,000.

24  Q.   We've talked a little bit about your finances with

25  Mr. Berhan.  How did you use the money you made for -- in the

**REED - CROSS / CRUDO**

1  course of doing coursework for these other officers?

2  **A.**   It was used for -- to pay off classes that I had to take

3  for myself, if I needed gas, if we needed groceries.  If

4  everyone's well, we would go out and do things.  Sometimes I

5  would pay for those things.  But it was money that was used

6  over a significant amount of time, so it wasn't a lot at once.

7  **Q.**   Did you and Mr. Berhan also have a business?

8  **A.**   Yes.

9  **Q.**   What kind of business?

10  **A.**   We had a small clothing business.  So I would use some of

11  that money towards the clothing business to buy some of the

12  clothes.

13  **Q.**   Was that business you shared with Mr. Berhan?

14  **A.**   Yes.

15  **Q.**   Why did you participate in these activities, Ms. Reed?

16  **A.**   Through the course of Patrick and I talking, it -- it was

17  made as an obligation for me to pull my weight in the

18  relationship; and for us to continue and have a future, it was

19  my duty, basically instead of having a job, to do this.

20         **MS. SARGENT:**  No further questions, Your Honor.

21         **THE COURT:**  Thank you.

22         You may cross.

23         **MR. CRUDO:**  Thank you, Your Honor.

24                    **CROSS-EXAMINATION**

25  \\\

REED - CROSS / CRUDO

1  BY MR. CRUDO:

2  Q.   Ms. Reed, good morning.  You doing okay?

3  A.   Hi.  Yeah.

4  Q.   Okay.  So my name's Tim Crudo.  I'm one of the lawyers for

5  Mr. Amiri.

6          We haven't met or talked before, have we?

7  A.   No.

8  Q.   You haven't talked to any of Mr. Amiri's lawyers before;

9  right?

10 A.   No.

11 Q.   Okay.  You haven't talked to Mr. Amiri about this case?

12 A.   No.

13 Q.   Haven't talked to him about your testimony or anything

14 like that?

15 A.   No.

16 Q.   Okay.  You've talked to the Government quite a bit; right?

17 A.   I've had meetings, yes.

18 Q.   About five or six over the last couple of years?

19 A.   Give or take, yes.

20 Q.   Including a couple in the last weak or two?

21 A.   Yes.

22 Q.   All right.  And that's those conversations with all the

23 people sitting at the table over here for the Government?

24 A.   Most of them, besides one.

25 Q.   All right.  And you also have a lawyer in this case?

**REED - CROSS / CRUDO**

1    A.    Yes, I do.

2    Q.    You actually have a couple of lawyers?

3    A.    One couldn't be here during this time.

4    Q.    Okay.  And outside of the time that you spent talking with

5    the Government about what you're going to say today, you've

6    prepared with your lawyers about what you're going to say

7    today; right?

8    A.    I don't know if that's something that --

9    Q.    I don't want to know what you talked about, but you've

10   spent some time with them, getting ready for today; right?

11   A.    Yes.

12   Q.    Okay.  So Ms. Sargent spoke with you yesterday about an

13   agreement that you have with the Government.  Do you remember

14   that testimony?

15   A.    Yes.

16   Q.    It's essentially an agreement that you won't be prosecuted

17   for the conduct that you've testified about today; right?

18   A.    Yes.

19   Q.    All right.  And so far you haven't been charged with

20   conspiracy?

21   A.    No.

22   Q.    You haven't been charged with wire fraud?

23   A.    No.

24   Q.    You haven't been charged with anything; right?

25   A.    No.

**REED - CROSS / CRUDO**

1   Q.   And you don't want to be; right?

2   A.   No.

3   Q.   All right.  You don't want to --

4            THE COURT:  Could you be a little careful with the

5   "right"?  Because you're saying "right" and she's saying "no."

6   We all know what you're talking about, but the record is going

7   to be a little muddled.

8            MR. CRUDO:  Good point, Your Honor.  I will see

9   if I can fix that.

10           THE COURT:  Thank you.

11  BY MR. CRUDO:

12  Q.   You don't want to do anything today that's going to put

13  that agreement at risk; correct?

14  A.   No.  I'm here just to tell the truth.  That's the only

15  reason why I'm here.

16  Q.   All right.  But you also don't want to put that agreement

17  at risk; right?

18  A.   No, I do not.

19  Q.   Because if you do, you might get prosecuted; right?

20  A.   Yes.

21  Q.   So you need to stick to the story that you told the

22  Government about in the meetings that you had with them; right?

23  A.   It's not a story.  It's the truth.

24  Q.   Okay.  But you need to -- whatever you told the

25  Government, you need to stick to that today; right?

**REED - CROSS / CRUDO**

1    A.    No, not necessarily.

2    Q.    Okay.  Your agreement provides that you, in the course of

3    all your meetings with the Government, would not withhold any

4    information from them; right?

5    A.    Yes.

6    Q.    So if it comes out, during your testimony today, that you

7    did withhold some information from them, you might be

8    prosecuted; right?

9    A.    Yes.  If it's something that I'm withholding that I knew

10    in my memory, yes.

11    Q.    Okay.  You also agreed with the Government that -- in all

12    the meetings with them you wouldn't give them any false

13    information; right?

14    A.    Yes.

15    Q.    Okay.  So if it comes out in your testimony that you told

16    the Government that something wasn't true, you could get

17    prosecuted; right?

18    A.    Yes.

19    Q.    And you agreed that you wouldn't protect any person by

20    failing to disclose information; right?

21    A.    Yes.

22    Q.    That was part of your agreement?

23    A.    Yes.

24    Q.    And if it comes out that -- today that you were actually

25    protecting somebody, you could be prosecuted; right?

