1
2
3
4                        UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    UNITED STATES OF AMERICA,              Case No. 23-cr-00264-JSW-2

8                     Plaintiff,            **ORDER DENYING MOTION FOR**
                                            **JUDGMENT OF ACQUITTAL ON**
9            v.                             **CONSPIRACY COUNT OR NEW**
                                            **TRIAL ON WIRE FRAUD AND**
10   MORTEZA AMIRI,                         **CONSPIRACY COUNTS**

11                    Defendant.            Re: Dkt. No. 350

12

13         Now before the Court is Defendant Morteza Amiri's motion for judgment of acquittal on

14   conspiracy count and/or new trial on wire fraud and conspiracy counts.  The Court has considered

15   the parties' papers, relevant legal authority, the record in this case, and oral argument.  The Court

16   finds this matter capable of resolution without further evidentiary hearing.  For the following

17   reasons, the Court DENIES the motion.

18                                    **BACKGROUND**

19         The Government brought charges for wire fraud and conspiracy to commit wire fraud

20   against Amiri and his five co-defendants: Patrick Berhan, Amanda Theodosy, Samantha Peterson,

21   Ernesto Mejia-Orozco, and Brauli Rodriguez Jalapa.  Following guilty pleas by all of his co-

22   defendants, Amiri proceeded to trial alone.

23         The evidence at trial showed that the City of Antioch created an education incentive

24   program to have a better educated police force.  Former Antioch Police Department Captain

25   Trevor Schnitzius testified that he had never heard of California Coast University ("CCU")

26   discussed as a "joke" school by officers.

27         The evidence showed that Amiri, then an officer with the Antioch Police Department, paid

28   Savannah Reed to complete Amiri's degree at CCU by taking his remaining courses online.  Amiri

United States District Court
Northern District of California

1    paid Reed via Venmo upon completion of each course.  Amiri submitted his completed degree to

2    the Antioch Police Department and received a pay increase.  Amiri asked Reed to complete a

3    master's program on his behalf as well, but he changed his mind when he learned that he would

4    not receive a pay increase for completing the program.

5         The evidence showed that Amiri was aware of other participants in the scheme.  Amiri

6    knew that his co-defendant Patrick Berhan, Reed's then-boyfriend, also had his courses completed

7    by Reed.  Amiri chose the same master's program as Berhan so that Reed could efficiently

8    complete both degrees.  Amiri referred his co-defendant Samantha Peterson to Reed, and he told

9    Reed that his sergeant might be interested in joining as well.

10        Secrecy was important to Amiri and the other participants.  Amiri texted Reed to tell her to

11   keep quiet about their arrangement so that he would not lose his job.  When Amiri and Berhan

12   learned that federal agents were investigating the officers, Amiri encouraged Reed and Berhan to

13   marry ahead of schedule, with the implication that they would not be able to testify against each

14   other.  Amiri and his wife were the only persons other than Reed and Berhan who knew of Reed

15   and Berhan's secret wedding.  At the same time, Reed stopped taking classes on behalf of the

16   officers and deleted the contents of her cell phone at Berhan's direction.

17        The evidence showed that Amiri received continuing benefits from the CCU degree in the

18   form of increased pay, and that he anticipated continuing to receive those benefits over time.

19        The jury returned a verdict of guilty on both charges.  The Court polled the jury, and each

20   juror affirmed that he or she agreed with the verdict.

21        Following the verdict, on the same day, Amiri and his wife approached the prosecution and

22   provided screen captures of texts between Amiri's wife and Reed indicating that Reed and

23   Peterson socialized together.  (Dkt. No. 367-1, Krishnamurthy Decl., Ex. A.)  Amiri's wife

24   attached a letter to the messages which stated, in part:

> Savannah [Reed] stated that she had never met Samantha Peterson, which
> contradicts what I know to be true. Savannah Reed was close to Christina
> Spacco, the stepdaughter of Antioch PD Sergeant Green. . . I have attached a
> screenshot of a message between Savannah and I dated July 1st, 2021, where
> she mentions being with Samantha 'from Antioch.'  In the law enforcement
> community, such a reference would clearly indicate Samantha Peterson of the
> Antioch Police Department. . .

1    (*Id.*)  Also after the verdict, counsel for Amiri spoke with counsel for co-defendant Peterson.