**REED - CROSS / CRUDO**

```
 1   A.   Yes.

 2   Q.   All right.  So you need to stick to what you told the

 3   Government before; right?

 4   A.   Again, it's what is the truth, from my knowledge, yes.

 5   Q.   Okay.

 6             Okay.  So you talked a little bit about wanting to

 7   become a nurse.  Do you remember that testimony?

 8   A.   Yes.

 9   Q.   That was something that you had wanted to do for a long

10   time?

11   A.   Yes.

12   Q.   And you spent part of your academic career getting

13   ready -- getting ready to become a nurse; right?

14   A.   Yes.

15   Q.   You started out at Santa Barbara Community College?

16   A.   Yes.

17   Q.   You didn't mention that yesterday when Ms. Sargent asked

18   about your -- the schools that you went to.  Is there a reason

19   that you left that out?

20   A.   No.  It was just -- I mean, I guess I was thinking about

21   things when I was with Patrick that were relevant to this time

22   period.

23   Q.   Okay.  And you were a full-time student at Santa Barbara?

24   A.   For the most part, yes.

25   Q.   All right.  And that was between the fall of 2013 and the
```

**REED - CROSS / CRUDO**

1   spring of 2015?

2   **A.**   Yes, I believe so.

3   **Q.**   So you were there for four semesters?

4   **A.**   I believe the third one, I had stopped and then was

5   working full-time.

6   **Q.**   Okay.  And each of those semesters was about four months

7   long?

8   **A.**   Yes, I believe so.

9   **Q.**   All right.  And you had what, three to five courses every

10   semester that you were there?

11   **A.**   Yes.

12   **Q.**   And, again, some of those were in chemistry, anatomy, to

13   get you ready for nursing?

14   **A.**   Yes.

15   **Q.**   Did you get a degree in anything from Santa Barbara

16   Community College?

17   **A.**   No.

18   **Q.**   All right.  You mentioned LMC yesterday.  What's LMC?

19   **A.**   Los Medanos College.

20   **Q.**   And that's here in Contra Costa County?

21   **A.**   Yes, it is.

22   **Q.**   And that's a community college?

23   **A.**   Yes.

24   **Q.**   And you were a part-time student there for a while?

25   **A.**   Yes.

**REED - CROSS / CRUDO**

1  Q.   And that you started there in the spring of 2016?

2  A.   Yes.

3  Q.   Does that sound right?

4       And you ended there in the fall of 2019?

5  A.   Yes, I believe so.

6  Q.   So for about seven semesters?

7  A.   Yeah.

8  Q.   And each -- again, each of those semesters four months'

9  worth of courses; right?

10 A.   Yes, but I would only take maybe one course at a time.

11 Q.   Okay.  And, again, those courses that you were taking were

12 nutrition, physiology, and things to prepare you for a career

13 in nursing; right?

14 A.   Yes.

15 Q.   To help get you into nursing school?

16 A.   Yes.

17 Q.   Did you get a degree from that school?

18 A.   No, I did not.

19 Q.   Okay.  So while you were going to school at LMC, you were

20 working for Victoria Secrets [sic] in Walnut Creek?

21 A.   Yes.

22 Q.   All right.  What were you doing there?  Sales?

23 Merchandise management?

24 A.   I was doing like merchandise management, so I would run

25 kind of the -- I guess the aesthetics of the store, flip over

**REED - CROSS / CRUDO**

1  the store if we needed to do any new displays or anything like

2  that, make sure inventory was checked, those kinds of things.

3  **Q.**   Okay.  And how long did you work for Victoria Secret?

4  **A.**   Like, almost four years, I believe, from Santa Barbara to

5  Walnut Creek.

6  **Q.**   Okay.  And then in January 2017, you changed course;

7  right?

8  **A.**   Yes.

9  **Q.**   All right.  You decided that it was time to do what you

10 needed to do to pursue your nursing?

11 **A.**   Yes.  At least bridge over into that aspect, yes.

12 **Q.**   So you quit Victoria Secrets; right?  And you went to work

13 at the Home Life Senior Care assisted living facility; right?

14 **A.**   Yes.

15 **Q.**   That was January of 2017?

16 **A.**   Yes, I believe so.

17 **Q.**   All right.  And that's out in Brentwood?

18 **A.**   Yes.

19 **Q.**   And just briefly, what did you do there?

20 **A.**   I would take care of, like, elderly patients.  A lot of

21 them have, like, Stage IV cancer.  Just people that their

22 families, unfortunately, couldn't be with them 24/7, so I would

23 be hired for, like, four to eight hours a day, to come in and

24 hang out with them and take care of them.

25 **Q.**   Okay.  And you were still taking those classes at

**REED - CROSS / CRUDO**

1    Los Madeiras?

2    **A.**    Los Medanos.

3    **Q.**    Los Medanos.

4    **A.**    Yes, I believe during that time I was.

5    **Q.**    All right.  And Mr. Berhan encouraged you to pursue your

6    interest in nursing; right?

7    **A.**    Yes.

8    **Q.**    At that same time, January 2017, you also moved in with

9    Mr. Berhan --

10    **A.**    Yes.

11    **Q.**    -- right?

12          And you I think you testified about that yesterday.

13    You were living with Mr. Amiri and another individual at

14    Mr. Amiri's house; right?

15    **A.**    Yes.

16    **Q.**    And while you were living at Mr. Amiri's house, Mr. Berhan

17    paid for your rent; right?

18    **A.**    Yes.

19    **Q.**    Okay.  He wanted to support you kind of, again, working

20    towards your nursing career; is that right?

21    **A.**    Yes.

22    **Q.**    All right.  And then later that year, in November, you and

23    Mr. Berhan moved into a new home; right?

24    **A.**    There was a short period between that where we lived at

25    his parents' house prior to moving into that Oakley home, but,

**REED - CROSS / CRUDO**

1  yes.