2    Peterson relayed, through her counsel, that Christina Spacco referred Peterson to Reed.  (Dkt. No.

3    350-1, Declaration of Timothy P. Crudo ("Crudo Decl."), ¶ 5.)  According to Peterson's counsel,

4    Peterson would be willing to testify that she did not speak with Amiri about any subject until

5    sometime after Reed began Peterson's courses.  (*Id.*)

6         The week after the verdict, the Government provided the defense with a portion of the draft

7    presentence investigation report for Patrick Berhan prepared by the Probation Office (the "Berhan

8    PSR").  (Crudo Decl., ¶ 9, Ex. 1.)  The Berhan PSR included a statement from Berhan that Reed

9    announced to a table of police officers at a police officer association Christmas party that she

10   completed Berhan's college courses for him.  (*Id.*, Ex. 1, at 2.)  Berhan also stated that Reed set

11   the terms of price for completing courses for other officers.  (*Id.*)  In relevant part, the statement

12   read:

13            The scheme of obtaining my fraudulent degree grew larger than intended.  I
             specifically remember the night at one of our police officer association
14           Christmas parties when my ex-wife [Reed] and I were bickering back and forth
             and as a jab she stated at a table full of officers that she did my college classes
15           for me.  Word spread and a few other officers approached me and asked if she
             could also do their college courses as they were facing the same fatigue and
16           frustrations with coursework as I did.  I relayed the propositions to my ex and
             she accepted them based on her terms of price.
17

18   (*Id.*)  The Government possessed the Berhan PSR prior to trial but did not timely produce it to

19   Amiri.  (*Id.*)

20        Amiri now seeks a judgment of acquittal on the conspiracy charge and a new trial on both

21   charges.

22                                    **ANALYSIS**

23   **A.    Amiri Is Not Entitled to a Judgment of Acquittal on the Conspiracy Count.**

24        Amiri argues that the Court should enter a judgment of acquittal on Count One, Conspiracy

25   to Commit Wire Fraud, because no rational juror could have found that Amiri belonged to a single

26   conspiracy with the other Defendants.  The Government disagrees and argues that the evidence

27   showed a single overarching conspiracy.

28

United States District Court
Northern District of California

1.      **Legal Standard Applicable to Motion for Judgment of Acquittal.**

Federal Rule of Criminal Procedure 29 requires courts to enter a judgment of acquittal "of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a), (c).  Evidence is sufficient when, "viewed in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Miller*, 953 F.3d 1095, 1108 (9th Cir. 2020) (quoting *United States v. Dearing*, 504 F.3d 897, 900 (9th Cir. 2007)) (internal marks omitted; emphasis in original).  "The hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high."  *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010).  If any rational jury could have found the government's proof sufficient, then a motion for acquittal must be denied.  *Id.*

2.      **The Jury Rationally Found Amiri Guilty of Conspiracy to Commit Wire Fraud.**

To obtain a conviction for conspiracy to commit wire fraud in violation of 18 U.S.C. section 1349, the Government needed to prove that Amiri agreed with one or more persons to commit wire fraud and that Amiri became a member of the conspiracy knowing at least one of its objects and intending to help accomplish it.  In order to prove a single conspiracy, rather than a collection of multiple conspiracies, the Government needed to demonstrate: (1) an overall agreement among the conspirators; (2) that Amiri "knew, or had reason to know, that his benefits were probably dependent upon the success of the entire operation."  *United States v. Fernandez*, 388 F.3d 1199, 1226 (9th Cir. 2004), *modified*, 425 F.3d 1248 (9th Cir. 2005) (quoting *United States v. Duran*, 189 F.3d 1071, 1080 (9th Cir. 1999)).

a.      **The Evidence Supported Finding an Overall Agreement Among the Conspirators.**

The Government need not prove a formal agreement existed in order to prove an overall agreement; instead, it may prove an agreement through circumstantial evidence and the defendants' conduct.  *United States v. Mincoff*, 574 F.3d 1186, 1194 (9th Cir. 2009).  Indicia of an agreement include a common goal, common conduct, or key common members.  *Fernandez*, 388 F.3d at 1248 n.34.  "A single conspiracy may involve several subagreements or subgroups of

conspirators." *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir. 1984).

### i.   Common Goal.

Amiri argues that "there was not a shred of evidence" at trial suggesting that Amiri and his co-conspirators shared common goals. (Dkt. No. 350, Mot., at 12:6.) Instead, according to Amiri, the evidence at trial at most showed an agreement between Amiri and Reed by which Amiri would benefit from a pay increase and Reed would benefit from payment for her services. To the extent other officers had similar arrangements with Reed, Amiri did not benefit and did not care about their successes. This argument echoes the arguments Amiri made to the jury.

In his opening statement, counsel for Amiri told the jury that it would not be able to find credible evidence of an overall agreement between the conspirators. His counsel stressed that "[i]t's not enough for people to know each other" and "[i]t's not enough for them to engage in similar conduct, or to even know that other people are engaging in similar conduct." (Dkt. No. 348, Opening Statement / Crudo, at 13:19-22.)