2  Q.   Okay.  And his parents didn't charge you rent?

3  A.   Not that I believe.

4  Q.   Okay.  You didn't pay any rent?

5  A.   I -- no.

6  Q.   Okay.  And, again, late 2017 Mr. Berhan bought a house;

7  right?

8  A.   Yes.

9  Q.   And he got help with that from his parents; right?

10 A.   Yes.

11 Q.   Okay.  Put down about a hundred thousand dollars for the

12 down payment?

13 A.   Yes.

14 Q.   All right.  And they're not wealthy people, are they?

15 A.   No.  Not what you would consider wealthy, no.

16 Q.   His dad is a former cop?

17 A.   Yes.

18 Q.   And his mom used to work in billing at Kaiser?

19 A.   Yes.

20 Q.   Okay.  And they also contributed to the monthly mortgage

21 payment; right?

22 A.   After a couple of months, I think, after we lived there,

23 yes.

24 Q.   Okay.  Because it was difficult making ends meet; right?

25 A.   Yes, and that's right around the time that I had quit my

REED - CROSS / CRUDO

1    job.

2    **Q.**   Okay.  They were contributing about $2,000 a month, at

3    that point, to the mortgage?

4    **A.**   I don't know the exact amount, but -- I'm not sure.

5    **Q.**   And whatever it is that they contributed, Mr. Berhan paid

6    the rest; right?

7    **A.**   Yes.

8    **Q.**   Okay.  His parents also gave you a car?

9    **A.**   Yes.

10   **Q.**   All right.  So at some point, you moved on from the Home

11   Life Senior Center to Doctors Group or Bay Area Surgical

12   Specialists?

13   **A.**   Yes.

14   **Q.**   Do you recall that?

15        What is that business?  What did you do there?

16   **A.**   It was basically a larger umbrella for like clinical

17   specialists.  I worked for a specialist in urology and then a

18   specialist in urology/gynecology and also a sports medicine

19   doctor that was also the general physician for an Olympic

20   sports team.

21   **Q.**   Okay.  Again, you were looking for experience to help

22   pursue your nursing dream; right?

23   **A.**   Yes.

24   **Q.**   All right.  And at that time, you were still taking

25   courses at LMC?

1   A.   I believe during this time, yes.

2   Q.   All right.  And as of the end of -- towards the end of

3   2018, at least at that point, you and Mr. Berhan had an equal

4   partnership; right?

5   A.   Equal as in how?

6   Q.   Well, you've described it as an equal partnership; right?

7   A.   We did not have an equal partnership, no.

8   Q.   Okay.  Let me ask you -- I'm going to take a look, please,

9   at Exhibit 330.

10          MR. CRUDO:  Your Honor, may I approach?

11          THE COURT:  Yes, approach.

12  BY MR. CRUDO:

13  Q.   Ms. Reed, do you have Exhibit 330 in front of you there?

14  A.   Yes.

15  Q.   All right.  Let me find it for myself.

16          Okay.  Exhibit 330 is an exchange of text messages

17  between you and Mr. Amiri in September of 2018; right?

18  A.   Yes.

19  Q.   Okay.

20          MR. CRUDO:  Your Honor, we move the admission of

21  Exhibit 330.

22          THE COURT:  Any objection?

23          MS. SARGENT:  No objection.

24          THE COURT:  Admitted.

25      (Trial Exhibit 330 received in evidence.)

REED - CROSS / CRUDO

```
 1   BY MR. CRUDO:
 2   Q.    Okay.  Let's publish that.  Let's pull up the first page,
 3   please.
 4         And I'm going to direct your attention -- maybe we can
 5   blow it up, the bottom two messages there.
 6         Again, your messages to Mr. Amiri are in blue; right?
 7   A.    Yes.
 8   Q.    And his back to you are in green; correct?
 9   A.    Yes.
10   Q.    Okay.  So you text to him (as read):
11             "Okay.  I think we are going to Catalina Island
12         that weekend, but maybe."
13             Catalina Island is a resort island in
14   Southern California?
15   A.    Yes.
16   Q.    All right.  And by "we," you were talking about yourself
17   and Mr. Berhan?
18   A.    I believe so, yes.
19   Q.    All right.  And then Mr. Amiri responds in the green box
20   and he says (as read):
21             "Where the hell do y'all pull this money from for
22         all these vacations?  LOL.  Been working almost every
23         single day to make my account grow.  LOL."
24             Do you see that?
25   A.    Yes, I do.
```

**REED - CROSS / CRUDO**

Q.   And you and Mr. Berhan frequently went on luxury trips;
right?

A.   I wouldn't call them luxury, but we were also living
paycheck to paycheck.

Q.   Okay.  You had trips to an exclusive spa in Cabo San Lucas
in 2019?

A.   We were going on our friend's timeshare, so the trips were
pretty much free.

Q.   Okay.  And Newport Beach?  Trips to Newport Beach?

A.   I don't know if I ever went on one to Newport Beach with
Patrick.  I can't recall.

Q.   But you recall you would go to trips to -- took at least
one trip to Newport Beach?

A.   Possibly to visit my cousin who lives there.

Q.   All right.  You went to Spain?

A.   Yes.

Q.   With Mr. Berhan?

A.   Yes.

Q.   You went to Italy with Mr. Berhan?

A.   On the same trip, yes.

Q.   Okay.  You chartered yachts down in San Diego with
Mr. Berhan?

A.   That was for a friend's boat for their birthday, and there
were 40 to 50 people there but, yes.

Q.   But you and Mr. Berhan were part of that group that

1  chartered a yacht?

2  **A.**   Yes.

3  **Q.**   Okay.  You went to a resort in Tulum, Mexico, during this

4  time?