In closing, Amiri's counsel told the jury that the Government had not put on any evidence that Amiri was connected to Mejia-Orozco, Theodosy, or Rodriguez Jalapa, and that a connection between them was implausible because they did not work at the same police department. (Dkt. No. 349, Closing Argument / Crudo, at 30:24-31:4.) Amiri's counsel further pointed out a lack of text evidence between Amiri and Reed regarding Peterson and any texts at all between Amiri and Berhan. (*Id.* at 32:2-5; 33:13-34:10.) He urged the jury to find no rim showing an "agreement among all those people," much like there is no agreement between neighbors when one neighbor refers the other to his doctor. (*Id.* at 34:21-35:6.) He also urged the jury to find that Amiri would not benefit from the other officers obtaining a bump in pay and vice versa. (*Id.* at 39:24-40:2.)

The Government in turn argued that Amiri was aware of the other co-conspirators and that he brought Ms. Peterson into the conspiracy. (*Id.*, Rebuttal Argument / Krishnamurthy, at 69:4-21.) Amiri also considered bringing in his sergeant. (*Id.*) Amiri contemplated his benefits were "probably dependent upon the success of the entire venture" because Reed took the same classes for the same programs for multiple officers. (*Id.* at 69:22-70:5.) Amiri sought to enroll in the same master's program as Berhan so that they could benefit from Reed completing the same

courses for both conspirators.  (*Id.* at 70:10-22.)  Finally, the Government argued that Amiri depended on the success of the entire venture—including his co-conspirator's silence—because he sought a "financial incentive that would keep going as long as he remained employed.  And so if anyone found out, that financial incentive would stop."  (*Id.* at 71:2-8.)

The Court instructed the jury to return a guilty verdict if they found, beyond a reasonable doubt, that: (1) Amiri "directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy"; (2) Amiri "knew or had reason to know that other conspirators were involved with those with whom [Amiri] directly conspired; and" (3) Amiri "had reason to believe that whatever benefits [Amiri] might get from the conspiracy were probably dependent upon the success of the entire venture." (Dkt. No. 332, Final Jury Instructions, No. 23.)  The Court cautioned that, "[i]t is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a plan to commit wire fraud as an object of the conspiracy." (*Id.* No. 22.)  Further, the Court explained that "one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists." (*Id.*)

In finding Amiri guilty, the jury rejected Amiri's theory of the case and found that the Government had proved a "common" purpose, over and above a mere "similarity of purpose." (*See* Mot., at 11:26-12:5.)  Amiri argues there was insufficient evidence for this conclusion as a matter of law.  In support, Amiri cites *Kotteakos v. United States*, 328 U.S. 750 (1946), *Rocha v. United States*, 288 F.2d 545 (9th Cir. 1961), and *United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023).  Each of those cases is distinguishable.

In *Kotteakos*, defendants used a common loan broker to obtain fraudulent loans under the National Housing Act.  328 U.S. at 753.  Many of the defendants did not have a relationship with each other aside from their common use of the loan broker at the hub.  *Id.* at 754.  The United States conceded on appeal that no rim enclosed the charged single hub-and-spoke conspiracy, but it argued that the convictions should be affirmed because the evidence showed multiple

conspiracies between the spokes and the hub. *Id.* at 755-56. The Supreme Court held that the jury could not have found a single conspiracy on the evidence that each defendant was connected to the hub and that each had "several [differing], though similar, purposes." *Id.* at 769.

In *Rocha*, six defendants were convicted of conspiracy to defraud the United States by entering into sham marriages with American citizens. 288 F.2d at 546. The Ninth Circuit reversed the convictions, finding that no participants outside of the central figure had any interest in any marriage other than their own. *Id.* at 550. The Court quoted at length another sham marriage case, *Lutwak v. United States*, 344 U.S. 604, 605-10 (1953), which affirmed conspiracy convictions for faux spouses who were previously acquainted with at least some other conspiracy members and who sought to bring brothers and a partner to the United States. *Rocha*, 288 F.2d at 552. The Ninth Circuit briefly distinguished the *Lutwak* facts by noting, in *Rocha*, there was "no basis for even an inference that any one 'husband' was interested in anyone's marriage or entry other than his own." *Id.*

*Abdelaziz* involved parents who hired a common "consultant" to fraudulently obtain admission for their children into prestigious universities. 68 F.4th at 12. The parents argued that the evidence at trial supported, at most, narrower conspiracies between themselves and the consultant, rather than a conspiracy with a rim encompassing all charged parents. *Id.* at 41. After surveying conspiracy case law, the First Circuit identified the relevant question as "whether the nature of the alleged scheme is such that it would be reasonable to infer that any parents who sought the assistance of the core group shared a goal of getting children other than their own into any university just because they sought such assistance for their own children." *Id.* at 45 (emphasis in original). The court found such an inference irrational. *Id.* Instead, the rational inference was that "the defendants were indifferent or even adverse" to the admission goals of the other parents. *Id.* at 46. To the extent that the parents referred others to the consultant or encouraged the consultant's success, the court held that the government defined the common goal at too high a level of generality, such that it "threaten[ed] to drain the common goal factor of any independent significance." *Id.* at 48.