5  **A.**   On another friend's timeshare, yes.

6  **Q.**   Okay.  So let's go to the next page and look at the

7  message at the top.

8         And, again, this is a message from you to Mr. Amiri;

9  right?

10  **A.**   Yes.

11  **Q.**   And it says (as read):

12         "They actually aren't very expensive and me and

13         Patrick have an equal partnership and equally pay for

14         things.  So maybe if you split it with someone, then

15         you can afford it, and you spend it on dumb shit."

16         You wrote that; right?

17  **A.**   Yes, I did.

18  **Q.**   Okay.  Thank you.  We can take that down.

19         So in February of 2019, you quit the doctor's office

20  that you had been working in; right?

21  **A.**   Yes, I did.

22  **Q.**   And you weren't working -- you weren't employed at that

23  point; right?

24  **A.**   No, I was not.

25  **Q.**   Okay.  The plan, again, was to focus on you getting your

**REED - CROSS / CRUDO**

1  nursing degree; right?

2  **A.**   Yes.

3  **Q.**   And you and Mr. Berhan agreed on that plan?

4  **A.**   Yes.

5  **Q.**   And he was going to pay the bills while you were going to

6  school?

7  **A.**   Yes.

8  **Q.**   You told people you'd make good money once you got to be a

9  nurse?

10  **A.**   I was hoping, yes, because I have many family members in

11  my household, that are in my family that are nurses.

12  **Q.**   All right.  And you told people that, at some point, you'd

13  make more than Patrick did once you got to be a nurse; right?

14  **A.**   I'm assuming, yes.

15  **Q.**   You talked yesterday and today about an accelerated

16  nursing program.  Do you recall that testimony?

17  **A.**   Yes.

18  **Q.**   And that's something you wanted to get -- a program you

19  wanted to get into; right?

20  **A.**   Yes.

21  **Q.**   Is that the program at Samuel Merritt University?

22  **A.**   Yes.

23  **Q.**   And that's here in Oakland?

24  **A.**   Yes.

25  **Q.**   All right.  And you wanted to apply by April of 2020;

**REED - CROSS / CRUDO**

1    right?

2    **A.**    I believe, yeah, that was the timing.

3    **Q.**    Okay.  And you wanted the accelerated program because

4    that's faster than the regular old nursing program; right?

5    **A.**    Yes.

6    **Q.**    And cheaper?

7    **A.**    No.

8    **Q.**    Okay.  It was going to be a hundred thousand dollars or

9    more?

10    **A.**    Yes, around there.

11    **Q.**    Okay.  Not cheap but cheaper than the regular program;

12    right?

13    **A.**    Yes, because it would have got me working sooner.

14    **Q.**    Okay.  And you had planned, at that point, on taking out a

15    hundred-thousand-dollar student loan that you were going to

16    have to pay for; right?

17    **A.**    It -- I was trying to see what we could do at that point

18    for financial aid and anything else, but the plan was to

19    possibly pull out a loan.

20    **Q.**    Okay.  And you referred -- in some of the text messages

21    you saw earlier this morning, there was a reference to a

22    hundred-thousand-dollar student loan; right?

23    **A.**    Yes, because I knew roughly how much it would be to get

24    in.

25    **Q.**    Okay.  You said, I think, you were going to pay -- take

**REED - CROSS / CRUDO**

 1  $500 or something that one of your clients was giving you to

 2  take the courses to help pay down that loan; right?

 3  **A.**   Yes, another student debt that I had accrued.

 4  **Q.**   Okay.  And by that time, so this is early 2020, you had

 5  accrued about $10,000 in debt to California Coast University;

 6  right?

 7  **A.**   Give or take because I was making payments.

 8  **Q.**   Okay.  And you needed to pay that down too?

 9  **A.**   Yes.

10  **Q.**   All right.  So the accelerated nursing program required

11  you to have a bachelor's degree; correct?

12  **A.**   Yes.

13  **Q.**   And you didn't have -- didn't have one; right?

14  **A.**   No.

15  **Q.**   All right.  And so you became aware of California Coast

16  University through Mr. Berhan; right?

17  **A.**   Yes.

18  **Q.**   And you decided to get a bachelor's degree for yourself

19  from CCU; right?

20  **A.**   Yes.

21  **Q.**   Because that would allow you to apply for this accelerated

22  program?

23  **A.**   Yes.

24  **Q.**   It was a good investment to make in yourself; right?

25  **A.**   Yes.

**REED - CROSS / CRUDO**

1    Q.   And the day after you completed your last final at CCU,

2    you were in the process of applying to that nursing program;

3    right?

4    A.   Yes.

5    Q.   And you couldn't get your diploma from CCU until you had

6    paid the entirety of your -- the tuition; right?

7    A.   Yes.

8    Q.   And you still had about $7500 outstanding?

9    A.   I can't remember, but --

10    Q.   But --

11    A.   -- probably.

12    Q.   Okay.  In that ballpark?

13    A.   Yeah.

14    Q.   Okay.  And you reached out to CCU to ask to send the

15    transcripts to Samuel Merritt; right?

16    A.   Yes.

17    Q.   And you told them you were having trouble paying your

18    student loan -- or the student debt because you couldn't work;

19    right?

20    A.   Yes.

21    Q.   And you couldn't work because of COVID; right?

22    A.   Yes.  There were -- there wasn't many options to kind of

23    go back.

24    Q.   Okay.  Ms. Sargent talked to you a couple of minutes ago

25    about a business that you and Mr. Berhan opened up together.

**REED - CROSS / CRUDO**

1  Do you recall talking about that?

2  **A.**   Yes.

3  **Q.**   That was called Savvy Boutique; is that right?

4  **A.**   Yes.