Here, unlike the defendants in *Kotteakos*, *Rocha*, and *Abdelaziz*, Amiri had a preexisting

United States District Court
Northern District of California

1    and ongoing relationship with Reed, Berhan, and several of the officers in the outer "spokes" of

2    the conspiracy.  With the exception of Reed, who was Amiri's close friend and Berhan's romantic

3    partner, all of the conspirators were police officers mostly from the neighboring Antioch and

4    Pittsburg Police Departments.  The group had friendly relationships with one another.  (Dkt. No.

5    339, Tr., at 20:23-21:3 (Reed testifying she was "happy" to help "close friends" by completing

6    their courses).); *see United States v. Disla*, 805 F.2d 1340, 1349 (9th Cir. 1986) (noting "a close

7    association among several of the key conspirators" supported finding a common scheme).

8    Because of their preexisting social and professional relationships, Amiri and his codefendants

9    were more akin to the defendants in *Lutwak* than in *Rocha*:  in *Lutwak*, where the Supreme Court

10   upheld a conspiracy conviction, the conspirators knew each other through family ties or through

11   their time in military service.  *Lutwak*, 344 U.S. at 609.  In contrast, in *Rocha*, some of the spoke

12   participants were familiar with each other, but they were strangers to and had no interest in the hub

13   figure's success with other spoke participants.  *Rocha*, 288 F.2d at 552.

14        Likewise, the spoke participants in *Kotteakos* and *Abdelaziz* were not connected other than

15   through the hub figure.  *See Kotteakos*, 328 U.S. at 754-55 (no overarching conspiracy where all

16   participants "dealt independently with [the hub figure] as their agent"); *Abdelaziz*, 68 F.4th at 45

17   (no overarching conspiracy where defendants "purchas[ed] a service from the core group in the

18   way that any consumer of a service would purchase it from a service provider").  To the extent the

19   spoke participants were aware of and dependent on one another, a narrower conspiracy which

20   involved multiple spoke figures could exist.  *See Kotteakos*, 328 at 758 (noting existence of "at

21   least eight" conspiracies where thirty-two defendants were charged).  Moreover, in *Abdelaziz*,

22   even if the defendants had known each other, their interests were adverse, as the parents competed

23   to obtain limited spots for their children.  68 F.4th at 46.  Amiri and his co-conspirators, in

24   contrast, helped each other obtain mutual benefits.

25        The instant case is further distinguishable given the ongoing benefits sought by the

26   conspirators.  The conspirators depended on one another to remain quiet so that they could

27   continue to obtain the benefits of their fraudulent raises.  Amiri and the other participants actively

28   worked to maintain the secrecy of the scheme with a cover-up effort, including by vetting new

United States District Court
Northern District of California

8

members for their ability to operate in secret, telling and texting Reed to keep quiet, and encouraging Reed and Berhan to marry.  This differs from the scheme in *Kotteakos*, where each spoke's participation in the conspiracy ended upon obtaining his loan; from the scheme in *Rocha*, where the conspiracy was completed upon the faux-spouses' entry into the United States; and from the scheme in *Adelaziz*, where the parents' participation ceased upon admission of their respective children into college.

Sufficient evidence supported the jury's conclusion that a common goal existed.

### ii.   Common Conduct.

The evidence at trial indicates Amiri and his co-conspirators shared a common modus operandi.  The conspirators all used Reed to complete courses at CCU.  They enrolled in the same or similar classes, in part so that Reed could complete the degrees faster.  (*See* Ex. 82-003 (Reed affirming completion "should be quick" because she had already taken the same courses for herself or Berhan); Ex. 82-110-14 (Amiri planning to enroll in same master's program as Berhan so that Reed could be more efficient); Ex. 82-076 (Amiri sending Reed completed test for future use).)  All of the conspirators who were able to obtain the fraudulent degrees submitted proof of completion to their respective Police Departments in order to obtain education incentives.

In *Abdelaziz*, the government introduced evidence of multiple avenues taken by the parent-defendants to cheat, including bribing university insiders, fabricating resumes, altering standardized test scores, and paying others to take courses for their children.  68 F.4th at 53-54.  This "dissimilarity in [] conduct" undercut a finding of a single agreement.  *Id.* at 53.  Here, in contrast, the conspirators used the same process to obtain the same benefits by working with Reed and Berhan to fraudulently obtain degrees to submit for pay increases.  Their common conduct supports finding an overarching conspiracy.