5  **Q.**   All right.  And you started that business together in

6  April 2021?

7  **A.**   Yes, I believe so.

8  **Q.**   All right.  And it was to sell clothes online and at

9  pop-ups?

10  **A.**   Yes.

11  **Q.**   It was your idea?

12  **A.**   It -- it was kind of both of our ideas.  We saw a lot of

13  people doing it in the area, so we figured why not us.

14  **Q.**   Okay.  Something you wanted to do, though?

15  **A.**   It was something that I was hoping, yeah, that would kind

16  of take off.

17  **Q.**   Okay.  And Mr. Berhan supported you in that?

18  **A.**   Yes and no.  For the most part.  Not fully financially

19  but, yes.

20  **Q.**   But he invested several -- tens of thousands of dollars in

21  that business, didn't he?

22  **A.**   I couldn't say several of tens of thousands of dollars,

23  no.

24  **Q.**   But he invested a substantial sum to help with that

25  business; right?

**REED - CROSS / CRUDO**

1  A.   It -- the business itself didn't need a ton of money.  It

2  was generating money and then we were putting the money, most

3  of it, back into it to buy more clothing.

4  Q.   And Mr. Berhan helped with that financially; right?

5  A.   Some of it, yes.

6  Q.   Okay.  I want to now talk about your classes at CCU.

7          So you applied for a bachelor's degree in -- from CCU

8  in July of 2019; right?

9  A.   Yes.  I believe so.

10  Q.   And that was for a Bachelor of Science in healthcare

11  administration --

12  A.   Yes.

13  Q.   -- right?

14          You found the courses pretty easy there?

15  A.   Yes.

16  Q.   All right.  Did you describe the school as a joke?

17  A.   Did I believe what?

18  Q.   Would you describe the school as a joke?

19  A.   I can see why other schools don't see it as an accredited

20  college, yes.

21  Q.   Okay.  And you told the Government you didn't think it was

22  a real school; right?

23  A.   I don't think I said that, but I believe that, yeah, the

24  school is not -- it's not what you would expect out of an

25  accredited online school.

**REED - CROSS / CRUDO**

1    **Q.**   Let me see if I can help you remember.

2          Let me show you what we're going to mark as

3    Exhibit 212.

4          **MR. CRUDO:**  Your Honor, may I approach?

5          **THE COURT:**  Yes, you may.

6          (Counsel approaches the witness.)

7    **BY MR. CRUDO:**

8    **Q.**   So, Ms. Reed, it's a long document.  I'm not going to ask

9    you to look at the whole thing; and I don't want you to read it

10   aloud, but I want you to take a look, please -- let me get to

11   it myself here.

12         Do you recall meeting with the Government in August of

13   2022?

14   **A.**   Yes.

15   **Q.**   All right.  Take a look, please, at page 5 of the

16   document -- you can see, up in the upper right-hand corner, it

17   says page 5 of the remainder -- and take a look at the second

18   full paragraph there.

19   **A.**   Mm-hmm.

20   **Q.**   The third sentence -- I'm sorry, the end of the second

21   line.  Do you see that?

22   **A.**   Yes.

23   **Q.**   All right.  Having read that, does that refresh your

24   recollection that you told the Government that you didn't think

25   CCU was a real school?

**REED - CROSS / CRUDO**

1    **A.**    Sorry.  It must be on the wrong page.  I don't see that

2    where it's talking about school.

3    **Q.**    Okay.  Are you -- there's a number in the lower right-hand

4    corner of the page.

5    **A.**    Yes.

6    **Q.**    What's that number?

7    **A.**    005.

8    **Q.**    I'm sorry.  Okay.  In the lower right-hand corner?

9    **A.**    Yes.

10   **Q.**    Okay.  Is it a number that ends with 40?

11   **A.**    Yes.

12   **Q.**    Okay.  If you go up, count the bottom paragraph, one, two,

13   three --

14   **A.**    Oh.

15   **Q.**    -- around the middle.

16           Okay.  Now you got it?

17   **A.**    Yeah.

18   **Q.**    Okay.  Look at the end of the second line, read that to

19   yourself, and then my question to you is:  Now having looked at

20   that, do you remember that you told the Government that you

21   thought -- you didn't think CCU was a real school?

22   **A.**    I don't know if this is directly quoted from me.

23   **Q.**    I just -- I don't want you to read it.  Just having read

24   it, now do you remember that that's what you told the

25   Government?

**REED - CROSS / CRUDO**

1  A.    I believe that CCU isn't an accredited school.  I don't

2  believe that it's something that is comparable to another

3  university, yes.

4  Q.    Okay.  My question is just this:  At a meeting that you

5  had with the Government in August of 2022, did you tell them,

6  in sum or substance, that you didn't think that CCU was a real

7  school?

8  A.    Yes.

9  Q.    Okay.  Thank you.

10         You can put that aside.  We're done with that.

11         All right.  Let me turn back to the courses that you

12  actually took there.

13         And there were no -- no -- you didn't need to look at

14  any lectures?  There were no lectures; correct?

15  A.    No.

16  Q.    All right.  Everything was -- was remote --

17  A.    Yes.

18  Q.    -- right?

19         All right.  No Zoom, no audio, nothing live?

20  A.    No.

21  Q.    You weren't required to read any books; right?

22  A.    You were supposed to read the books, yes.

23  Q.    Okay.  But you didn't read --

24  A.    No.

25  Q.    -- the books?

**REED - CROSS / CRUDO**

1          Okay.  And you were able to get the textbook online;

2   right?

3   **A.**   Yes, most of them.

4   **Q.**   All right.  And then you talked about quizzes and tests

5   that you had to take; right?

6   **A.**   Yes.

7   **Q.**   All right.  Those are all open book?

8   **A.**   I don't believe they were open book.