### iii.   Common Key Figures.

The evidence at trial showed Reed and Berhan were central hub figures for all of the conspiracy's activities: Berhan induced Reed to complete the courses, introduced Reed to most of the participants, set the prices, and assisted with the coursework.  Reed did most of the work to complete the courses, including by circumventing the proctor system and writing the essays and

9

exams.  The common participation of Reed and Berhan supports finding an overarching conspiracy.

> **b.** **The Evidence at Trial Supported the Jury's Finding that Amiri Knew, or Had Reason to Know, that His Benefits Were Probably Dependent Upon the Success of the Entire Operation.**

Amiri argues that the Government failed to produce evidence of interdependence among the spoke participants.  According to Amiri, the evidence showed that his participation effectively ended after he obtained his raise.  "After that, Mr. Amiri would have retained his benefits even if Ms. Reed simply decided to quit her business the moment she completed Mr. Amiri's last final or failed every single course that she was subsequently hired to take for Ms. Theodosy, Ms. Peterson, Mr. Mejia-Orozco, or Mr. Rodriguez Jalapa."  (Dkt. No. 377, Reply, at 7:12-14.)  The Government's position, and the one accepted by the jury, was that Amiri's participation in the conspiracy depended on the entire venture's ongoing success.

The evidence at trial showed that Amiri played a key role in the conspiracy even after obtaining his raise.  Amiri brought Peterson into the conspiracy and considered recruiting his sergeant.  He actively sought to cover up the conspiracy's activities, including by reminding Reed to keep quiet and telling Reed and Berhan to marry to avoid testifying against one another.  He also shared completed class materials with Reed to enable her to complete courses on behalf of other officers faster.  Amiri contemplated that Reed would do a master's program on his behalf, and he chose the same program as Berhan to obtain the degree faster.  At the time of each of these acts, Amiri protected his ongoing benefits by ensuring that the scheme was not uncovered.  The jury could have (and did) rationally conclude from the evidence that Amiri was part of an ongoing effort to defraud the City of Antioch, and that discovery of the scheme would have jeopardized Amiri's benefits.

> **c.** **The Evidence Did Not Show a Prejudicial Variance Between the Indictment and Proof at Trial.**

Amiri next argues that the evidence at trial showed a number of smaller conspiracies between each of the defendants and Reed, or perhaps between each of five of the defendants and Reed and Berhan.  Amiri claims he was prejudiced by the following evidence relating to other co-

conspirators outside of the narrow conspiracy in which he concedes he may have participated: (1) pay raises and reimbursements for co-conspirators from the Pittsburg (not Antioch) Police Department; (2) Mr. Berhan and Ms. Theodosy's Advanced POST certificates; and (3) Ms. Theodosy's lateral move to the Santa Clara Police Department.

The Government argues that the conviction must be sustained even if the only conspiracy involving Amiri is a narrower conspiracy between Amiri, Reed, and Berhan.  The Government contends that the agreement between Amiri, Reed, and Berhan is contained within the charged conspiracy and that it is "well settled that there is generally no prejudice when the government proves a narrower conspiracy that is within the scope of the conspiracy charged in the indictment." (Opp. at 15:22-24 (quoting *United States v. Sanders*, 778 F.3d 1042, 1050 (D.C. Cir. 2015)).)

Variance between the charged conspiracy and proved conspiracy warrants reversal if it affects the "substantial rights" of the defendant.  *United States v. Duran*, 189 F.3d 1071, 1081 (9th Cir. 1999).  The Ninth Circuit has identified three ways in which the defendant's substantial rights may be compromised by a variance: (1) the defendant lacks adequate notice of the nature of the charges against him; (2) the defendant is vulnerable to re-prosecution for the same offense; and (3) evidentiary spillover.  Amiri contends that evidentiary spillover tainted the verdict against him.

A defendant may be prejudiced by "evidentiary spillover" when it is "highly probable" that evidence of conduct outside the scope of the proven conspiracy "had substantial and injurious effect or influence in determining the jury's verdict."  *Duran*, 189 F.3d at 1081 (quoting *Kotteakos*, 328 U.S. at 776).  Spillover may occur if evidence is not "easily compartmentalized." *Id.*  Evidence is easily compartmentalized when "the acts constituting the crimes that were allegedly misjoined are discrete."  *Id.* at 1081-82.  However, "there is no problem of spillover" when "a defendant stands trial alone."  *United States v. Liu*, 631 F.3d 993, 1000 (9th Cir. 2011) (quoting *United States v. Anguiano*, 873 F.2d 1314, 1318 (9th Cir. 1989)).