9   **Q.**   Could you refer to anything that you wanted while you were

10  taking the exam?

11  **A.**   No.  I don't think you were supposed to.

12  **Q.**   Well, did you?

13  **A.**   Yes.

14  **Q.**   Okay.  In fact, you used the crtl-F function on your

15  e-books to help answer the quiz and exam questions; right?

16  **A.**   Yes.

17  **Q.**   Okay.  And the exam questions were, for the most part,

18  taken right from the book; right?

19  **A.**   Yes.

20  **Q.**   All right.  And you could search the Internet during exams

21  and quizzes?

22  **A.**   You weren't supposed to.

23  **Q.**   Okay.  But you did?

24  **A.**   Yes.

25  **Q.**   All right.  And there's nobody there to keep you from

**REED - CROSS / CRUDO**

1  doing it; right?

2  **A.**    Yes.

3  **Q.**    You talked about using Quizlet.  Do you remember that

4  testimony?

5  **A.**    Yes.

6  **Q.**    And Quizlet is basically an online platform that publishes

7  some of the CCU quizzes and tests, including others -- many

8  other schools, for you to access; right?

9  **A.**    Well, it's not something that's published.  It's where

10 students go to, like, study, and you can either publicly

11 publish your flashcards or privately have them.  So -- but

12 there were public ones on there, so that's how I was able to

13 find the questions.

14 **Q.**    All right.  And you were able, during the quiz or the

15 exam, to go to Quizlet and find the answers?

16 **A.**    Yes.

17 **Q.**    And you talked a little bit about the essays.  Those were

18 all about a page in length; right?

19 **A.**    Yes.

20 **Q.**    And you could use the crtl-F function, again, to cut and

21 paste material from the e-book to put into the essay if you

22 wanted to?

23 **A.**    I -- you could but I don't recall, like, taking from a

24 passage of the book.  It was just if you had to directly quote,

25 like, an example, you could.  But I would never directly take,

1    like, a full paragraph and rewrite it from there.  The only

2    time I would do that is from an actual paragraph that I had

3    written.

4    Q.    Okay.  But you could take parts of -- parts of the book if

5    you wanted, cut and paste them into your essay; right?

6    A.    Yeah.

7    Q.    And you could do the same going on the Internet; right?

8    A.    Yes.

9    Q.    All right.  Let me ask you to look, please, at

10    Exhibit 413.

11           MR. CRUDO:  Your Honor, may I approach?

12           THE COURT:  Yes, you may.

13                  (Counsel approaches witness.)

14           THE CLERK:  Counsel, what exhibit number is this?

15           MR. CRUDO:  This is Exhibit 413.

16           THE CLERK:  Thank you.

17           MR. CRUDO:  I have to find it myself.

18           Your Honor, this is a page from Exhibit 305, which is

19    a lengthy document, over 700 pages, that's already been

20    admitted.  We just have this one page to make it easier to deal

21    with.

22           So we would move Exhibit 413 into evidence.

23           THE COURT:  All right.  So you've given it a separate

24    number?

25           MR. CRUDO:  We've given it a separate number to make

**REED - CROSS / CRUDO**

 1   it easier.

 2          **THE COURT:**  Any objection?

 3          **MS. SARGENT:**  No, Your Honor.

 4          **THE COURT:**  It's admitted.

 5       (Trial Exhibit 413 received in evidence.)

 6          **MR. CRUDO:**  Okay.  Let's pull that up.

 7   BY MR. CRUDO:

 8   Q.   Do you have that in front of you, Ms. Reed?

 9   A.   Yes, I do.

10   Q.   All right.  So this says "Received Date 2/24/2020."  Do

11   you see that?

12   A.   Yes.

13   Q.   And your testimony earlier was that you were writing

14   essays for Mr. Amiri at this point?

15   A.   Yes.

16   Q.   All right.  You had already written quite a few essays for

17   CCU by this point; right?

18   A.   Yes.  I don't know if this falls in line with the exact

19   class.  I believe it does.  I can't remember.

20   Q.   Okay.  You had already written about 40 essays of your own

21   for your own courses; right?

22   A.   Probably, yes.

23   Q.   All right.  By this point?

24   A.   Yes.

25   Q.   Okay.  Just looking at Exhibit 413 here, is this a typical

**REED - CROSS / CRUDO**

1  length of an essay that you wrote during the -- for all the

2  essays that you wrote for CCU?

3  **A.**   For CCU they required, I believe it was, 300 words for

4  bachelor's and then 475 for a master's.

5  **Q.**   Okay.  So let me -- that's a good point.  Let me focus

6  just on the bachelor's courses that you took.

7        Looking at Exhibit 413 here, is this about the typical

8  length of an essay?

9  **A.**   Give or take some words, yes.

10  **Q.**   Okay.  And let's take a look at the next page.

11        You would get graded on those essays; right?

12  **A.**   Yes.

13  **Q.**   All right.  And the grade here you got was 23 out of 25

14  for this essay; right?

15  **A.**   Yes.

16  **Q.**   And then let's go to the third page.  It says "Notes."  Do

17  you see that there?

18  **A.**   Yes.

19  **Q.**   And those -- when you would submit an essay, sometimes you

20  would get notes back from whoever was reviewing them at CCU;

21  right?

22  **A.**   I believe so.  Honestly, I didn't -- if it passed, I never

23  looked at notes or, like, the evaluation.

24  **Q.**   Okay.  So you wouldn't know -- do you have any sense

25  whether this is typical of the -- kind of the depth and quality

1    of the reviews that you would get?

2    **A.**    I would only look at it if I didn't pass it to see why I

3    had failed.

4    **Q.**    Okay.

5            All right.  We can take that down.  Thank you.  You

6    can put that aside.