As discussed above, the Court finds that the evidence at trial tended to support the existence of one overarching conspiracy rather than multiple, smaller conspiracies.  Evidence regarding other officers was probative of the common scheme by the officers to defraud their respective cities via faux college degrees.

United States District Court
Northern District of California

11

1    To the extent multiple conspiracies may have existed, Amiri was not prejudiced by

2    spillover evidence.  No other defendants stood trial with Amiri.  *See Liu*, 631 F.3d at 1000 (noting

3    "[a] multiple conspiracy instruction is not required when a defendant 'stands trial alone' because

4    'there is no problem of spillover.' ") (quoting *Anguiano*, 873 F.2d at 1318).  Additionally, the

5    Court instructed the jury to base its verdict "solely on the evidence against the remaining

6    defendant [Amiri]."  (Final Jury Instructions, No. 10.)  Amiri was not prejudiced by evidence

7    relating to his co-conspirators.

**B.    A New Trial Is Not Warranted.**

9    Amiri next argues that the Government wrongfully withheld exculpatory evidence and

10   solicited false testimony, and thus he is entitled to a new trial on both counts.  Amiri further argues

11   that he newly discovered evidence which may have changed the outcome at trial.  The

12   Government responds that the withheld evidence was not material, denies that it solicited false

13   testimony, and denies that Amiri discovered any new evidence.

**1.    Legal Standards Applicable to Motion for New Trial.**

15   Rule 33 provides that the Court "may vacate the judgment and grant a new trial if the

16   interest of justice so requires."  Fed. R. Crim. P. 33(a).  New trial motions are disfavored and

17   should be granted "only in exceptional cases in which the evidence preponderates heavily against

18   the verdict."  *United States v. Rush*, 749 F.2d 1369, 1370 (9th Cir. 1984) (quoting *United States v.*

19   *Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981)).

20   A defendant may move for a new trial within three years of conviction if his motion is

21   based upon the discovery of new evidence.  Fed. R. Crim. P. 33(b)(1).  Evidence is "newly

22   discovered" if it could not have been found before close of trial despite the defendant's diligence.

23   *United States v. Brugnara*, 856 F.3d 1198, 1206 (9th Cir. 2017) (quoting *United States v. Hinkson*,

24   585 F.3d 1247, 1264 (9th Cir. 2009)).  The Ninth Circuit has provided multiple tests for

25   determining whether a new trial is warranted.

26   The default test requires the defendant to satisfy five prongs: "(1) the evidence must be

27   newly discovered; (2) the failure to discover the evidence sooner must not be the result of a lack of

28   diligence on the defendant's part; (3) the evidence must be material to the issues at trial; (4) the

United States District Court
Northern District of California

1  evidence must be neither cumulative nor merely impeaching; and (5) the evidence must indicate

2  that a new trial would probably result in acquittal." *United States v. Kulczyk*, 931 F.2d 542, 548

3  (9th Cir. 1991).

4        The applicable standard is relaxed when the government engages in misconduct.  If the

5  newly discovered evidence shows that the government knew or should have known that a

6  witness's testimony was perjured, then the conviction "must be set aside if there is any reasonable

7  likelihood that the false testimony could have effected [sic] the judgment of the jury." *United*

8  *States v. Young*, 17 F.3d 1201, 1203 (9th Cir. 1994).

9        When the government unknowingly solicits perjurious testimony, the default five-part test

10  applies.  *United States v. Krasny*, 607 F.2d 840, 844-45 (9th Cir. 1979).  However, when a

11  conviction is "based in part on false evidence, even false evidence presented in good faith, [it]

12  hardly comports with fundamental fairness." *Young*, 17 F.3d at 1203-04.  Thus, rather than

13  demonstrate that a new trial would probably result in acquittal, the defendant need only

14  demonstrate that a new trial would probably result in a different outcome.  *Id.* at 1204; *see Turner*

15  *v. United States*, 582 U.S. 313, 331 (2017) (Kagan, J., dissenting) (noting that "different outcome"

16  means "an acquittal or hung jury rather than a conviction").

17        A similar standard applies when a defendant moves for a new trial based on violation of

18  *Brady v. Maryland*, 373 U.S. 83 (1963).  The government violates its duties under *Brady* when "it

19  withholds evidence that is favorable to the defense and material to the defendant's guilt or

20  punishment." *Turner*, 582 U.S. at 315 (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)) (emphasis

21  removed).  A defendant is entitled to a new trial if he can establish "a reasonable probability that,

22  had the evidence been disclosed, the result of the proceeding would have been different." *Id.* at

23  324.  A different result is reasonably probable if the suppressed evidence "undermines confidence

24  in the outcome of the trial." *Id.* (citations omitted).