7            So you completed your first course for your degree at

8    CCU in September of 2019; right?

9    **A.**    I believe so.  I can't remember exact dates.

10   **Q.**    Let me -- and I know it was a few years ago.  Let me give

11   you a document that might help, or maybe it's in the binder in

12   front of you.  Do you have Exhibit 306?

13   **A.**    (Witness examines document.)  I don't think I do.

14   **Q.**    It's a big thick one.

15   **A.**    It looks like this only goes to 84.

16   **Q.**    Okay.  Let me see if I can get you that.  That might be

17   helpful.

18   **A.**    Thank you.

19                   (Pause in proceedings.)

20           **MR. CRUDO:**  Your Honor, may I approach?

21           **THE COURT:**  Yes, you may.

22                   (Counsel approaches witness.)

23           **THE WITNESS:**  Thank you.

24   BY MR. CRUDO:

25   **Q.**    Okay.  So Exhibit 306 is already in evidence, so let's

REED - CROSS / CRUDO

1    take a look at page 2 of 306.  I'm sorry, it's page 4.  There

2    we go.

3              So, Ms. Reed, just so you know, so we're on the same

4    page here, when I refer to the page number -- because I know

5    there are a bunch of different documents in here, in the lower

6    right-hand corner, there's a little stamp there.  It says "EXH"

7    and that stands for exhibit.

8    A.    Okay.

9    Q.    And then there's a dash, it says "306."  That refers to

10   the exhibit number.  And then there's a dash.  It says "004."

11   A.    Okay.

12   Q.    Do you have that?

13   A.    Yes.

14   Q.    Okay.  So that last number refers to the page number, so

15   that's the number I'm referring to.

16             All right.  Are you with me?  Are you on page 4?

17   A.    Yes.

18   Q.    All right.  And this page is a copy of your transcript for

19   your own bachelor's degree at CCU; right?

20   A.    Yes.

21   Q.    And so you mentioned, I think -- and, again, feel free to

22   refer to the transcript here.

23             You said that you had completed your first course in

24   September of 2019, specifically on the 10th of September?

25   A.    Yes.

**REED - CROSS / CRUDO**

1  Q.   And then you were able to do another one three days later?

2  A.   Yes.

3  Q.   And you did two each in October, November, and January;

4  right?

5  A.   Yes.

6  Q.   And then six courses in February?

7  A.   Yes.

8  Q.   And another six in March?

9  A.   Yes.  Yes.

10  Q.   All right.  So during that January to March winter

11  semester, you actually had completed 16 courses for yourself;

12  right?

13  A.   Yes.

14  Q.   Fair to say you're not spending 135 hours per course?

15  A.   Yes.

16  Q.   All right.  And you finished the degree program, at least

17  you completed your last exam, on February 20th, 2020; right?

18  A.   I'm not sure.  Sometimes they were -- these dates

19  sometimes don't -- aren't the same as when you actually

20  completed the course.

21  Q.   Okay.  So -- but at least on the exhibit here, on your

22  transcript, under "Date Completed" for your final course, it

23  lists a date of February -- April 20, 2020; right?

24  A.   Yes.

25  Q.   And you finished with pretty good grades; right?

**REED - CROSS / CRUDO**

1   A.   Yes.

2   Q.   Okay.  12 As, 9 Bs, and 2 Cs?

3   A.   Yes.

4   Q.   Okay.  Fair to say that CCU was a lot easier than

5   Santa Barbara Community College?

6   A.   Yes.

7   Q.   And lot easier than LMC --

8   A.   Yes.

9   Q.   -- right?

10          So -- okay.  You can put that aside.

11          So the Government walked you through a lot of text

12   messages this morning; right?

13   A.   Yes.

14   Q.   All right.  Hopefully I won't go through as many, but I

15   want to show you some.

16          The Government showed you Exhibit 82, which includes

17   text messages between you and Amiri from December 6th, 2019,

18   through February 26th, 2020.  Do you recall that?

19          Take a look.  I'm sorry.

20   A.   Oh, sorry.

21   Q.   It's probably not a fair question.  Take a look at

22   Exhibit 82.

23   A.   You're just saying all of these text messages?

24   Q.   Right, all of the texts.  So the first text there is

25   between you and Mr. Amiri, December 6th, 2019; right?

**REED - CROSS / CRUDO**

1    A.    (Witness examines document.)

2    Q.    That's on the very first page.

3    A.    Oh.

4          (Witness examines document.)   Yes.

5    Q.    Okay.  And the last text message between the two of you,

6    at least in this exhibit, is on April 26, 2020; right?

7    A.    Yes.

8    Q.    So about a five-month period?

9    A.    Yes.

10   Q.    But these are only some of the text messages that you and

11   Mr. Amiri exchanged over a five-year period; right?

12   A.    Yes.

13   Q.    Fair to say that you and Mr. Amiri texted quite

14   frequently?

15   A.    Probably almost every single day, yes.

16   Q.    Would it surprise you that, during that five-year time

17   period, if you printed up all the texts, it would run to about

18   2200 pages?

19   A.    I would not be surprised, no.

20   Q.    Okay.  So, Ms. Reed, in fact, it was you who reached out

21   to Mr. Amiri and asked to take courses for him; isn't that

22   true?

23   A.    I recall we had one text message exchange.

24   Q.    Okay.  I believe you testified on direct that Mr. Amiri

25   first reached out to you, but, in fact, you reached out to him

**REED - CROSS / CRUDO**

1  to take courses for him; right?

2  **A.**   This was a conversation that me and Patrick had prior, and

3  there was multiple conversations that me and Morteza had in

4  person and then I had reached out to him.  So it's not --

5  **Q.**   I'm asking -- did you get your answer in?  I don't want to

6  cut you off.