25        **2.**     **A New Trial Is Not Warranted Based on the Alleged *Brady* Violation.**

26        Amiri contends that the Government violated *Brady* by failing to produce the Berhan PSR

27  until after trial, despite having the PSR in its possession for months.  The Government concedes

28  that it failed to disclose the Berhan PSR prior to trial and that certain statements therein were

United States District Court
Northern District of California

13

1    favorable to Amiri.  It denies, however, that the Berhan PSR was evidence or material.

2    Amiri claims that a new trial is required because the Berhan PSR undermines the

3    Government's theory that secrecy was an object of the charged conspiracy or that Amiri intended

4    to defraud Antioch: if Reed announced to a table of police officers that she took college courses

5    for Berhan, then it was not a secret.  If Reed set her own prices and determined which clients to

6    accept, then Berhan's role was less central and tends to show Reed at the center of a buyer-seller

7    relationship rather than a rimmed hub-and-spoke conspiracy.  Amiri argues that the statement

8    would also cast doubt on Amiri's conviction for wire fraud because Amiri could not have intended

9    to deceive the Antioch Police Department if the Department was aware of Reed's services.  The

10   defense was deprived of the opportunity to conduct discovery on who was present for Reed's

11   announcement or what exactly Reed stated.  Amiri was unable to cross-examine Reed on the

12   statement, which would have undermined Reed's extensive testimony about the urgency of

13   maintaining secrecy.

14   The Government first counters that the Berhan PSR cannot be the basis of a *Brady*

15   violation because Berhan's statements are hearsay, and Amiri does not propose to call Berhan as a

16   witness to explore the statements.[1]  This response is not well-taken.  The Government is required

17   to disclose exculpatory material contained in presentence reports, even though such material is

18   likely to be hearsay.  *See United States v. Cestoni*, 185 F. Supp. 3d 1184, 1191 (N.D. Cal. 2016)

19   (granting motion for new trial on basis of statement contained in draft PSR over government's

20   hearsay objection).  Whether the statements fit into a hearsay exception or would otherwise be

21   admissible is context dependent.  Had the Government fulfilled its obligation to provide Berhan's

22   statements to the defense, Amiri could have explored alternate ways to bring in evidence relating

23   to the Christmas party incident.  At a minimum, counsel could have asked Reed about the incident

24   on cross-examination.

25

---

26   [1] In his reply, Amiri asserts that he "was deprived of the opportunity to weigh this withheld
     evidence in determining whether to call Mr. Berhan to testify" and that the Government merely
27   speculates that Berhan would not testify.  (Reply, at 13:17-18.)  However, at oral argument, when
     asked what Amiri would do differently in a new trial, counsel for Amiri stated that the defense
28   would call Peterson or Spacco to impeach Reed, not Berhan.

United States District Court
Northern District of California

1    The Government next asserts that the Berhan PSR was not material when viewed in

2    context of the evidence at trial.  The Court agrees.  Although Reed may have told a number of

3    police officers outside of the conspiracy about taking classes for Berhan on one occasion, the

4    evidence at trial showed that Amiri actively sought to cover up the scheme so that he and the other

5    officer conspirators could maintain the ongoing benefit of fraudulently increased paychecks.

6    Amiri told Reed via text message to keep quiet, and he encouraged Reed and Berhan to marry

7    when he learned of investigations into the police officers.  Reed's slip-up, which was apparently

8    unknown to Amiri before trial, does not change Amiri's intent to deceive.  Moreover, the

9    deception worked.  Word of the scheme did not reach the relevant decisionmakers in Antioch:

10   Captain Schnitzius testified that the educational incentive program was intended to encourage

11   officers to be better educated, and that he had never heard Antioch officers discuss CCU as a joke

12   school.

13           Berhan's statement that Reed set the prices, if true, would not change the structure of the

14   conspiracy or implicate Amiri's participation.  The evidence at trial showed that Amiri contacted

15   Reed via text to ask if she would complete his courses after discussing the possibility with Berhan.

16   (*See* Ex. 82-001 ("I've been meaning to ask you… can i hire your [sic] to do my cal coast classes?

17   ill pay you per class").)  Berhan served as the connection between Reed, Amiri, and the other

18   police officers.  (*See* Dkt. No. 339, Tr., at 21:4-24 (Reed explaining that she discussed doing

19   Amiri's coursework with Berhan); Crudo Decl., Ex. 1, at 2 (Berhan stating that officers

20   approached Berhan and asked if Reed could do their college courses).)  Moreover, Berhan's

21   statement is of limited value given that he had motive to downplay his role in the conspiracy prior

22   to sentencing.  *See United States v. Sarno*, 73 F.3d 1470, 1505 (9th Cir. 1995) (undisclosed

23   witness statement had "negligible" value "given the latent taint of bias and self-interest").