7  **A.**   Yeah.  Sorry.

8  **Q.**   Okay.  So the first time that you talked to Mr. -- you and

9  Mr. Amiri talked about you doing courses for him was when you

10  reached out to him and asked if he wanted you to do his courses

11  for him; right?

12  **A.**   No, that is not correct.

13  **Q.**   Okay.  And, in fact, it was you who first told Mr. Amiri

14  that Mr. Berhan -- that you were taking courses for Mr. Berhan;

15  isn't that true?

16  **A.**   I -- are you asking if I said that?

17  **Q.**   Yes.

18  **A.**   Yes.

19  **Q.**   Okay.  And that was the first that Mr. Amiri heard of

20  that, was from you; right?

21  **A.**   I don't believe so, no.

22  **Q.**   All right.  I'm going to ask you to take a look at

23  Exhibit 391.

24          **MR. CRUDO:**  May I approach?

25          **THE COURT:**  Sure.

**REED - CROSS / CRUDO**

1              And just so you know, we're going to -- you need to

2      stop in about four minutes because I'm going to then give the

3      jury an instruction.  So you can show that --

4              **MR. CRUDO:**  I'll be quick.

5              **THE COURT:**  Thank you.  Thank you.

6      BY MR. CRUDO:

7      Q.   I'm going to be quick here.  Exhibit 391 is a text

8      exchange between you and Mr. Amiri; right?

9      A.   Yes.

10             **MR. CRUDO:**  Your Honor, we move Exhibit 391 into

11     evidence.

12             **THE COURT:**  Objection?

13             **MS. SARGENT:**  No objection.

14             **THE COURT:**  Admitted.

15         (Trial Exhibit 391 received in evidence.)

16             **MR. CRUDO:**  Let's pull that up.

17     BY MR. CRUDO:

18     Q.   The first date of the text message chain is March 21st,

19     2019; right?

20     A.   Yes.

21     Q.   And that's about nine months before the first e-mail --

22     the first text exchange that the Government showed you today;

23     right?

24     A.   Yes.

25     Q.   Okay.  Let's take a look, please, at the exhibit; and I

**REED - CROSS / CRUDO**

```
 1   want to take a look at the first one on the first page, the
 2   first one.
 3              This is you in blue; right?
 4   A.   Yes.
 5   Q.   So March 21st, 2019, you reach out to Mr. Amiri and you
 6   say (as read):
 7              "Do you still have copies of all those tests for
 8         Cal Coast?"
 9              Right?
10   A.   Yes.
11   Q.   And you understood that many officers at the police
12   departments were taking courses at CCU; right?
13   A.   Yes.
14   Q.   All right.  And you understood that there was a collection
15   from prior years that these officers had assembled; right?
16   A.   Yes.
17   Q.   And they were using them as study aids; right?
18   A.   Yes.
19   Q.   And then down at the bottom of that page, Mr. -- you say
20   to Mr. Amiri (as read):
21              "Can you send them all to me or can I make
22         copies, please?"
23              Do you see that?
24   A.   Yes.
25   Q.   And over on the next page -- let's go to page 2 -- he
```

**REED - CROSS / CRUDO**

1   responds and says (as read):

2           "Once you pay me after all this time."

3           Do you see that?

4   **A.**   Yes.

5   **Q.**   Okay.  And he was referring to the fact that you owed him

6   money from your utilities from the time you lived at his house;

7   right?

8   **A.**   I don't believe it was for that.  It was for a different

9   instance.

10  **Q.**   Okay.  And then you respond; again, this is the middle of

11  the second page of Exhibit 391, and you say (as read):

12          "You are so annoying.  LOL.  I'm trying to get

13          done Patrick's school for him.  I'll do a couple of

14          classes for you."

15          You wrote that to Mr. Amiri; right?

16  **A.**   Yes.

17  **Q.**   Okay.  And then he responds; right?  Down at the bottom of

18  the page, he says (as read):

19          "Y'all got millions of that bougie money.  LOL."

20          Right?

21  **A.**   Yes.

22  **Q.**   He didn't take you up on your offer to do courses for him,

23  did he?

24  **A.**   Not during this text message thread.

25  **Q.**   Okay.  And then there are a number of other text messages.

**REED - CROSS / CRUDO**

1   You pinged him again three days later, on the third page, down

2   at the bottom.  You say (as read):

3           "I need those tests, please.  When can you get

4       them for me?"

5           Do you see that?

6   A.   Yes.

7   Q.   Because he hadn't gotten those tests for you; right?

8   A.   Yes.

9   Q.   And on page 4, you ask him again, you say (as read):

10          "I'll do a couple of your classes."

11          Do you see that?

12  A.   Yes.

13  Q.   And he responds again later (as read):

14          "I'm at training in Napa the new few days.  I'll

15      be back Thursday."

16          Do you see that?

17  A.   Yes.

18  Q.   Okay.  He doesn't take you up on your offer, does he?

19  A.   Well, again, these are just text messages.

20          THE COURT:  So, Counsel, would this be a good time to

21  break?

22          MR. CRUDO:  Yes, Your Honor.

23          THE COURT:  Thank you very much.

24          You may step down until tomorrow morning --

25          THE WITNESS:  Thank you.

REED - CROSS / CRUDO

1          **THE COURT:** -- at 8:00, Ms. Reed.  Thank you.

2                    (End of excerpt.)

3               (Proceedings adjourned at 2:55 p.m.)

4                    ---o0o---

5

6               **CERTIFICATE OF REPORTER**

7          I certify that the foregoing is a correct transcript

8     from the record of proceedings in the above-entitled matter.

9

10    DATE:   Tuesday, August 6, 2024

11

12

13

14

15          Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
                Official Reporter, U.S. District Court

16

17

18

19

20

21

22

23

24

25