24   Ultimately, the question of who set the prices between Reed and Berhan is tangential and does not

25   undermine confidence in the verdict.  *See id.* at 1506-07 ("The *Brady* evidence—if such it were—

26   tugs at loose threads hanging from the margins of the Government's case, but in no way

27   challenges the bulk of the evidence upon which the convictions rest.").  The Berhan PSR is not

28   material under *Brady*.

United States District Court
Northern District of California

1        Newly discovered evidence which is not material under the *Brady* standard is not material

2   under the Rule 33 standard.  *United States v. Miller*, 953 F.3d 1095, 1107 n.18 (9th Cir. 2020).

3   Therefore, the statements within the Berhan PSR do not support a new trial under Rule 33.

4        **3.**     **A New Trial Is Not Warranted Based on Peterson's Statements.**

5        Amiri argues a new trial is required because newly discovered evidence demonstrates that

6   Savannah Reed falsely testified that (1) Amiri brought Peterson into the conspiracy, and (2) Reed

7   never socialized with Peterson.

8        At trial, Amiri's attorney Mr. Crudo probed Reed's connection with Peterson and Spacco

9   during cross-examination of Reed.  Mr. Crudo asked Reed if she had socialized with Peterson and

10  Reed together.  (Dkt. No. 340, Tr., at 3:6-9.)  Reed denied ever meeting Peterson.  (*Id.*)

11       After the verdict, Amiri learned that Christina Spacco, a friend of Reed, allegedly referred

12  Peterson to Reed, and that Reed and Peterson in fact knew each other socially.  This belief derives

13  from a conversation between Mr. Crudo and Peterson's attorney, Ellen Leonida, after the verdict.

14  (Crudo Decl., ¶ 5.)  Ms. Leonida told Mr. Crudo that Ms. Peterson told Ms. Leonida that Ms.

15  Peterson would testify that Ms. Spacco suggested she hire Reed.  (*Id.*)  Ms. Peterson also offered

16  to testify that she did not speak to Amiri until after she hired Reed.  (*Id.*)

17       Mr. Crudo did not obtain an affidavit from Peterson or Ms. Leonida regarding Peterson's

18  potential testimony.

19       Mr. Crudo's representation is not newly discovered evidence.  The Government objects to

20  Peterson's representation as double-hearsay, and the Court agrees.  Peterson's statement, conveyed

21  through two layers of counsel and not given under oath, is not evidence and cannot alone

22  contradict Reed's sworn and cross-examined statements regarding Peterson.

23       Even if the Peterson's statement were evidence, Amiri has failed to make a showing that

24  the information was newly discovered.  At the time of Reed's testimony that she had never met

25  Peterson, Amiri was aware that Reed and Peterson socialized together on at least one occasion

26  because Amiri's wife had text messages to that effect.  Although Amiri may not have anticipated

27  the Government's theory of the case, he was aware before the verdict that Reed and Peterson may

28  have had a connection that did not include Amiri.  *See United States v. McKinney*, 952 F.2d 333,

United States District Court
Northern District of California

335-36 (9th Cir. 1991) (holding information obtained during jury deliberations was not "newly discovered" after trial).

Amiri also failed to make a showing that he could not have uncovered the evidence with reasonable diligence.  He argues that it would have required more than reasonable diligence to discover and rebut Reed's story that Amiri brought Peterson into the conspiracy.  The Court is unconvinced.  Amiri was charged alongside only five co-defendants, and his theory at trial was that he lacked personal connections to almost all of them.  Reasonably diligent counsel would have explored potential connections between Amiri and the other co-defendants.  If investigating five co-conspirators is unreasonable, Counsel should have nevertheless investigated the relationship between Amiri and Peterson, the only two conspirators charged from the Antioch Police Department.

Finally, Amiri failed to make a showing that testimony by Peterson would have probably resulted in a different outcome.  Amiri's connection to Peterson was only one portion of Amiri's participation in the conspiracy.  Amiri contemplated bringing his sergeant into the conspiracy; coordinated classes with Berhan; pressured Reed to remain silent; and was aware that other officers were using Reed as well.  In this context, rebuttal testimony by Peterson that she met Reed in person and/or was referred to Reed by Spacco would not have likely shifted the outcome at trial.

A new trial is not warranted.

## CONCLUSION

For the foregoing reasons, the Court DENIES Amiri's motion.

**IT IS SO ORDERED.**

Dated: October 25, 2024

JEFFREY S. WHITE
United States District Judge